# No. 22-2039

OKLAHOMA FIREFIGHTERS PENSION & RETIREMENT SYSTEM, ELECTRICAL
WORKERS PENSION FUND LOCAL 103, I.B.E.W., GOVERNMENT
EMPLOYEES' RETIREMENT SYSTEM OF THE VIRGIN ISLANDS, MANHATTAN
AND BRONX SURFACE TRANSIT OPERATING AUTHORITY PENSION PLAN,
METROPOLITAN TRANSPORTATION AUTHORITY DEFINED BENEFIT
PENSION PLAN MASTER TRUST, BOSTON RETIREMENT SYSTEM, UNITED
FOOD AND COMMERCIAL WORKERS UNION AND PARTICIPATING FOOD
INDUSTRY EMPLOYERS TRI-STATE PENSION FUND, SOUTHEASTERN
PENNSYLVANIA TRANSPORTATION AUTHORITY, ON BEHALF OF
THEMSELVES AND ALL OTHER SIMILARLY SITUATED,

*Plaintiffs-Appellants,*

v.

BANCO SANTANDER (MEXICO) S.A. INSTITUCION DE BANCA MULTIPLE,

*(caption continued on inside cover)*

Appeal from the United States District Court
for the Southern District of New York (No. 1:18-cv-02830)

## REDACTED BRIEF AND SPECIAL APPENDIX FOR PLAINTIFFS-APPELLANTS

VINCENT BRIGANTI
MARGARET C. MACLEAN
LOWEY DANNENBERG, P.C.
44 South Broadway, Suite 1100
White Plains, NY 10601
(914) 997-0500

GRUPO FINANCIERO SANTANDER MEXICO, BBVA BANCOMER S.A., INSTITUCION DE BANCA MULTIPLE, GRUPO FINANCIERO BBVA BANCOMER, HSBC MEXICO, S.A., INSTITUCION DE BANCA MULTIPLE, GRUPO FINANCIERO HSBC, BANCO NACIONAL DE MEXICO, S.A., INSTITUCION DE BANCA MULTIPLE, GRUPO FINANCIERO BANAMEX, BANK OF AMERICA MEXICO, S.A., INSTITUCION DE BANCA MULTIPLE, GRUPO FINANCIERO BANK OF AMERICA, DEUTSCHE BANK MEXICO, S.A. INSTITUCION DE BANCA MULTIPLE,

*Defendants-Appellees*,

BANCO SANTANDER, S.A., SANTANDER INVESTMENT SECURITIES INC., SANTANDER HOLDINGS USA, INC., SANTANDER INVESTMENT BOLSA, SOCIEDAD DE VALORES, S.A.U., BANCO BILBAO VIZCAYA ARGENTARIA, S.A., BBVA SECURITIES INC., BBVA COMPASS BANCSHARES, INC., GRUPO FINANCIERO BBVA BANCOMER, S.A. DE C.V., JPMORGAN CHASE & CO., JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, JP MORGAN SECURITIES LLC, J.P. MORGAN BROKER-DEALER HOLDINGS, INC., HSBC HOLDINGS PLC, HSBC BANK PLC, HSBC SECURITIES (USA) INC., HSBC MARKETS (USA) INC., HSBC NORTH AMERICA HOLDINGS INC., HSBC LATIN AMERICA HOLDINGS (UK) LIMITED, BARCLAYS PLC, BARCLAYS CAPITAL PLC, BARCLAYS CAPITAL INC., BARCLAYS BANK PLC, GRUPO FINANCIERO BARCLAYS MEXICO, S.A. DE C.V., CITIGROUP INC., CITIGROUP GLOBAL MARKETS INC., CITIGROUP FINANCIAL PRODUCTS INC., CITIGROUP GLOBAL MARKETS HOLDINGS INC., BANK OF AMERICA N.A., BANK OF AMERICA CORPORATION, BANKAMERICA INTERNATIONAL FINANCIAL CORPORATION, MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, DEUTSCHE BANK AG, DEUTSCHE BANK SECURITIES, INC., DEUTSCHE BANK AMERICAS HOLDING CORP., J.P. MORGAN SECURITIES PLC, GRUPO FINANCIERO BANAMEX S.A. DE C.V., BANCO J.P. MORGAN, S.A. INSTITUCION DE BANCA MULTIPLE, J.P. MORGAN GRUPO FINANCIERO, BARCLAYS CAPITAL SECURITIES LIMITED, BARCLAYS BANK MEXICO, S.A., INSTITUCION DE BANCA MULTIPLE, GRUPO FINANCIERO BARCLAYS MEXICO, CREDIT SUISSE GROUP AG, CREDIT SUISSE AG, BANCO CREDIT SUISSE (MEXICO) S.A., ING GROEP N.V., ING BANK, N.V., ING FINANCIAL MARKETS LLC, GRUPO FINANCIERO CREDIT SUISSE (MEXICO), S.A. DE C.V., UBS BANK MEXICO, S.A., INSTITUCION DE BANCA MULTIPLE, UBS GRUPO FINANCIERO, JOHN DOES 1-10,

*Defendants*.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ......................................................... i

TABLE OF AUTHORITIES .................................................................................. ii

INTRODUCTION ................................................................................................1

JURISDICTION....................................................................................................4

STATEMENT OF THE ISSUES............................................................................4

STATEMENT OF THE CASE...............................................................................5

    I.    Factual Background......................................................................5

    A.    The MGB Market ........................................................................5

    B.    MGB Marketing and Sales ........................................................7

    II.    Procedural History....................................................................18

SUMMARY OF ARGUMENT ...........................................................................21

STANDARD OF REVIEW .................................................................................23

ARGUMENT ......................................................................................................23

    I.    Supreme Court Precedent and This Court's Precedents Establish Specific
Personal Jurisdiction Over Defendants..............................................23

    A.    Defendants' extensive in-forum conduct in furtherance of their
conspiracy, including transactions of the price-fixed MGBs directly
with plaintiffs, unquestionably subjects them to personal jurisdiction
here. ...............................................................................................25

    B.    The Supreme *Court's* intervening decision in *Ford* independently
requires a finding of personal jurisdiction here.........................33

    II.    The District Court Abused its Discretion in Denying Jurisdictional
Discovery .........................................................................................41

CONCLUSION ...................................................................................................42

## CORPORATE DISCLOSURE STATEMENT

All Plaintiffs-Appellants state either that they are not required to make a corporate disclosure statement, or that no parent corporation or publicly held corporation owns 10% or more of their shares.

# TABLE OF AUTHORITIES

## Federal Cases

*Anderson News, L.L.C. v. Am. Media, Inc.,*
  680 F.3d 162 (2d Cir. 2012) .................................................................. 40

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez,*
  305 F.3d 120 (2d Cir. 2002) .................................................................. 27

*Burger King v. Rudzewicz,*
  471 U.S. 462 (1985) ............................................................................. 29

*Carpenter v. Rep. of Chile,*
  610 F.3d 776 (2d Cir. 2010) .................................................................. 23

*Celestin v. Caribbean Air Mail, Inc.,*
  30 F.4th 133 (2d Cir. 2022) .................................................................. 27

*Charles Schwab Corp. v. Bank of Am. Corp.,*
  883 F.3d 68 (2d Cir. 2018) .......................................................... passim

*Chloe v. Queen Bee of Beverly Hills, LLC,*
  616 F.3d 158 (2d Cir. 2010) ........................................................... 23, 27

*Daniel v. Am. Bd. of Emergency Med.,*
  428 F.3d 408 (2d Cir. 2005) .................................................................. 24

*Eades v. Kennedy, PC Law Offices,*
  799 F.3d 161 (2d Cir. 2015) .................................................................. 27

*Ford Motor Co. v. Montana Eighth Judicial District Court,*
  141 S. Ct. 1017 (2021) ............................................................... passim

*Gelboim v. Bank of Am. Corp.,*
  823 F.3d 759 (2d Cir. 2016) ........................................................... 39, 40

*Goodyear Dunlop Tires v. Brown,*
  564 U.S. 915 (2011) ............................................................................. 24

*Gucci Am., Inc. v. Weixing Li,*
768 F.3d 122 (2d Cir. 2014) ............................................................................. 24

*In re Publ'n Paper Antitrust Litig.,*
690 F.3d 51 (2d Cir. 2012) ................................................................................ 40

*Iraq Telecom Ltd. v. IBL Bank S.A.L.,*
43 F.4th 263 (2d Cir. 2022) .............................................................................. 41

*Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.,*
709 F.3d 129 (2d Cir. 2013) ............................................................................. 39

*McGee v. Int'l Life Ins. Co.,*
355 U.S. 220 (1957) .......................................................................................... 29

*Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC,*
22 F.4th 103 (2d Cir. 2021) ........................................................................ passim

*Todd v. Exxon Corp.,*
275 F.3d 191 (2d Cir. 2001) ............................................................................. 40

## Statutes

28 U.S.C. §1331 ...................................................................................................... 4

**INTRODUCTION**

This is a case alleging a conspiracy to fix the prices of Mexican Government Bonds ("MGBs") and to profit from transactions in those price-fixed MGBs in the United States. Each step of the price-fixed bond transactions at the heart of defendants' conspiracy was centered in New York, where each defendant's respective sales desk brokered trades between investors and the relevant defendant. The whole trading process took place in the U.S., from marketing to attract investors in the first instance, to investors communicating with a U.S.-based salesperson in a bank's U.S. office to request a price, to defendants sending fixed prices for trades to the U.S., to the parties agreeing on the terms of the transaction in the U.S., to investors sending and receiving the relevant payments and bonds in the U.S. These transactions occurred in the context of each defendant's significant and deliberate efforts to reach out beyond Mexico and cultivate the market for MGBs centered in New York. Plaintiffs' complaint was replete with factual allegations showing that defendants intentionally fixed the prices of the MGBs that they traded in the United States. Yet somehow defendants evaded personal jurisdiction in the district court (Oetken, J.) simply because the traders deciding on the artificial price and conveying that price to their U.S.-based sales colleagues were physically located in Mexico. That decision was plainly incorrect.

The defendants here are banks that dominate the market for MGBs—debt securities issued by the Mexican government, analogous to U.S. Treasury bonds.[1] Plaintiffs allege that the defendants worked as a tight-knit cartel to fix the prices of MGBs and to reap massive, supracompetitive profits from trading those MGBs with unwitting investors, which, with respect to MGB transactions in the United States, violated the Sherman Act and state law. Because a great many of those investors are located in the United States, the defendants set up extensive systems to market and trade their price-fixed MGBs here through U.S.-based sales personnel in their U.S. branch offices. Plaintiffs are U.S. investors who transacted MGBs in the United States *directly with defendants*, to the tune of millions of dollars. The injuries plaintiffs suffered when they were overcharged and underpaid in those transactions arise directly out of defendants' in-forum conduct, *i.e.*, defendants' in-forum choices to overcharge and underpay plaintiffs and others like them.

---

[1] This Brief refers to defendant Banco Santander (Mexico) S.A. Institucion de Banca Multiple, Grupo Financiero Santander Mexico as "Santander Mexico;" to defendant BBVA Bancomer S.A., Institucion de Banca Multiple, Grupo Financiero BBVA Bancomer as "BBVA-Bancomer;" to defendant HSBC Mexico, S.A., Institucion de Banca Multiple, Grupo Financiero HSBC as "HSBC Mexico;" to defendant Banco Nacional de Mexico, S.A., Institucion de Banca Multiple, Grupo Financiero Banamex as "Citibanamex;" to defendant Bank of America Mexico, S.A., Institucion de Banca Multiple, Grupo Financiero Bank of America as "Bank of America Mexico;" and to defendant Deutsche Bank Mexico, S.A. Institucion de Banca Multiple as "Deutsche Bank Mexico."

The case for specific personal jurisdiction over defendants on these facts could hardly be stronger. This has been true now under many years of Supreme Court precedent, but three relatively recent decisions from this Court and the Supreme Court make the issue even clearer: *Charles Schwab Corp. v. Bank of Am. Corp.* ("*Schwab I*"), 883 F.3d 68 (2d Cir. 2018), *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC* ("*Schwab II*"), 22 F.4th 103 (2d Cir. 2021), and *Ford Motor Co. v. Montana Eighth Judicial District Court*, 141 S. Ct. 1017 (2021). The district court misapplied the controlling law, grounding its error in its mistaken belief that defendants' "conspiracy" somehow occurred entirely in Mexico, despite the fact that virtually every part of the profit-generating transactions defendants conspired to enter took place in the United States.

Notably, another case addressing the specific application of these three cases on the question of personal jurisdiction over defendants who conspired to profit from trades in price-fixed derivatives, and sold those derivatives to investors in the United States, has already been fully briefed before this Court. *See Sullivan v. Barclays PLC*, No. 19-1769. The outcome of *Sullivan* will impact this matter, either by rendering the decision obvious or by necessitating additional briefing. Accordingly, plaintiffs have kept their briefing relatively short and focused on the uniquely damning facts (for defendants) here. At the end of the day the issue is very simple. Defendants extensively availed themselves of the privilege of doing

business in MGBs in the United States, and abused that privilege by fixing the prices of the MGBs they traded in the United States to the detriment of their U.S. investor counterparties. Nothing more is needed to hale these defendants into a U.S. court to compensate the investors they defrauded.

## JURISDICTION

Plaintiffs brought claims under the federal antitrust laws, 15 U.S.C. §1 *et seq.*, and state law. The district court had subject matter jurisdiction over the federal and state-law claims under 28 U.S.C. §1331 and §1367 respectively. Final judgment was entered on August 17, 2022 (SA37), and plaintiffs timely noticed this appeal on September 15, 2022, Dkt.1. This Court has jurisdiction under 28 U.S.C. §1291.

## STATEMENT OF THE ISSUES

1. Whether the district court had personal jurisdiction over defendants with respect to plaintiffs' antitrust and unjust enrichment claims, where defendants enacted their conspiracy to profit from price-fixed MGB transactions via an extensive infrastructure they created to market and sell MGBs entirely in the United States, and engaged in millions of dollars' worth of those transactions directly with plaintiffs in the United States.

2. Whether the district court erred in denying plaintiffs' request for limited jurisdictional discovery on the grounds that plaintiffs had not made out "a prima facie case for personal jurisdiction."

# STATEMENT OF THE CASE

## I.    Factual Background

### A. The MGB Market

The Mexican Government issues bonds to raise capital and fund deficits. HA 383 (¶ 291). Federal Treasury Certificates ("CETES"), JA 386-87 (¶¶ 302-05), Fixed-Rate Federal Government Development Bonds ("BONOS"), JA 387-89 (¶¶ 306-10), Inflation-Hedged Federal Government Development Bonds ("UDI-BONOS"), JA 389-90 (¶¶ 311-12), and Federal Government Development Bonds ("BONDES D"), JA 390-91 (¶¶ 313-15) (collectively, "MGBs"). MGBs are issued through regularly scheduled auctions conducted by Banco de Mexico ("Banxico"), the Mexican central bank. JA 384 (¶¶ 293-94). These auctions are limited to a group of pre-approved financial institutions, consisting mostly of Banxico desig-nated "Market Makers" that are responsible for buying MGBs at auctions and re-selling the bonds to investors. JA 384-85, 391-92 (¶¶ 294-96, 316-20). All defend-ants in this case are Market Makers. JA 321 (¶ 65).

Investors in MGBs, including plaintiffs here, do not bid for MGBs in Banxico's auctions that take place in Mexico. JA 384-85 (¶ 296). Rather, investors purchase MGBs directly from Market Makers after auctions have taken place through a sales desk operated by one of the defendants' New York-based affiliates, as explained in more detail below. JA 384-85 (¶ 296). Thus, the MGB market is

structured as a three-tiered pyramid with the Bank of Mexico at the top, Defendants in the middle, and investors at the bottom. JA 384-85 (¶¶ 293-296). Market Makers act as intermediaries between the Mexican government, which issues MGBs, and investors that purchase MGBs as investments. JA 384-85 (¶¶ 294-296). Plaintiffs are eight pension funds located in the United States that purchased MGBs from defendants through the MGB sales process described below. JA 310-15 (¶¶ 14-21); JA 478-87 (Appendix D to SAC).

Market Makers are granted exclusive privileges, including access to syndicated auctions where Banxico reopens existing bond issues, JA 384, 389, 416 (¶¶ 295, 310, 408), and the Market Maker Option Program. JA 433 (¶¶ 447-49). In exchange for these privileges, Banxico requires Market Makers to provide liquidity in the MGB market. JA 391 (¶ 316). Market Makers must submit competitive bids for a pro rata share of bonds issued in each auction, adding up to a collective share of 100% of the MGBs offered. JA 392 (¶ 318). Market Makers must also provide "two-way quotes"—i.e., a "bid" price at which Market Makers will purchase MGBs from, and an "ask" price at which they will sell MGBs to—investors, for each MGB. JA 392 (¶¶ 318-19). Each Market Maker is required to maintain a minimum 7% quarterly market share measured by transaction volume. JA 306-07 (¶ 3). All Appellees were Market Makers during the Class Period. JA 321 (¶ 65). This market structure concentrated MGB supply among defendants, which accounted

for more than 80% of dealer activity during the Class Period. JA 393 (¶¶ 323-24, 326).[2]

The MGB market is an over-the-counter market, JA 392 (¶ 322), characterized by relatively low liquidity and large customer flows. JA 393 (¶ 327). Accordingly, defendants' MGB trading desks followed a "flow trading" model, whereby dealers earn profits by anticipating customer demand and adjusting prices and trading positions accordingly. JA 394 (¶¶ 328-29). Defendants earn profits in the MGB market by selling MGBs to investors at higher prices than they purchase MGBs, as frequently as possible. JA 322 (¶ 69). Defendants compensated their traders based on the amount of profit generated from MGB trading. JA 322 (¶¶ 68-69). This structure incentivized traders to pool information about expected customer flows to adjust pricing and avoid holding trading positions that would be negatively affected by changes in supply and demand. HA 394-95 (¶¶ 331-32).

## B. MGB Marketing and Sales

Each defendant organized its MGB trading business pursuant to an industry-standard structure that included two components: (1) an MGB trading desk in Mexico operated by an Appellee, and (2) a sales desk located in New York operated by an affiliate within the same banking group. JA 321-22 (¶ 66). Defendants'

---

[2] Other than defendants, only one other bank, ING Mexico (which withdrew from the program in 2011), served as a Market Maker. JA384 (¶ 294); JA399( ¶353); JA 423 (¶¶ 420-21).

MGB trading desks and their New York sales desks had different, but equally essential roles in carrying out their MGB trading business in the United States. *Id.*

### 1. MGB Marketing

Employees on the New York sales desks had important roles in the process of marketing MGBs to investors in the United States. JA 325 (¶¶ 76-79). For example, the sales desks managed customer relationships, made sales calls, distributed trade ideas provided by defendants' traders to U.S. investors, and arranged MGB trades with the bank's U.S. customers. JA 330, 334, 335-36 (¶¶ 95, 110-11, 114-15) (Santander Mexico), JA 339-40, 342 (¶¶ 131-32, 139) (BBVA-Bancomer), JA 346-48 (¶¶ 156-58, 160-62) (Citibanamex), JA 352-54 (¶¶ 176-78, 180-82) (Deutsche Bank Mexico), JA 357-60 (¶¶ 197-99, 203-04) (HSBC Mexico), JA 363-65, 367 (¶¶ 216-17, 220-22, 229) (Bank of America Mexico).

The traders on each defendant's MGB trading desk also actively participated in these MGB marketing activities in the United States. *See* JA 331-33 (¶¶ 99-105). Defendants' MGB traders were responsible for generating trade recommendations for U.S. MGB customers and sending these recommendations to their sales desks in New York. JA 322-23 (¶¶ 69-73). This role in marketing MGBs was important to defendants' business, and defendants provided their U.S.-based sales desk with trade ideas and recommendations for the bank's U.S. client base, in English, on a near-daily basis. JA 323 (¶¶ 71-73). The sales desks, in turn, distributed these trade

recommendations to the bank's U.S. customer base. JA 330, 334, 335-36 (¶¶ 95, 110-11, 114-15) (Santander Mexico), JA 339-40, 342 (¶¶ 131-32, 139) (BBVA-Bancomer), JA 346-48 (¶¶ 156-58, 160-62) (Citibanamex), JA 352-54 (¶¶ 176-78, 180-82) (Deutsche Bank Mexico), JA 357-60 (¶¶ 197-99, 203-04) (HSBC Mexico), JA 363-65, 367 (¶¶ 216-17, 220-22, 229) (Bank of America Mexico). Because the MGB market is an opaque, over-the-counter market, U.S. MGB investors rely on their dealer to advise them when, how, and at what price they should trade MGBs. *See* JA328-29 (¶¶ 88-90).

The SAC provides granular specifics about Defendants' traders' U.S. MGB marketing activities. For example,



a Citibanamex trader

JA 346 (¶ 154).

While at Santander Mexico,

*See* JA 323, 333-34 (¶¶ 73, 108).

BBVA-Bancomer's

██████████████████████████████████████████████████████

█████████████████████████████████████ including BBVA Se-

curities Inc.'s New York-based sales team.  JA 339-40 (¶ 131). Bank of America

Mexico's ████████, also charged by COFECE, was similarly responsible for

generating trade ideas to send to the bank's New York sales desk for distribution to

U.S. customers. *See* JA111 (¶ 408) (█████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████

In addition to marketing MGBs in the United States while physically located

abroad, defendants' traders understood the importance of traveling to New York to

meet with New York sales staff and clients. As UBS Mexico's ████████████

explained to Barclays Mexico's ████████, another MGB trader charged with

anticompetitive conduct, it was "so important to come to New York" to meet with

MGB customers. JA 323-24 (¶ 74). This was originally "███████" advice (*i.e.*

HSBC Mexico trader ████████). *See* JA 308-09, 323-24 (¶¶ 7, 74). The de-

fendants' respective MGB businesses promoted their expertise in the MGB market

to their customers in the United States and their role as exclusive dealers in

Banxico's Market Maker Program. *See* JA 333-35 (¶¶ 106-12) (Santander Mex-

ico); JA 338-41 (¶¶ 126-36) (BBVA-Bancomer); JA 346-47 (¶¶ 151-58) (Citi-

banamex); JA 351-53 (¶¶ 172-78) (Deutsche Bank); JA 356-59 (¶¶ 193-200)

(HSBC Mexico); JA 362-64 (¶¶ 212-18) (Bank of America Mexico). The goal of defendants' MGB marketing activities was to generate profits by attracting business from the bank's MGB customer base in the United States. JA 322, 324 (¶¶ 68-69, 75). These U.S. marketing efforts were successful. MGB holdings by U.S. investors more than tripled during the alleged Class Period, rising from approximately $24 billion in 2006 to more than $119 billion in 2016. JA 331-33 (¶¶ 98-104).

## 2. The MGB Sales Process

Every trade in MGBs executed by investors with a defendant involved both the defendant's MGB trading desk in Mexico and a defendant's New York sales affiliate, using the process described below. Each time a customer in the United States contacted a sales desk in New York to trade MGBs (for example, in response to trade recommendations written by a defendant and distributed by a New York sales desk, or a sales call made by the New York sales affiliate), the sales desk  forwarded the customer request to defendants' traders in Mexico to determine a price, who were well aware that they were pricing an MGB trade that would be executed in the United States.  This occurred every time an investor in the United States transacted an MGB with a defendant or a defendant's affiliate because sales employees are neither authorized to price MGBs nor maintain MGB in-

ventory for trading. JA 325 (¶ 78). Rather, defendants' MGB traders were respon-

sible for pricing the trade and sending the price back to their respective New York

sales desk, either by telephone or electronically, so that the sales desk could offer

the price to the customer in the United States. JA 326-28 (¶¶ 81-87). Each defend-

ant used a similar process for pricing U.S. MGB trades with customers. JA 335-36

(¶¶ 113-16) (Santander Mexico); JA 341-42 (¶¶ 137-40) (BBVA-Bancomer); JA

348 (¶¶ 159-62) (Citibanamex); JA 353-54 (¶¶ 179-182) (Deutsche Bank Mexico);

JA 359-60 (¶¶ 201-204) (HSBC Mexico); JA 364-65 (¶ 219-222) (Bank of Ame-

rica Mexico).

Defendants obtained MGB inventory available for sale by their respective

MGB businesses through their membership in Banxico's exclusive Market Maker

Program. JA 321-22, 332-33, 393 (¶¶ 66, 104, 323-24). Each time a customer ac-

cepted a price quoted by a defendant for an MGB sale, the defendant's MGB trad-

ers distributed MGBs from the defendant's inventory into the customer's account

to complete the transaction (and vice-versa for an MGB purchase from a cus-

tomer). JA 332-33 (¶ 104). The defendants executed these customer trades by exe-

cuting a "back-to-back" transaction in which a defendant transferred MGBs to a

broker-dealer within the same bank, and simultaneously executed an equal and off-

setting transaction with the customer to send the MGBs to the customer's account

in the United States. Simultaneously, the New York sales affiliate executed a similar "back-to-back" transaction in which money was routed from the customer's account in the United States to a broker-dealer affiliate, and then immediately sent to the defendant in Mexico. Each defendant used a similar trade execution process to complete MGB trades with investors in the U.S. market. The SAC includes specific allegations as examples of how this process worked for each defendant in the trades it entered with plaintiffs in the United States. JA 327-28 (¶¶ 84-87) (example using JPMorgan internal trade data); JA 338 (¶¶ 123-24) (Santander Mexico); JA 344-45 (¶¶ 149-50) (BBVA-Bancomer), JA 349-50 (¶¶ 167-68) (Citibanamex); JA 355-56 (¶¶ 188-89) (Deutsche Bank); JA 361-62 (¶¶ 210-11) (HSBC Mexico); JA 367 (¶¶ 229-30) (Bank of America Mexico).

Defendants then recorded the gain or loss from the trade in their profit and loss records, which were used to determine the compensation of traders on the MGB trading desk. JA 322-23, 338 (¶¶ 68-70, ¶ 124) (Santander Mexico); JA 345 (¶ 150) (BBVA-Bancomer), JA 349-50 (¶ 168) (Citibanamex); JA 356 (¶ 189) (Deutsche Bank Mexico); JA 362 (¶ 211) (HSBC Mexico); JA 367 (¶ 230) (Bank of America Mexico). This entire process occurred electronically each time a defendant traded an MGB with a customer in the United States. *See* JA 337 (¶ 121). Using the process described above, the defendants priced and executed hundreds of MGB transactions directly with plaintiffs, *see* SAC, App'x D, and many more

trades with other investors in the United States throughout the Class Period.

JA331-33 (¶¶ 99-104).

### 3. The Alleged Conspiracy

Plaintiffs allege that defendants used their dominant position in the MGB market to manipulate prices, restrain supply, and distort pricing in the MGB market for their own benefit at the expense of plaintiffs and defendants' other customers that traded MGBs with a defendant or affiliated entity in the United States. JA 307-08, 449-50 (¶¶ 6, 501-04).

In the SAC, plaintiffs allege chat transcripts and trade data, received from two banks that entered into settlement agreements with plaintiffs. JA 307-09, 426 (¶¶ 5-7, 429). Although plaintiffs have only settled with two banks and not had the benefit of discovery, the SAC contains excerpts of bilateral and multilateral chats among defendants' traders, in which the traders: (i) shared private, commercially-sensitive information regarding their respective clients (*e.g.,* JA 418-20 (¶ 413)



), JA 413 (¶ 402) (

), JA 413-14 (¶ 403)

); (ii) disclosed information about their bank's respective proprietary trading positions and strategies (*e.g.,* JA 414 (¶ 404) (

███████████████████████████████████████████

███████████████████████████████████ ); (iii) coordinated their MGB

trading (*e.g.* JA 414 (¶ 404) (████████████████████████████

███████████████████████████████████████████

██████████ ); and (iv) jointly agreed on supra-competitive MGB prices to quote

customers. JA 418-20 (¶ 413) (████████████████████████████

███████████████████████████████████████████

██████████ ); *see also* JA 307-09, 410-25 (¶¶ 6-7, 399-424). By sharing non-

public, private information about customer inflow and outflow in chatrooms, over

the phone, and in in-person meetings, Defendants were able to unlawfully coordi-

nate prices and trading positions ahead of anticipated investor demand. JA 307-09,

410-25 (¶¶ 6-7, 399-424).

On September 23, 2019, COFECE issued formal charges against defendants

Bank of America Mexico, BBVA-Bancomer, JPMorgan Mexico, Citibanamex,

Santander Mexico, Deutsche Bank Mexico, and Barclays Mexico[3] for engaging in

"absolute monopolistic practices"— which are equivalent to *per se* violations of

the Sherman Act (JA 408-09 (¶¶ 391-394))—in the MGB market. COFECE also

███████████████████████████████████████████

---

[3] Accordingly, COFECE charged every Market Maker with engaging in absolute monopolistic practices with the sole exception of ING Mexico. ¶¶ 294, 325, 420-21.

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

On the same date, COFECE issued a 600+-page Statement of Objections ("SO") containing evidence of an agreement among defendants to: (1) fix prices; (2) restrain supply; (3) allocate markets; (4) rig bids; and/or (5) exchange information for the purpose of fixing prices, restraining supply, rigging bids, or allocating markets in the MGB market. JA 408-09 (¶¶ 391-393). The SO is heavily redacted so that only communications implicating a recipient of the SO are visible to that recipient. JA 425-26 (¶¶ 425-28). Plaintiffs only had access to the versions

provided to the two settling banks when filing the SAC and have not seen the versions of the SO provided to defendants. JA 425 (¶ 425). On October 14, 2019, Sergio Lopez, head of COFECE's investigative authority, announced in a radio interview that COFECE's investigation found evidence of an overarching agreement to manipulate MGB bond prices over a span of ten years. JA 409 (¶ 395). In particular, as reflected in a transcript submitted by defendants with their motion to dismiss in the district court, Mr. Lopez stated "[t]here existed elements that led us to believe that there was ***an agreement in place*** concerning what I have just told you, in order to manipulate the price and thus restrict the supply in the market for intermediation of debt securities." ECF No. 186-1 at 4 (emphasis added). Collectively, the chats cited in the SAC provide direct "smoking gun" evidence of a price-fixing conspiracy in which Bank of America Mexico, Barclays Mexico, BBVA Mexico, Citibank Mexico, Deutsche Bank Mexico, JPMorgan Mexico, HSBC Mexico, and UBS Mexico each participated.

### 4. Plaintiffs Here

Plaintiffs here are eight pension funds that traded MGBs directly with defendants using the sales process described in Part C. JA 311-15, 338 (¶¶ 14-21, ¶¶ 123-24) (Santander Mexico); JA 344-45 (¶¶ 149-50) (BBVA-Bancomer), JA 349-50 (¶¶ 167-68) (Citibanamex); JA 355-56 (¶¶ 188-89) (Deutsche Bank); JA 361-62 (¶¶ 210-11) (HSBC Mexico); JA 367 (¶¶ 229-30) (Bank of America Mexico).

Plaintiffs allege that, when the defendants determined and then transmitted prices to their respective New York sales desks, those prices were artificial as a result of the conspiracy alleged in the SAC rather than the result of honest competition among defendants. As a result, plaintiffs suffered injury when they transacted MGBs in the United States, through defendants' respective New York sales desks, at artificial prices sent by defendants in Mexico for execution in the United States. Plaintiffs further allege that defendants sent bonds and money into to their respective sales affiliates in the United States to execute price-fixed MGB transactions with plaintiffs and other U.S. investors. JA 338 (¶¶ 123-24) (Santander Mexico); JA 344-45 (¶¶ 149-50) (BBVA-Bancomer), JA 349-50 (¶¶ 167-68) (Citibanamex); JA 355-56 (¶¶ 188-89) (Deutsche Bank); JA 361-62 (¶¶ 210-11) (HSBC Mexico); JA 367 (¶¶ 229-30) (Bank of America Mexico). Plaintiffs seek to represent a class of investors that traded MGBs in the United States directly with a defendant or an affiliate of a defendant. JA 450 (¶ 504).

## II.  Procedural History

Plaintiffs Oklahoma Firefighters Pension & Retirement System filed its initial complaint on March 30, 2018, asserting claims against defendants and their corporate affiliates for violations of Sections 1 and 3 of the Sherman Act, 15 U.S.C. § 1 *et seq.*, and common law unjust enrichment. JA 260-62 (¶¶ 394-408). After the remaining plaintiffs initiated their own actions in the same district court,

the court issued an order on June 18, 2018, consolidating all the related actions and appointing interim lead counsel for the putative class. *In re Mex. Gov't Bonds Antitrust Litig.*, No. 1:18-cv-02830, ECF No. 49 (S.D.N.Y.) ("District Court Docket"). Plaintiffs then filed their first Consolidated Amended Class Action Complaint ("FAC") on July 18, 2018. JA 165.

Defendants moved to dismiss the action for lack of personal jurisdiction, improper venue, and failure to state a claim. The district court granted their motion to dismiss for failure to state a claim in a September 30, 2019 Opinion and Order ("*MGB I*"), explaining that plaintiffs' statistical evidence and descriptions of regulatory inquiries failed to link individual defendants to the alleged conspiracy. SA 1-19. As it turned out, a more concrete basis for this link had emerged just a week earlier. On September 23, 2019, the Mexican Federal Economic Competition Commission ("COFECE") formally charged seven entities, including six defendants here, with participation in a conspiracy to manipulate Mexican Government Bond prices, and disclosed extensive chatroom evidence implicating each individual cartel member. JA 404 (¶ 375). The remaining defendant here, HSBC Mexico, S.A., Institucion de Banca Multiple, Grupo Financiero HSBC ("HSBC Mexico") was investigated by COFECE and provided evidence to assist in the inquiry. JA 318 (¶ 41).

Armed with this information and with settlement cooperation from two defendants, on October 21, 2019, plaintiffs sought leave to file a Second Consolidated Amended Class Action Complaint ("SAC"). District Court Docket, ECF No. 159. The district court granted leave, *id.* at ECF No. 162, and plaintiffs filed the SAC against defendants on December 9, 2019. JA 457. The SAC alleged a wealth of new evidence not present in the FAC based on materials received by plaintiffs from cooperating settling defendants, including chat transcripts and partial versions of the COFECE Statement of Objections. *See, e.g.*, JA 410-26 (¶¶ 396-428).

Defendants once again moved to dismiss the pleading for lack of personal jurisdiction, improper venue, and failure to state a claim, and, on November 30, 2020, the district court once again granted dismissal ("*MGB II*"), but on different grounds. The district court avoided the impact of plaintiffs' new substantive evidence and dismissed the action for lack of personal jurisdiction, holding that *Schwab I* prescribed a requirement that defendants' forum contacts must "bear a causal relationship to defendants' wrongdoing." SA25. Plaintiffs sought reconsideration of the district court's holding on the basis of *Ford*'s rejection of the causation standard, and the district court denied the motion on March 30, 2022, holding that the causation standard set forth in *Schwab I* still remains in effect for financial

product conspiracy cases, unless and until this Court tells it otherwise. SA31-36.[4] Plaintiffs requested entry of final judgment, which the district court granted on August 17, 2022. SA 37. Plaintiffs duly appealed the district court's rulings on September 15, 2022. JA 488-92.

## SUMMARY OF ARGUMENT

Plaintiffs' argument proceeds in four parts. First, plaintiffs explain that defendants' extensive chain of U.S.-based activities in furtherance of their conspiracy to profit from trading in price-fixed MGBs easily subjects them to personal jurisdiction here, where defendants engaged in all those activities *directly with plaintiffs* to give rise to their injuries and resulting claims. With these facts, personal jurisdiction is crystal-clear both under *Schwab I* and under much older Supreme Court precedent such as *Burger King*.

Next, plaintiffs show that the Supreme Court's recent *Ford* decision greatly expands the scope of personal jurisdiction over defendants who, like defendants here, systematically market and sell a particular *type* of product into the forum in question, even if plaintiff did not acquire her own specific product directly from

_____

[4] The district court also denied the motion for reconsideration on the grounds that it was "untimely," and that plaintiffs should have sought an extension to file it until such time as *Ford* was decided. SA34. Plaintiffs of course had no way of knowing when or how *Ford* would come down. In any event, the district court then did go on to evaluate the motion on the merits, and reached the wrong conclusion as a matter of law, just as it did in *MGB II*.

defendant. *Ford* also abrogated this Court's previous law to the extent it required a causal connection between a defendant's in-forum conduct and a plaintiff's claims to support specific personal jurisdiction. *See* 141 S.Ct. at 1026-27. It is enough that the defendant's in-forum transactions be "related to" the plaintiff's claims. *See id.* Under this generous standard, there can be no question that defendants' hundreds of billions of dollars of MGB transactions in the United States, made possible by their enormous in-forum infrastructure of in-forum marketing and sales, would suffice to extend personal jurisdiction over defendants even if (contrary to fact) plaintiffs had not been among their direct victims.

Third, plaintiffs set forth yet another independently sufficient basis for personal jurisdiction over defendants here: conspiracy jurisdiction. The district court's basis for rejecting this argument below was its erroneous belief that defendants' many in-forum "overt acts" in furtherance of the conspiracy did not qualify as such, and the entire conspiracy took place in Mexico. In reality, of course, defendants' process of U.S.-based marketing to, negotiating with, and trading its price-fixed MGBs in the United States was the very meat of their conspiracy, without which the conspiracy would have no purpose. Combined with plaintiffs' detailed and plausible allegations of the existence of a conspiracy

(one for which multiple regulators have already fined defendants) and each defendant's participation in that conspiracy, conspiracy jurisdiction should be readily available here.

Finally, plaintiffs argue that the district court also abused its discretion in denying plaintiffs' request for limited jurisdictional discovery. That denial was based on the district court's already-described legal error in finding that plaintiffs "failed to make out a prima facie case for jurisdiction."

## STANDARD OF REVIEW

Dismissal for lack of personal jurisdiction is reviewed *de novo*. *Schwab II*, 22 F.4th at 121. "[P]laintiffs need only make a prima facie showing of personal jurisdiction," and the court considering a Rule 12(b)(2) motion "construe[s] the pleadings and affidavits in the light most favorable to plaintiffs, resolving all doubts in their favor." *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010) (quoting *Porina v. Marward Shipping Co.*, 521 F.3d 122, 126 (2d Cir.2008)).

This Court reviews a district court's denial of jurisdictional discovery for abuse of discretion. *Carpenter v. Rep. of Chile*, 610 F.3d 776, 780 (2d Cir. 2010).

## ARGUMENT

I.   **Supreme Court Precedent and This Court's Precedents Establish Specific Personal Jurisdiction Over Defendants.**

Because the defendants are headquartered abroad, the relevant analysis is the doctrine of specific personal jurisdiction. *See Goodyear Dunlop Tires v. Brown*,

564 U.S. 915, 924 (2011).  Specific personal jurisdiction is available when a "suit 'arises out of or relates to the defendant's contacts with the forum.'"  *Id.* at 923-24 (quoting *Helicopteros*, 466 U.S. at 414 n.8).[5] The Supreme Court has recently clarified that this does not require a causal relationship between the defendant's forum contacts and the episode in suit—and the claims can thus "arise from" *or* "relate to" defendants' forum contacts, *see Ford*, 141 S. Ct. at 1026-27. Plaintiffs' claims here do both. They arise from defendants' in-forum transactions in price-fixed

---

[5]  The relevant "forum" in this context is the United States as a whole. This Court has repeatedly assumed that, like "several of [its] sister circuits have" held, "when a civil case arises under federal law and a federal statute authorizes nationwide service of process, the relevant contacts for determining personal jurisdiction are contacts with the United States as a whole." *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 142 n.21 (2d Cir. 2014). Here, both the Clayton Act and Rule 4(k)(2) permit service on defendants based on their contacts with the United States. *See* 15 U.S.C. §22 (permitting worldwide service of process in antitrust cases); Fed. R. Civ. P. 4(k)(2) (permitting personal jurisdiction over federal claims in federal court whenever constitutional if no state court would have personal jurisdiction).  Accordingly, the Court may consider defendants' contacts with the entire United States in the constitutional due process analysis. And though the district court did not reach the issue, plaintiffs' complaint alleges a sufficient statutory basis for personal jurisdiction under the Clayton Act. The Clayton Act's venue provision is satisfied so long as the defendant "transacts business ... of any substantial character" in the judicial district in the "ordinary and usual sense." *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 428 (2d Cir. 2005) (quoting *Eastman Kodak Co. of New York v. S. Photo Materials Co.*, 273 U.S. 359, 373 (1927)). Here, defendants' substantial marketing and trading of MGBs via their sales affiliates based in the Southern District of New York plainly constitutes "transacting business" under the Clayton Act. And if those allegations were somehow insufficient, Rule 4(k)(2) provides an alternate source of statutory authorization for personal jurisdiction over federal claims in federal court wherever constitutional if no state court would have personal jurisdiction.

MGBs directly with plaintiffs, and they relate to defendants' massive, systematic sales of MGBs in the United States.

### A. Defendants' extensive in-forum conduct in furtherance of their conspiracy, including transactions of the price-fixed MGBs directly with plaintiffs, unquestionably subjects them to personal jurisdiction here.

Each remaining defendant here transacted millions of dollars of price-fixed MGBs in the United States *directly with plaintiffs.* That is to say that defendants colluded to profit from fixing the prices of MGBs, and then executed every part of the price-fixed, profit-generating transactions with plaintiffs from New York. As plaintiffs allege, the defendants structured their MGB trading businesses so that a salesperson in New York had to call a trader in Mexico to receive pricing information each time a U.S.-based customer executed a trade. Defendants, each of which (except for HSBC Mexico, which was implicated in chat messages and elsewhere in the SO, *see* Part I.C., below), was found to have engaged in an unlawful agreement to restrain the MGB market, ¶¶ 375-90, directly communicated fixed prices to colleagues located in a sales office in New York. As this Court has held, such communications about price-fixing into and out of the United States are more than sufficient to establish personal jurisdiction over related antitrust claims. *See Schwab II,* 22 F.4th at 124.

In *Schwab II*, this Court found that bank executives in the United States who made directives to employees abroad to make artificially low submissions to calculate the U.S. dollar LIBOR, an interest rate benchmark used to price financial products, acted in furtherance of an alleged conspiracy to suppress the rate. *See id*. The directives at issue in that case were sufficient to subject all members of the conspiracy to personal jurisdiction, yet they pale in comparison to the communications between defendants and their New York sales affiliates here. Here, the communications directly led to plaintiffs paying more and receiving less on their in-forum MGB transactions than they otherwise would have. ¶¶ 113-16 (Santander Mexico); ¶¶ 137-40 (BBVA-Bancomer); ¶¶ 159-62 (Citibanamex); ¶¶ 179-182 (Deutsche Bank Mexico); ¶¶ 201-204 (HSBC Mexico); ¶ 219-222 (Bank of America Mexico). Nothing about these communications was isolated or fortuitous. Rather, the defendants structured their MGB businesses so that a New York-based salesperson was **required** to communicate with one of defendant's traders to price customer trades.

In addition to deliberately sending fixed MGB prices into the forum, defendants, both themselves and acting together with their New York sales affiliates, engaged in other conduct that made it possible for the conspiracy to operate in the United States. For example, defendants delivered MGBs into the forum to complete trades at artificial prices with U.S. investors. *See Eades v. Kennedy, PC Law*

*Offices*, 799 F.3d 161, 168 (2d Cir. 2015) (exercising personal jurisdiction where the out-of-state defendant "mail[ed] one debt collection notice to [one plaintiff in New York], engag[ed] in one debt collection phone call with [her], and mail[ed] a summons and complaint to [the plaintiffs' New York homes]."); *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 171 (2d Cir. 2010) (exercising personal jurisdiction based on California defendant's sale of a trademark-infringing bag in New York). This conduct must also be understood in the context of defendants' sustained marketing efforts in the forum, which enabled defendants to cultivate a customer base here. *See Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 128 (2d Cir. 2002) (holding that "the activities of a firm which maintains its presence and reputation in a particular legal market" are sufficient to establish personal jurisdiction with respect to legal malpractice claims). Of course, the result of all this conduct in and directed at the forum was that plaintiffs and the class traded MGBs at artificial prices, and were injured as a result, in the United States. *See Celestin v. Caribbean Air Mail, Inc.,* 30 F.4th 133, 146 n.17 (2d Cir. 2022) (stating in the context of dismissal for *forum non conveniens* that "Moreover, Plaintiffs allege that the surplus fees at issue were charged within the United States, so the events giving rise to Plaintiffs' claims, as well as the parties, are clearly connected to the United States.").

Here, defendants acted in concert to benefit themselves at the direct expense of U.S. counterparties; affirmatively chose to market and sell millions of dollars' worth of those price-fixed MGBs directly to plaintiffs in the United States via U.S.-based salespeople working out of U.S. offices; and then claimed not to be subject to the jurisdiction of United States courts in plaintiffs' lawsuit against them for the injuries plaintiffs suffered *in those very transactions*. That is not the law and never has been.

In reality, a claim related to a contract defendants entered with the plaintiff in the forum is the archetypical case for specific personal jurisdiction, and the Supreme Court has made that clear for many decades. For example, the Supreme Court held in *Burger King* that a defendant who entered into a franchise agreement with a plaintiff from Florida was subject to personal jurisdiction there for claims relating to that contract. The defendant was not in Florida when the contractual relationship was formed—indeed, had never been there in his life, quite unlike defendants here—but the relationship he formed with the Florida plaintiff in negotiating, entering, and performing their contract still sufficed to subject him to personal jurisdiction in Florida courts. *See Burger King v. Rudzewicz*, 471 U.S. 462, 476, 479 (1985). And, in fact, the Supreme Court has upheld personal jurisdiction in cases involving contracts with forum residents where the defendant's in-forum conduct fell well short of actually entering into a contract directly with a plaintiff

on the ground in that forum.  *See, e.g.*, *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957) ("It is sufficient for purposes of due process that the suit was based on a contract which had *substantial connection* with that State. The contract was *delivered* in California, the premiums were mailed from there and the insured was a resident of that State *when he died*.") (emphases added).  If those kinds of looser contractual connections to an in-forum plaintiff suffice, there can be no question at all that a defendant who marketed MGBs to U.S. investors like plaintiffs, took phone calls in its U.S. branch offices from plaintiffs in the U.S., quoted (fixed) prices to plaintiffs in the U.S., negotiated and entered into contracts based on those fixed prices with plaintiffs in the U.S., and made and received (artificially high or low) payments to and from plaintiffs in the U.S., cannot possibly escape the jurisdiction of U.S. courts.

Were there any doubt, this Court squarely held in *Schwab I* that "[a]llegations of billions of dollars in transactions in [the forum] easily make out a prima facie showing of personal jurisdiction *for claims relating to those transactions*."  *See* 883 F.3d at 82-83 (emphasis added).  *Schwab I* involved California plaintiffs that purchased financial instruments priced based on the U.S. dollar LIBOR benchmark asserting state-law fraud and contract claims against the panel banks that allegedly manipulated the benchmark by making false submissions in London. *Id.* at 79-80. This Court distinguished between two different categories of plaintiffs' claims: (a)

those "premised solely on Defendants' false LIBOR submissions in London," *id.* at 83, and (b) those relating to Defendants' conduct "in the course of selling [LIBOR-based instruments]." *Id.* The Court found no jurisdiction over defendants with respect to the former category of claims, because their factual basis—limited "solely" to conduct abroad"—simply had no relationship to plaintiffs' transactions in California. *Id.* at 83-84. There was, however, jurisdiction over defendants with respect to the latter category. In holding that claims related to defendants' in-forum transactions gave rise to a prima facie showing of jurisdiction, this Court unambiguously rejected the premise "that the plaintiffs could establish personal jurisdiction only where a plaintiff established a prima facie case that 'defendants' LIBOR *manipulation* took place in the relevant forum.'" *Id.* at 89-90 (quoting *LIBOR IV*, 2015 WL 6243526, at *32) (this Court's emphasis). Indeed, this Court described that view as "erroneous" precisely because, under that theory, "sales and solicitation in [the forum] were insufficient to give rise to personal jurisdiction even over a specifically identified direct seller." *Id.* at 90. The district court below made the identical error, and because each of the defendants here is a "specifically identified direct seller," the personal-jurisdiction holding below must be reversed based on the unambiguous holding of *Schwab I*.

In fact, the proposition that direct sales of manipulated financial instrument to a plaintiff in the forum give rise to personal jurisdiction is so obvious that—although

they had convinced the court below to hold otherwise—the *Schwab I* defendants "effectively concede[d]" to this Court "that direct sales in [the forum] could give rise to personal jurisdiction for claims relating to those sales." *See* 883 F.3d at 83. And now that this Court has actually ruled in *Schwab I*, that proposition is even more incontestable. This single, simple principle is sufficient on its own to reverse the district court's holding. Put differently, the district court's error was clear long before *Ford*[6]—though the district court did correctly anticipate that *Ford* would likely overrule its "parsimonious" view of specific personal jurisdiction. SA28.

Where the district court here seems to have gone astray was in misunderstanding the purpose of the conspiracy plaintiffs alleged. It interpreted plaintiffs to allege "three discrete but related schemes: the conspiracy to fix the Banxico MGB auctions; the conspiracy to sell MGBs in the over-the-counter market at inflated prices; and the alleged conspiracy to fix the bid-ask spread." First PJ Op. at 6. So far so good. But from there, it concluded that defendants' in-forum transactions with plaintiffs in

---

[6] The SAC makes clear that the real counterparties to plaintiffs' in-forum MGB trades were defendants, including where defendants' affiliates are listed as counterparties in plaintiffs' trading records. JA 327-28, 338 (¶¶ 84-87, ¶¶ 123-24) (Santander Mexico); JA 344-45 (¶¶ 149-50) (BBVA-Bancomer), JA 349-50 (¶¶ 167-68) (Citibanamex); JA 355-56 (¶¶ 188-89) (Deutsche Bank); JA 361-362 (¶¶ 210-11) (HSBC Mexico); JA 367 (¶¶ 229-30) (Bank of America Mexico). Even if the Court were to find that plaintiffs' transactions were indirect, these allegations are sufficient to confer personal jurisdiction based on indirect sales, which requires only that "the alleged agent acted in New York for the benefit of, with the knowledge and consent of, and under some control by, the nonresident principal." *Schwab I*, 883 F.3d at 85.

the MGBs they price-fixed were merely "*ex post* attempt[s] to profit from the conspiracy." *See id.* This cannot be. As the district court itself acknowledged, defendants conspired to *sell MGBs at inflated prices.* Those sales themselves were not an afterthought or a side benefit; they *were* the conspiracy itself, its object and its center. A conspiracy to sell goods at inflated prices is nonsensical without sales. So too with the conspiracy to fix the bid-ask spread, which is simply another way of saying "offering to buy at artificially low prices and sell at artificially high prices." The offer on its own does not yield any benefit for defendants; the counterparty's *response* to the offer by entering into the transaction itself is what matters. And every aspect of that mission-critical transaction, from marketing through negotiation through final payment and delivery, took place in the United States.

In this way, the facts here are quite different from those in *Schwab*, where the defendants were alleged to have conspired to suppress LIBOR in London, with the primary goal of projecting a false image of their own financial soundness. *Schwab I*, 883 F.3d at 78. That kind of conspiracy *does* make sense, and can be fully completed, without sales of financial products tied to LIBOR, and for this reason "nowhere in Schwab's complaint [were] there allegations that [non-direct-seller] Defendants undertook such sales as part of the alleged conspiracy." *Id.* at 87. This complaint, by contrast, is chock full of them—detailed descriptions of the exact mechanisms by which defendants interacted with plaintiffs and others in the United States

to achieve the ultimate object of their conspiracy, namely sales of price-fixed MGBs to U.S. investors. *See supra* Factual Background. The district court's decision should thus be readily reversed.

## B. The Supreme *Court's* intervening decision in *Ford* independently requires a finding of personal jurisdiction here.

Although the foregoing rationale easily suffices to reverse the personal-jurisdiction holdings below, the Supreme Court's intervening decision in *Ford* provides another clear basis for reversal. The district court's contrary view, apparently based on the meaningless distinction that "*Ford* is not about the sale of financial instruments; not about rate-setting; and not about fraud or conspiracy" (SA35), is incorrect.

Prior to *Ford*, this Court had generally taken the view that, in order for a defendant's actions in a forum to matter for purposes of personal jurisdiction, those actions had to have some *causal* relationship to the plaintiff's claim or injury. As this Court put it in *Schwab I*: "'Courts typically require that the plaintiff show some sort of *causal relationship* between a defendant's U.S. contacts and the episode in suit,' and the plaintiff's claim must in some way 'arise from the defendants' purposeful contacts with the forum.'" 883 F.3d at 84 (quoting *Waldman v. PLO*, 835 F.3d 317, 341, 343 (2d Cir. 2016)) (emphasis added). This premise of a causal requirement meant that prior to *Ford*, defendants' massive operations employing U.S.

sales personnel in U.S. branch offices to market and sell hundreds of billions of dollars' worth of MGBs in the United States were jurisdictionally irrelevant—unless the plaintiff's claim arose out of one of those specific transactions. Of course, that *is* the case here, as described in Section I.A above. But now, defendants' extensive in-forum sales would constitute an independent basis for personal jurisdiction even if plaintiffs themselves had not been on the other side of the transactions.

In *Ford*, the Supreme Court made it clear that this "causation-only approach finds no support in this Court's requirement of a 'connection' between a plaintiff's suit and a defendant's activities," 141 S. Ct. at 1026 (quoting *Bristol-Myers Squibb Co. v. Super. Ct. of Calif., San Francisco Cty.*, 137 S. Ct. 1773, 1776 (2017)). The Court thus emphasized that it is enough for personal jurisdiction if a defendant's forum contacts "*relate to*" the plaintiff's claim—and that the claim thus does not need to "arise out of" those contacts as this Court had said in *Waldman* and its prog-eny. *See Ford*, 141 S. Ct. at 1026 (Court's emphasis). Accordingly, the Court ex-plained that "systemically serv[ing] a market" for a given *type* of product in a forum can give rise to personal jurisdiction in that forum, whether or not the defendant sold the particular one that injured the plaintiff directly to that plaintiff in the forum. *See id.* at 1028. That unanimous holding abrogated the rule stated in *Waldman* and re-peated in *Schwab I*, and so significantly broadened the kinds of connections that could suffice to create personal jurisdiction in a case like this one.

It also rendered the district court's analysis here erroneous. In its earlier opinion, the district court interpreted "the upshot of" *Schwab I* to be "that purposeful availment in antitrust cases generally requires in-forum contacts that bear a causal relationship to defendants' wrongdoing, not merely to plaintiff's harm." SA25.But even after learning from *Ford* that this causal connection was no longer required, the district court still refused to credit defendants' myriad connections to the forum on the grounds that "the alleged misconduct—conspiring to fix auctions, prices, and a bid-ask spread—took place outside of the United States." SA34-35. In other words, the district court was looking only for in-forum instances of its own artificially narrow definition of price-fixing misconduct—*only* the decision among conspirators to fix prices—and none of the subsequent steps to sell those price-fixed products, or the "related" steps of setting up an entire infrastructure complete with U.S.-based sales teams in U.S. branch offices. *Ford* renders that narrow focus incorrect.

In fact, considering the facts of *Ford* itself can resolve the personal-jurisdiction question here by close analogy. In *Ford*, the manufacturer argued that it was subject to personal jurisdiction only where it (1) sold the car to the plaintiff, or (2) designed or manufactured the defective element. The analogous argument here would limit jurisdiction to only those forums where defendants either (1) engaged in the particular transaction at issue with the plaintiff; or (2) designed or carried out

their scheme to fix the prices of MGBs. But the Supreme Court rejected this argument in terms, *see* 141 S. Ct. at 1026, 1028, finding it enough that Ford marketed, sold, and serviced its cars generally, including the *type* of cars at issue, in the forum States. *See id.* at 1028. The same rule should apply here, where defendants exerted complete control over the supply of MGBs to investors in the secondary market, and accounted for approximately 80% of dealer activity in that market, including hundreds of billions of dollars in the United States. JA331 (¶ 99); JA393 (¶ 325).

Likewise, *Ford*'s account of how Ford availed itself of the market in the forum States is relevant here. The Court explained in *Ford* that "[i]n conducting so much business in Montana and Minnesota, Ford 'enjoys the benefits and protection of [their] laws'—the enforcement of contracts, the defense of property, the resulting formation of effective markets," and "[a]ll that assistance to Ford's in-state business creates reciprocal obligations—most relevant here, that the car models Ford so extensively markets in Montana and Minnesota be safe for their citizens to use there." *See id.* at 1029-30. The same could be said of how defendants take advantage of the financial markets in New York and the United States, including specifically the markets for MGBs. It is in order to access and "avail themselves" of those markets that defendants so extensively worked with their respective sales desks in New York, employed an MGB sales force in the United States to market and sell MGBs to U.S. investors directly on their home turf, collected the proceeds from those transactions

in New York, and regularly sent MGB traders to visit the United States to meet with clients.  *See* JA333-338 (¶¶ 106-24) (Santander Mexico); JA338-45 (¶¶ 125-50) (BBVA-Bancomer); JA346-51 (¶¶ 151-71) (Citibanamex); JA351-56 (¶¶ 172-92 (Deutsche Bank Mexico); JA356-62 (¶¶ 193-211) (HSBC Mexico); JA362-67 (¶¶ 212-30) (Bank of America Mexico).

And so while the district court bypassed these facts as irrelevant, *Ford* unambiguously demonstrates that they are anything but.  Just like Ford, when defendants chose to trade massive amounts of MGBs in the United States, due process imposed a "reciprocal obligation" on them not to trade those MGBs in a fraudulent manner calculated to cause harm to U.S. citizens. Their violation of that obligation exposes them to liability in U.S. courts.

### B. Conspiracy Jurisdiction Would Provide Yet Another Independently Sufficient Basis for Personal Jurisdiction Over Defendants Here

Either of the two bases described above (defendants' direct transactions with plaintiffs in price-fixed MGBS, and their extensive marketing and sales operations in the U.S. for MGBs) would be independently sufficient to find specific personal jurisdiction over defendants. The two of them together make the question overwhelmingly clear. But on top of that, there is yet a *third* basis on which defendants are subject to specific personal jurisdiction here: conspiracy jurisdiction, as articulated by this Court in both *Schwab I* and *Schwab II*.

As those cases explained, "conspiracy jurisdiction" is appropriate over a given defendant where a plaintiff "plausibly allege[s] that '(1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a forum to subject that co-conspirator to jurisdiction in that forum.'" *Schwab II*, 22 F.4th at 122 (quoting *Schwab I*, 883 F.3d at 87). The district court never had occasion to rule on prongs 1 or 2 with respect to plaintiffs' currently operative SAC. In response to the district court's order dismissing the FAC, plaintiffs added substantial, detailed allegations about each defendant's participation in the conspiracy (a conspiracy for which defendants have already been fined by multiple government regulators), based on documents produced by two cooperating defendants. JA 311 (¶ 13); JA410-426 (¶¶ 396-428). But because the district court believed that defendants' extensive MGB sales in the forum could not constitute "overt acts" in furtherance of the conspiracy, it rejected plaintiffs' conspiracy jurisdiction argument on that basis alone. SA27. This decision was error. As described above, defendants' in-forum MGB sales, both to plaintiffs and others, were at the very heart of their conspiracy—part and parcel of "defendants' wrongdoing," as the district court put it, not just of "plaintiffs' harm." SA25. They are the most important "overt acts" in furtherance of the conspiracy. This Court should therefore reverse the district court's opinion holding otherwise,

and remand for consideration of the sufficiency of plaintiffs' allegations about the conspiracy and defendants' participation in it in the first instance.

In the alternative, should the Court wish to evaluate the strength of plaintiffs' conspiracy allegations itself, the task is an easy one. In this Circuit, plaintiffs plausibly allege an agreement in violation of antitrust law by alleging "enough factual matter (taken as true) to suggest that an agreement was made." *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 781 (2d Cir. 2016). The SAC is replete with facts demonstrating that each of the defendants agreed to join a horizontal conspiracy to restrain trade in the MGB market, including chatroom transcripts that rise to the level of direct evidence. These are the modern-day version of the paradigmatic example of direct evidence: "a recorded phone call in which two competitors agreed to fix prices at a certain level." *Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013). Here, the SAC alleges not just one, but multiple communications demonstrating that the defendants agreed to fix prices and allocate the MGB market. JA 418-21 (¶¶ 413-16).

Circumstantial facts further show that the conspiracy alleged here is plausible. Notably, COFECE found that all defendants[7] engaged in the alleged conspiracy. JA 404-07 (¶¶ 375, 379-90). Chatroom transcripts in the SAC reflect traders sharing

---

[7] The sole exception is HSBC Mexico, but chat transcripts in the SAC and the SO demonstrate its involvement in the conspiracy. *See* JA308-09, JA 410, JA 418-20 (¶¶ 7, 399, 413).

proprietary information in parallel, a highly unusual form of interdependent conduct that would likely not have occurred in the absence of an agreement. *See Anderson News, L.L.C. v. Am. Media, Inc.,* 680 F.3d 162, 172 (2d Cir. 2012). This is especially true given that sharing proprietary pricing and trading information with rival dealers would normally highly dangerous. JA 395 (¶¶ 333-35). The fact that defendants were the exclusive Banxico-approved Market Makers with an aggregate estimated market share of more than 80%, JA 393 (¶ 325), in a market characterized by large, infrequent customer purchases, JA 393-94 (¶¶327-32), further shows that a conspiracy in this market would have been feasible to carry out. JA 393 (¶ 325); *see Todd v. Exxon Corp.,* 275 F.3d 191, 208 (2d Cir. 2001) (explaining that "the possibility of anticompetitive collusive practices is most realistic in concentrated industries" and that 80%-90% "is an extremely high market share by any measure."); *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 65 (2d Cir. 2012) (holding that summary judgment was inappropriate where plaintiffs showed "that the publication paper industry is conducive to collusion."). Moreover, defendants' status as Market Makers that are required to bid for new MGBs in every auction and resell the same MGBs to investors at a profit (JA 391-92 (¶¶ 316-20)) furnished defendants with a common motive to conspire. *See Gelboim*, 823 F.3d at 781. But again, in plaintiffs' view, the correct course is to remand those previously unconsidered questions to the district court.

## II.    The District Court Abused its Discretion in Denying Jurisdictional Discovery

Plaintiffs were also prepared to conduct limited discovery to unearth more specific evidence that Defendants fixed the prices of the MGBs they transacted with plaintiffs in the forum. SA29. To be sure, additional allegations in this regard should not be necessary. Plaintiffs have already more than adequately alleged that defendants fixed the prices of MGBs traded in the United States as a matter of practice during the time that plaintiffs traded. *See supra* at Statement of the Case, Sections I.B.3-I.B.4. But to the extent the district court believed otherwise, it should plainly have permitted plaintiffs to seek the discovery. Demonstrating that defendants conspired to, and did, fix the prices of the specific MGBs they traded with plaintiffs, with the specific purpose of profiting from those transactions, would definitively establish specific personal jurisdiction over defendants here. The district court's refusal to allow the discovery on the basis that "plaintiffs have failed to make a prima facie case for personal jurisdiction" is, as discussed above, legal error, and as such is also necessarily an abuse of discretion requiring reversal. *See Iraq Telecom Ltd. v. IBL Bank S.A.L.*, 43 F.4th 263, 270 (2d Cir. 2022) ("A district court abuses its discretion if it ... bases its decision on an error of law or uses the wrong legal standard[.]" (quoting *Villiers v. Decker*, 31 F.4th 825, 831 (2d Cir. 2022)).

*    *    *

**CONCLUSION**

For the foregoing reasons, the judgment below should be reversed and the case remanded for further proceedings.

Dated: November 7, 2022
      White Plains, New York

Respectfully submitted,

By:    /s/ *Vincent Briganti*

Vincent Briganti
Margaret MacLean
**LOWEY DANNENBERG P.C.**
44 South Broadway
White Plains, NY 10601
Tel.: (914) 997-0500
Fax: (914) 997-0035
Email: vbriganti@lowey.com
mmaclean@lowey.com

*Plaintiffs-Appellants' Lead Counsel*

**CERTIFICATE OF COMPLIANCE**

1. This document complies with the type-volume limit of 2d Cir. R. 32.1(a)(4)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 9,935 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Word 2016 in 14-point Times New Roman font.

By: _/s/ Vincent Briganti_____
Vincent Briganti

**CERTIFICATE OF SERVICE**

I hereby certify that on November 7, 2022, I caused the foregoing document to be

electronically filed with the Clerk of Court for the U.S. Court of Appeals for the

Second Circuit by using the appellate CM/ECF system.  I certify that all partici-

pants in this case are registered users of that system and that service will be accom-

plished by that system.

By:    /s/ *Vincent Briganti*
          Vincent Briganti

**SPECIAL APPENDIX**

## TABLE OF CONTENTS

Page

Opinion and Order (Dkt. 158) (9/30/19) ..................................................SA1

Opinion and Order (Dkt. 222) (11/30/20) ...........................................SA20

Opinion and Order (Dkt. 278) (3/30/22) .............................................SA31

Judgment (Dkt. 285) (12/9/19) ............................................................SA37

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE: MEXICAN GOVERNMENT
BONDS ANTITRUST LITIGATION

18-CV-2830 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

In this consolidated putative class action, Plaintiffs — eight U.S. pension funds — allege that Defendants — ten banks and related entities — conspired to manipulate the market for certain debt securities issued by the Mexican government. Specifically, Plaintiffs allege that Defendants rigged the auction process by which the Mexican government issues the bonds and conspired to manipulate the pricing of the bonds on the secondary market, in violation of Sections 1 and 3 the Sherman Act and the common law of unjust enrichment. Defendants move to dismiss the complaint for failure to state a claim, and a subset of Defendants also move to dismiss the complaint for lack of personal jurisdiction, pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(b)(1), respectively. Because the Court agrees that Plaintiffs have failed to state a claim against any Defendant, the claims are dismissed.

## I.      Background

The following facts are taken from the complaint and presumed true for the purposes of the motion to dismiss.

A.     **Factual Background**

1.     **The Mexican Bond Market**

Mexican government bonds ("MGBs") are debt securities issued and backed by the

Mexican government.  (Dkt. No. 75 ("CAC") ¶¶ 248–249.)  The Bank of Mexico ("Banxico")

issues MGBs via auctions that typically occur once a week.  (CAC ¶¶ 249–250.)  After auction,

MGBs may be resold by auction winners to consumers and thereafter bought or sold on the

secondary market.  (CAC ¶ 252.)  This case concerns four instruments categorized as MGBs:

"CETES" (CAC ¶¶ 258–261);[1] "BONOS" (CAC ¶¶ 262–266);[2] "UDIBONOS" (CAC ¶¶ 267–

268);[3] and "BONDES D" (CAC ¶¶ 269–271.)[4]  The distinguishing characteristics of each of

these instruments, though not critical for the purposes of the present motion, are described in the

footnotes.

MGB auctions usually occur on Tuesdays, and Banxico announces them on the last day

of the week prior.  (CAC ¶ 250.)  In advance of the auction, participants submit "bid schedules"

---

[1] CETES are short-term, zero-coupon bonds.  (CAC ¶ 258.)  They have maximum tenors of one year and a par value of ten pesos.  (*Id.*)  CETES represent approximately 16% of the outstanding MGBs on the market.  (CAC ¶ 260.)

[2] BONOS are fixed-rate coupon bonds with maturities greater than one year.  (CAC ¶ 262.)  They pay a semi-annual coupon payment and have a par value of 100 pesos.  (*Id.*)  To date, BONOS have been issued with maturities of three, five, ten, twenty, and thirty years.  (CAC ¶ 263.)  They represent approximately 54% of the outstanding MGBs on the market.  (CAC ¶ 264.)

[3] UDIBONOS are inflation-hedged coupon bonds that pay a return every six months based on a real interest rate determined on the issue date of the security.  (CAC ¶ 267.)  Their par value is 100 UDIs.  (*Id.*)  (UDIs are "inflation investment units" tied to Mexico's National Consumer Price Index.  (*Id.*))  UDIBONOS represent approximately 5% of the outstanding MGBs on the market.  (*Id.*)

[4] BONDES D are variable rate bonds with a par value of 100 pesos.  (CAC ¶ 269.)  They can be issued with any maturity in multiples of twenty-eight days but are typically issued with maturities of three, five, or seven years.  (*Id.*)  They pay a coupon every month and represent approximately 25% of the outstanding MGBs on the market.  (*Id.*)

indicating the amount and price of MGBs they would like to buy.  (CAC ¶ 251.)  Banxico rules

prohibit auction participants from sharing their bid schedules with one another (CAC ¶ 303), and

the schedules are submitted by either sealed envelope or encrypted electronic file to ensure their

confidentiality (CAC ¶ 251).

CETES and BONDES D are issued in "multi-price" auctions.  (CAC ¶¶ 259, 269.)  Bids

are arranged in order from highest price to lowest price, and the bonds are allocated in

descending order based on the quantity requested by each bidder until the bonds offered at that

auction are exhausted.  (CAC ¶ 259.)  BONOS and UDIBONOS are issued in "single-price"

auctions.  (CAC ¶¶ 263, 267.)  In a single-price auction, the bids are similarly arranged in order

from highest to lowest price, and the bonds allocated in descending order based on the quantity

requested.  But a single-price auction differs from a multi-price auction in that all bonds are sold

at the final price where the auction stops.  (CAC ¶ 263.)

Some of the Defendants[5] — referred to hereafter as the "Market Maker Defendants" —

participate in the "Market Maker Program" for MGBs.  (CAC ¶ 3.)  The program helps guarantee

liquidity in the MGB market.  (CAC ¶ 272.)  The Market Maker Defendants were the exclusive

approved market makers for MGBs during the class period.  (CAC ¶ 2.)  Market makers receive

certain privileges and incur corresponding obligations.  (CAC ¶ 273.)  For example, they must

submit competitive bids in MGB auctions for the lower of either 20% of the amount of MGBs

offered at the auction or the market maker's per capita share among all market makers for that

auction.  (CAC ¶ 274.)  They may participate in the "Market Maker Option Program," which

---

[5] The Market Maker Defendants are: (1) Santander Mexico, (2) BBVA-Bancomer,
(3) JPMorgan Mexico, (4) HSBC Mexico, (5) Barclays Mexico, (6) Citibanamex, (7) Bank of
America Mexico, (8) Deutsche Bank Mexico, (9) Banco Credit Suisse (Mexico), S.A., and (10)
ING Bank Mexico S.A.  (CAC ¶ 197.)

allows participants to purchase additional MGBs the day after an auction at the previous day's auction price.  (CAC ¶ 320.)  To do so, a market maker submits a bid for a certain amount of additional MGBs at the prior's day auction price.  (CAC ¶ 321.)  Banxico then issues additional bonds equal to 25% of the total volume sold at the previous auction, distributed pro rata among all participants that submitted bids based on the amount of bonds requested.  (*Id.*)

Market makers are also obligated to present "two-way quotes . . . to consumers for each MGB, in all their maturities."  (CAC ¶ 275.)  They are thereby obligated to participate in not only the government-run auctions for newly issued MGBs but also the secondary market for extant MGBs.  The difference between the quoted price at which the market maker will buy a given MGB outside an auction (the "bid" price) and the quoted price at which it will sell the same MGB (the "ask" price) is called the bid-ask spread.  (CAC ¶ 276.)  Market makers can earn profits by collecting the difference between the bid and ask price — i.e., by collecting the spread. (*Id.*)

### 2.    The Alleged Conspiracy

Plaintiffs are eight pension funds that transacted in MGBs with certain of the defendants from January 1, 2006, to April 19, 2017 (the putative class period).  (CAC at 1, ¶¶ 65–72.) Defendants are the ten market makers for MGBs, in addition to forty-two of the market markers' corporate affiliates, parents, and subsidiaries, and ten unnamed individuals and entities.  (*See* CAC ¶¶ 73–197.)

In essence, Plaintiffs allege that Defendants conspired to manipulate the MGB markets in three main respects.  First, they allege that the market makers shared bids in advance of auctions in order to artificially depress auction prices.  Second, they allege that the market makers conspired to artificially inflate the prices at which they resold newly issued MGBs purchased at

the auctions.  Finally, they allege that market makers conspired to fix the MGB bid-ask spreads

artificially wide.  (CAC ¶ 6.)  In support of this theory, they allege three main types of evidence.

### a.        Regulatory Investigations

On April 19, 2017, Mexico's antitrust regulator, the Comisión Federal de Competencia

Económica ("COFECE"), announced that it had discovered evidence of price fixing and

collusion in the "government bond intermediation market."  (CAC ¶ 280.)  In May 2017,

COFECE expanded its investigation.  (CAC ¶ 282.)  Bloomberg reported that the regulator had

"zeroed in on 7 banks, including three from the U.S., as part of a widening investigation into

price manipulation," and named Defendants Banco Santander Mexico, BBVA-Bancomer,

JPMorgan Mexico, HSBC Mexico, Barclays Mexico, Citibanamex, and Bank of America

Mexico as subjects of the inquiry.  (*Id.*)  Since this announcement, each of the banks has

acknowledged that it is subject to the inquiry.  (CAC ¶ 283.)  Bloomberg additionally reported

that one unidentified Defendant was cooperating with COFECE's investigation in exchange for a

more lenient punishment.  (*See* CAC ¶ 284.)  Mexico, Plaintiffs allege, extends leniency to

antitrust cooperators only if the party can show that it participated in or contributed to the

commission of a cartel and can "deliver sufficient information to COFECE which would allow

for the initiation of an investigation procedure or to assume the existence of cartel conduct."

(CAC ¶¶ 285–286 (alteration omitted).)

Other media reports provide some insight, Plaintiffs allege, into the contours of the

investigation.  According to *El Financiero*, a Mexican newspaper, the COFECE investigation

included both the bond auctions and the secondary market, and focused on the period from

October 28, 2006, to present.  (CAC ¶ 288.)  A different financial reporter wrote that Guillermo

Vega, a Managing Director at BBVA in New York, was among the individuals under

investigation.  (CAC ¶ 291.)  Vega had previously been fired by Citibanamex for misconduct related to client MGB orders.  (*See id.*)  On May 25, 2017, the same reporter stated that COFECE had moved forward with the investigation and was collecting emails and phone records.  (CAC ¶ 292.)

In August 2017, the Comisión Nacional Bancaria y de Valores ("CNBV"), Mexico's securities regulator, announced that it was also proceeding with a misconduct investigation in the MGB market.  (CAC ¶¶ 5, 293.)  The Mexican media reported leaked information that an unknown witness had testified before CNBV regarding collusion among Defendants.  (CAC ¶ 294.)  At the time the Consolidated Amended Complaint was filed, both investigations were ongoing.  (CAC ¶ 297.)

### b.  Statistical Evidence

Plaintiffs also present statistical analyses that they argue corroborate their allegations of conspiracy.  Broadly speaking, the statistical analyses they proffer fall into two categories.  The first category shows comparisons of data from before and after COFECE announced its investigation.  Plaintiffs allege that these longitudinal comparisons suggest that Defendants changed their behavior in response to COFECE's announcement, supporting the inference that they were engaged in illicit anticompetitive conduct before the announcement.

Plaintiffs' first analysis of this nature is a comparison of the difference between the highest and lowest bid in a given auction — what they call the "bid dispersion" — during the "Pre-Announcement Period" and the bid dispersion in the "Post-Announcement Period."[6]  (CAC ¶ 306.)  Their results show an increase in bid dispersion from the Pre- to Post-Announcement

---

[6] For the purpose of this analysis, the Pre-Announcement Period is defined as January 1, 2006, to April 18, 2017, and the Post-Announcement Period is defined as April 19, 2017, to November 28, 2017.  (CAC ¶ 306.)

Period in certain tenors of BONOS and CETES.  (CAC at 68 fig.1.)  This, Plaintiffs urge, demonstrates an increase in price uncertainty after COFECE's announcement, buttressing the claim that prior to the announcement Defendants were sharing their bid sheets.  (CAC ¶¶ 307–309.)  Plaintiffs also offer a graph alleging that the bid dispersion of ten-year BONOS increased from the Pre- to Post-Announcement Periods, even once the data was adjusted for macroeconomic factors like the global financial crisis, suggesting that the changes in bid dispersion illustrated in the first analysis were not the result of exogenous factors.  (CAC at 69 fig.2, ¶ 311.)

Next, Plaintiffs allege certain data regarding Market Maker Defendants' "fill rates" at MGB auctions.  The fill rate is the percentage of bonds allocated to a bidder relative to the total amount for which they bid.  (CAC ¶ 313.)  Plaintiffs' graphical allegations show the difference between the average fill rate of market makers and non-market makers for BONOS, UDIBONOS, and BONDES D during the Pre-Announcement Period compared to the same measures during the Post-Announcement Period.[7]  (CAC at 70 fig.3.)  The figures show that the difference in fill rate between the two groups was narrower during the Post-Announcement period.  (*See id.*)  Plaintiffs allege that the change in Defendants' relative success in the auction reflects collusive conduct in the period preceding the announcement.  (CAC ¶ 314.)

Another graph shows the fill rate for Defendants in the Market Maker Option Program during the Pre- and Post-Announcement Periods.[8]  (*See* CAC at 74 fig.6.)  Defendants had a

---

[7] For the purposes of this analysis the Pre-Announcement Period is defined as July 1, 2016, to April 19, 2017, and the Post-Announcement Period is defined as April 20, 2017 to January 30, 2018.  (*See* CAC at 70 fig.3)

[8] For the purposes of this analysis, the Pre-Announcement Period is defined as January 1, 2006, to April 19, 2017, and the Post-Announcement Period is defined as April 20, 2017, to April 5, 2018.  (*See* CAC at 74 fig.6.)

higher fill rate of BONOS and UDIBONOS during the Pre-Announcement Period than during the Post-Announcement Period.  (*Id.*)

Finally, Plaintiffs allege that the median bid-ask spread Defendants quoted for various tenors of BONOS and CETES narrowed from the Pre-Announcement Period to the Post-Announcement Period.[9]  (CAC at 76 fig.7, 77 fig.8.)

The two remaining graphs are not comparisons of Pre- and Post-Announcement Periods, but rather purport to show data from entirely before the COFECE announcement.  The first alleges differences between the fill rate volatility of market makers and non-market makers during the Class Period.  (CAC at 71 fig.4., ¶¶ 315–316.)  It shows that during this period, market makers had less fill rate volatility in auctions for BONOS and UDIBONOS than did non-market makers.  (CAC at 71 fig.4.)  The relative lack of volatility for market makers, the Plaintiffs allege, supports the inference that Defendants were engaged in collusive conduct that contributed to their "better results" in the auctions.  (CAC ¶ 316.)

The last set of statistical allegations relates to the resale of MGBs purchased at auctions.  It depicts the "average normalized spot price" of thirty-year BONOS throughout the trading day on auction days and non-auction days, during the period between October 2006 and April 2017.  (CAC at 72 fig.5.)  The "average normalized spot price" purports to show price movements over the course of the day, rather than a comparison of absolute, day-to-day prices.  (*See id.*)  On non-auction days, the spot price remained relatively stable, increasing very slightly over the course of the day.  (*See id.*)  On auction days, the graph shows, among other things, an increase in the average normalized spot price between 11:30 a.m. and 12:00 p.m., just after the announcement of auction results.  (*See id.*)  In other words, the price of thirty-year BONOS

---

[9] The Pre- and Post-Announcement Periods are not defined for these charts.

jumped immediately after auctions, relative to the immediately pre-auction price.  These price movements, Plaintiffs allege, support the inference that Defendants conspired to sell MGBs following the auction at artificially high prices.  (CAC ¶ 317.)  Similar trends are evident in graphs depicting the same data for three-month CETES, six-month CETES, one-year CETES, and ten-year BONOS, during the period from January 2005 to April 2017.  (CAC app. C.)

Plaintiffs do not allege that any of their quantitative analyses show statistically significant results.

### 3.      Other Evidence

Plaintiffs offer other assorted allegations in service of their claims.  In short, they allege that Defendants' MGB traders often know one another and frequently move laterally among employment with different Defendants (*see* CAC ¶¶ 332–345), and that certain Defendants have been fined or sanctioned for various other antitrust violations, including manipulating benchmark rates like LIBOR and Euribor, manipulating the precious metals and derivatives markets, and several other conspiracies.  (*See* CAC ¶¶ 346–378.)

### B.      Procedural Background

Plaintiffs filed the operative Consolidated Amended Complaint on July 18, 2018, seeking damages and injunctive relief under Sections 1 and 3 of the Sherman Act, disgorgement of the "ill-gotten gains" from the conspiracy under the common law of unjust enrichment, and certification under Federal Rule of Civil Procedure 23 of a class of all U.S. persons who entered into MGB transactions with Defendants during the class period.[10]  (CAC at 96).

---

[10] Specifically, the proposed class definition is:

> All persons that entered into an MGB transaction between at least January 1, 2006, and April 19, 2017 (the "Class Period"), where such persons were either domiciled in the United States or its

Defendants moved jointly on September 17, 2018, to dismiss the Consolidated Amended Complaint for failure to state a claim, and a subset of Defendants known as the Foreign Defendants[11] moved to dismiss the claims for lack of personal jurisdiction and improper venue. (*See* Dkt. Nos. 113, 114, 144.)  Defendants argue that the complaint impermissibly relies on "group pleading" by failing to differentiate among Defendants; that the complaint does not allege a plausible antitrust conspiracy; that Plaintiffs lack antitrust standing to assert their claims; that the Foreign Trade Antitrust Improvements Act bars the auction-rigging claims; that the claims are partially time-barred; and that Plaintiffs fail to state a claim for unjust enrichment.  Because the Court is persuaded by the first of these arguments, the motion to dismiss for failure to state a

---

territories or, if domiciled outside the United States or its territories, transacted in the United States or its territories. Excluded from the Class are Defendants and their employees, agents, affiliates, parents, subsidiaries and co-conspirators, whether or not named in this Complaint, and the United States government.

(CAC ¶ 382.)

[11] Foreign Defendants include: Bank of America México, S.A., Institución de Banca Múltiple; the BBVA Foreign Defendants (Banco Bilbao Vizcaya Argentaria, S.A.; BBVA Bancomer S.A., Institución de Banca Múltiple, Grupo Financiero BBVA Bancomer; BBVA Compass Bancshares, Inc.; Grupo Financiero BBVA Bancomer, S.A. de C.V.); the Barclays Foreign Defendants (Barclays Bank México, S.A., Institución de Banca Múltiple, Grupo Financiero Barclays México; Barclays Bank PLC; Barclays Capital Securities Limited; Barclays PLC; Grupo Financiero Barclays México, S.A. de C.V.); the Citi Foreign Defendants (Banco Nacional de México, S.A., Institución de Banca Múltiple, Grupo Financiero Banamex; Grupo Financiero Banamex, S.A. de C.V.); the Credit Suisse Foreign Defendants (Banco Credit Suisse (Mexico) S.A.; Credit Suisse AG; Credit Suisse Group AG; Grupo Financiero Credit Suisse (Mexico), S.A. de C.V.); the Deutsche Bank Foreign Defendants (Deutsche Bank AG; Deutsche Bank México, S.A., Institution de Banca Múltiple); the HSBC Foreign Defendants (HSBC Holdings PLC; HSBC Bank PLC; HSBC Latin America Holdings (UK) Limited; HSBC México, S.A., Institución de Banca Múltiple, Grupo Financiero HSBC); the ING Foreign Defendants (ING Bank N.V.; ING Groep N.V.); the J.P. Morgan Foreign Defendants (Banco J.P. Morgan, S.A., Institución de Banca Múltiple, J.P. Morgan Grupo Financiero; J.P. Morgan Securities plc); and the Santander Foreign Defendants (Banco Santander (México), S.A., Institución de Banca Múltiple, Grupo Financiero Santander México ("Banco Santander Mexico"); Banco Santander, S.A.; Santander Investment Bolsa, Sociedad de Valores, S.A.U.).  (*See* Dkt. No. 144 at 1 n.1.)

claim is granted, and the motion to dismiss for lack of personal jurisdiction is denied as moot.[12]

## II.      Legal Standard

To survive a Rule 12(b)(6) motion to dismiss for "failure to state a claim upon which

relief can be granted," Fed. R. Civ. P. 12(b)(6), a complaint "must contain sufficient factual

matter" that, if taken to be true, would "allow[] the court to draw the reasonable inference that

the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Thus, in the antitrust context, "[a] plaintiff's job at the pleading stage, in order to overcome a

motion to dismiss, is to allege enough facts to support the inference that a conspiracy actually

existed."  *In re GSE Bonds Antitrust Litig.* (*GSE Bonds*), No. 19 Civ. 1704, 2019 WL 4071070,

at *4 (S.D.N.Y. Aug. 29, 2019) (quoting *Mayor & City Council of Baltimore v. Citigroup, Inc.*

(*Citigroup*), 709 F.3d 129, 136 (2d Cir. 2013)).  Of course, "[t]hreadbare recitals of the elements

of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S.

---

[12] Ordinarily, courts address challenges to personal jurisdiction and other threshold matters before addressing the merits of a claim.  *See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431–32 (2007) ("[A] federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the . . . parties (personal jurisdiction).").  But "in cases such as this one with multiple defendants — over some of whom the court indisputably has personal jurisdiction — in which all defendants collectively challenge the legal sufficiency of the plaintiff's cause of action, we may address first the facial challenge to the underlying cause of action and, if we dismiss the claim in its entirety, decline to address the personal jurisdictional claims made by some defendants."  *Chevron Corp. v. Naranjo*, 667 F.3d 232, 246 n.17 (2d Cir. 2012).  Bypassing the question of personal jurisdiction is especially appropriate when, as here, "the personal jurisdictional challenges are based on factual allegations that are . . . still under development."  *Id.*; *see also In re Libor-Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262, 2015 WL 4634541, at *16 (S.D.N.Y. Aug. 4, 2015) (bypassing personal jurisdiction inquiry), *amended* No. 11 MDL 2262, 2015 WL 13122396 (S.D.N.Y. Oct. 19, 2015); *First Capital Asset Mgmt., Inc. v. Brickelbush, Inc.,* 150 F. Supp. 2d 624, 631 (S.D.N.Y. 2001) (same), *aff'd sub nom. First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159 (2d Cir. 2004); 4 Charles Alan Wright et al., Federal Practice and Procedure § 1067.6 (4th ed. 2019) ("[A] court simply may avoid the [personal jurisdiction] issue by resolving the suit on the merits when they clearly must be decided in favor of the party challenging jurisdiction . . . .").

at 678. Rather, the complaint must contain specific factual allegations that, if true, "permit the court to infer more than the mere possibility of misconduct." *Id.* at 679.

An antitrust plaintiff can overcome a motion to dismiss in two ways. "First, a plaintiff may, of course, assert direct evidence that the defendants entered into an agreement in violation of the antitrust laws. Such evidence would consist, for example, of a recorded phone call in which two competitors agreed to fix prices at a certain level. But, in many antitrust cases, this type of 'smoking gun' can be hard to come by, especially at the pleading stage." *Citigroup*, 709 F.3d at 136 (citation omitted). Accordingly, a complaint may provide a basis for inferring an agreement by alleging "conscious parallelism, when such interdependent conduct is accompanied by circumstantial evidence and plus factors." *Id.* (citations omitted). Plus factors may include facts like "a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications. Generally, however, alleging parallel conduct alone is insufficient, even at the pleading stage." *Id.* (citations omitted).

## III. Discussion

### A. Sherman Act Claims

Defendants argue that the allegations impermissibly treat the defendants as a single, undifferentiated bloc and fail to put forth specific allegations of specific conduct by specific entities or individuals. (Dkt. No. 114 at 24–25.)

An antitrust complaint that "fail[s] to connect each or any individual entity to the overarching conspiracy, or[,] alternatively, satisf[ies] the requirements for imputing another affiliated entity's liability" cannot ordinarily survive a motion to dismiss. *Concord Assocs., L.P. v. Entm't Props. Tr.*, No. 12 Civ. 1667, 2014 WL 1396524, at *20 (S.D.N.Y. Apr. 9, 2014). Allegations about the defendants "as a general collective bloc, or generalized claims of parallel

conduct, must . . . be set aside . . . as impermissible group pleading." *In re Interest Rate Swaps Antitrust Litig.*, No. 16 MD 2704, 2018 WL 2332069, at \*15 (S.D.N.Y. May 23, 2018); *see also In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 384 (S.D.N.Y. 2016) (dismissing claims because plaintiffs had "resort[ed] to . . . group pleading").  To be sure, a plaintiff need not "adduce direct evidence (such as a chatroom transcript) for each and every defendant named. . . .  But there must be something in the complaint that ties each defendant to the conspiracy." *GSE Bonds*, 2019 WL 4071070, at \*7.  Thus, without "a coherent explanation for each defendant['s] participation in the alleged conspiracy, an antitrust claim can stand only against those defendants as to whom the [c]omplaint offers some specific, individual showing of" anticompetitive conduct. *Sonterra Capital Master Fund Ltd. v. Credit Suisse Grp. AG*, 277 F. Supp. 3d 521, 556 (S.D.N.Y. 2017).

Plaintiffs argue that, at the motion to dismiss stage, they need not allege specific conduct by each defendant, but rather "need only plausibly allege each defendant's involvement in a conspiracy."  (Dkt. No. 146 at 39.)  But to say that a defendant need only "*plausibly* allege *each* defendant's involvement" is to beg the question.  (*Id.* (emphases added).)  Post-*Twombly* authorities overwhelmingly hold that a complaint that provides no basis to infer the culpability of the *specific* defendants named in the complaint fails to state a claim.  For example, Plaintiffs quote *Hinds Cty. v. Wachovia Bank N.A.*, 790 F. Supp. 2d 106 (S.D.N.Y. 2011), for the proposition that the complaint "need not be detailed with overt acts by each defendant," *id.* at 115.  Yet, in *Hinds*, the court undertook a painstaking, defendant-by-defendant analysis of the allegations, and ultimately dismissed most of the claims because the complaint did not furnish allegations against each individual defendant that satisfied the strictures of Rule 8.  *See, e.g., id.* at 116 ("[T]he Complaint must plead facts which, taken as true, would tend to show not only that

a transaction in question was fixed, but also that [the defendant] knew of and participated in the malfeasance.  The absence of any such specific factual allegations here is fatal to the . . . claim."); *id.* at 118 ("The . . . Complaint fails . . . to allege any illegal conduct specifically attributable to [the next defendant], nor does it allege veil-piercing or alter ego fact patterns sufficient to permit [the defendant] to be held liable for its former subsidiary's alleged transgressions.").  Similarly, in *Iowa Public Employees' Retirement System v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285 (S.D.N.Y. 2018), also cited by Plaintiffs, the complaint stated a claim only because the allegations involved specific instances of conspiratorial conduct by each defendant or its employees, *id.* at 317 & n.11 (collecting allegations of specific conduct).  And in *GSE Bonds*, 2019 WL 4071070, cited by Plaintiffs in a supplemental submission (*see* Dkt. No. 157 at 3), the court selectively dismissed claims against defendants as to which there were no "allegations relating to specific actions," while permitting claims against defendants implicated in chats to go forward.  *Id.* at *7.  These cases — each cited by Plaintiffs — exemplify the requirement that an antitrust complaint must provide some basis for inferring that the specific defendants participated in the alleged conspiracy.

Here, even if Plaintiffs have alleged the plausible existence of an antitrust conspiracy — a question the Court does not reach — they have not alleged anything that would "plausibly suggest that the *particular* defendants named in this suit were part of that conspiracy."  *Id.* at *8 (emphasis added).  Indeed, the complaint contains almost no individualized allegations at all.

Consider first the only allegation Plaintiffs characterize as direct evidence of a conspiracy: that an unnamed entity is participating in a government "leniency program" in connection with the COFECE investigation into the MGB market.  (Dkt. No. 146 at 12–13.)  The unnamed entity's cooperation with government investigators, Plaintiffs argue, is direct evidence

of the conspiracy because a precondition of acceptance into the Mexican government's program is the cooperator's membership in a "cartel." (*Id.*) But even if the Court were to indulge the inferential leap from cooperation to culpability, Plaintiffs fail to allege which, if any, of the Defendants is the beneficiary of the leniency program. And even if one Defendant's participation in the program suggested *that* Defendant's culpability, that allegation would not, without more, be direct evidence of a conspiracy implicating the fifty-one *other* institutional defendants, or the unnamed individual defendants.

In the absence of direct evidence, Plaintiffs are left to rely on allegations of circumstantial evidence. But here, again, Plaintiffs have failed to articulate a link between their allegations and the specific defendants named in the complaint. Plaintiffs characterize their statistical analyses as evidence of parallel conduct in bidding and bid-ask quoting. (*See* Dkt. No. 146 at 16–17.) As Defendants rightfully emphasize, though, the statistical analyses proffered by Plaintiffs are simply "group pleading in another form." (Dkt. No. 114 at 25.) Some of Plaintiffs' statistical analyses do not distinguish between Defendants and non-defendant auction participants *at all*. (*See* CAC at 68 fig.1, 69 fig.2, 72 fig.5.) Those that do distinguish rely on "averages" and medians among the market makers that obscure any given Defendant's contribution to an observed trend. (*See* CAC at 70 fig.3, 71 fig.4, 74 fig.6, 76 fig.7, 77 fig.8.)

These aggregated statistics are not irrelevant to Plaintiffs' claim that a conspiracy existed. But because the statistical analyses lump together the market makers, at best, the allegations evidence a "conspiracy [that] could well have involved some of [the Defendants], or none of them, or a mix of the named defendants and other" market participants. *GSE Bonds*, 2019 WL 4071070, at *8. Thus, in the absence of any other allegations that would allow the Court to infer the participation of the individual Defendants — for example, allegations of specific conduct by

specific defendants, or allegations that because of market makers' role, privileges, and

concomitant obligations in the MGB market, only they and their corporate affiliates *could* have

plausibly engineered the alleged conspiracy[13] — the group statistical pleadings cannot carry the

day.  *Cf. Precision Assocs., Inc. v. Panalpina World Transp., (Holding) Ltd.*, No. CV-08-42,

2013 WL 6481195, at *17 (E.D.N.Y. Sept. 20, 2013) ("[D]ue to the nature of the freight

forwarding industry the price-fixing conspiracies alleged herein would not have worked unless

there was involvement from both the parent company and its subsidiaries . . . ."); *In re London

Silver Fixing, Ltd., Antitrust Litig.*, 213 F. Supp. 3d 530, 561 (S.D.N.Y. 2016) (explaining that

aggregate statistical trends were circumstantial evidence of trading by the defendants because

they were the "only entities" that could have produced the observed phenomenon).

Finally, relying principally on public media reports, Plaintiffs allege that the Mexican

regulatory authorities' investigations in the MGB markets constitute a "plus factor."  (CAC

¶¶ 280–297.)  Plaintiffs characterize these reports as establishing that COFECE and CNBV were

investigating Defendants and had uncovered some evidence of wrongdoing.  (Dkt. No. 146 at

18–19.)

It is far from clear that an ongoing government investigation involving Defendants

would, in the absence of more substantial allegations, weigh in favor of the complaint's

plausibility.  *Cf. In re Commodity Exch., Inc.,* 213 F. Supp. 3d 631, 662 (S.D.N.Y. 2016) ("[T]he

mere fact that regulatory entities have investigated, and may still be investigating, the possibility

---

[13] In their brief in opposition to the motion to dismiss, Plaintiffs argue that "[u]nless all Market Makers agreed to participate in the conspiracy, other market participants would have no trouble finding more favorable price quotes." (Dkt. No. 146 at 20.)  But they cite no allegations for this conclusion, and it is not self-evident from Plaintiffs' other allegations why this would be so.  After all, the market makers were not the only participants in the MGB auctions.  Nor, of course, were they the only participants in the secondary market for MGBs, and the complaint provides no allegations regarding each individual Defendant's market share.

of misconduct . . . is not a plus factor." (internal quotation marks omitted)); *In re London Silver*, 213 F. Supp. 3d at 561 ("[T]he mere fact that regulatory entities are investigating the possibility of . . . misconduct . . . is not a plus factor." (internal quotation marks omitted)); *In re Aluminum Warehousing Antitrust Litig.*, No. 13 MD 2481, 2014 WL 4277510, at *34 (S.D.N.Y. Aug. 29, 2014) (holding that "inquiries or investigations alone can[not] plausibly support an alleged § 1 conspiracy"), *supplemented*, No. 13 MD 2481, 2014 WL 4743425 (S.D.N.Y. Sept. 15, 2014), *and aff'd*, 833 F.3d 151 (2d Cir. 2016); *Hinds Cty.*, 620 F. Supp. 2d at 514 ("This Court agrees that the various investigations, inquiries, and subpoenas do not make the [complaint's] allegations plausible, for the purposes of deciding a motion to dismiss under the standards as laid out in *Twombly* and *Iqbal*.").  *But see GSE Bonds*, 2019 WL 4071070, at *6 (holding, in the context of a claim involving allegations of direct evidence, that "the plausibility of the alleged conspiracy is bolstered, at least to some extent, by the ongoing Department of Justice investigation into the same alleged misconduct.").  But the Court need not decide whether the allegations of ongoing government investigations carry any water in alleging a plausible antitrust conspiracy, because the reports cited by Plaintiffs state nothing about wrongdoing *on behalf* of Defendants here.  Several of the market makers — to say nothing of the dozens of corporate affiliates named in the complaint — are not mentioned *at all* as subjects of the inquiry, beyond the generic assertion that *all participants* in the *entire MGB market* were potentially subject to the government's scrutiny.  (CAC ¶ 287.)  The report describes seven Defendants as the "focus of the probe," but even as to them, it states that "[n]one of [them] has been accused of wrongdoing."  *See* Isabella Cota et al., *Seven Banks Said to Be Focus of Mexico Bond Collusion Probe*, Bloomberg (May 16, 2017), https://www.bloomberg.com/news/articles/2017-05-16/seven-dealers-said-to-be-focus-of-mexico-bond-collusion-probe.  And, even if the Court were

to credit the investigations as a plus factor supporting the involvement of certain Defendants in an antitrust conspiracy, plus factors in the absence of parallel conduct or direct evidence are insufficient to state an antitrust claim.

For the same reason, the allegations that the Defendants shared a common motive to conspire, which would, at best, constitute a plus factor, fail to move the needle.  (*See* Dkt. No. 146 at 19–20.)  Similarly unavailing is Plaintiffs' allegation that the horizontal mobility of employees among Defendants constitutes a plus factor because it fostered a professional and social network that afforded Defendants the "opportunity to conspire."  (CAC ¶¶ 332–345.) Moreover, Plaintiffs do not allege that those personnel took part in the alleged conspiracy, and "[t]he mere opportunity to conspire does not by itself support the inference that such an illegal combination actually occurred."  *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 545 (2d Cir. 1993).  And though, as Plaintiffs emphasize, some Defendants have conspired in other markets in recent years, the Second Circuit has expressly rejected this sort of "if it happened there, it could have happened here" reasoning.  *In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007) (per curiam).  These arguments therefore cannot revive Plaintiffs' deficient pleadings.

Because Plaintiffs' group pleading is fatal to their Sherman Act claims, the Court declines to reach the myriad other issues raised by Defendants.

### B.      Unjust Enrichment Claims

Finally, Defendants argue that to the extent the antitrust claims have been found lacking, so too must the unjust enrichment claims.  (*See* Dkt. No. 114 at 39.)  "[W]ithout a viable underlying claim of illegality, an unjust enrichment claim must be dismissed."  *In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 500 (S.D.N.Y. 2017) (citation and internal quotation marks omitted); *see also In re Aluminum Warehousing*, 2014 WL 4743425, at *4

(dismissing unjust enrichment claims predicated on dismissed antitrust violations); *Kramer v. Pollock-Krasner Found.*, 890 F. Supp. 250, 257 (S.D.N.Y. 1995) (dismissing an unjust enrichment claim because it "'hinges on . . . practices claimed by plaintiff to be illegal' . . . [but] the allegations of illegality in the complaint fail" (first alteration in original) (quoting *Sands v. Ticketmaster-N.Y., Inc.*, 616 N.Y.S.2d 362, 364 (1st Dep't 1994)).  Plaintiffs do not seriously contest this principle's application here.  Though they assert that the elements of an unjust enrichment claim and an antitrust claim are not coextensive, the difference they identify (that Plaintiffs need not be "efficient enforcers" to prevail on their unjust enrichment claim) is not the basis of this dismissal and is therefore inapposite.  (*See* Dkt. No. 146 at 46.)  Dismissal of the Sherman Act claims compels dismissal of the unjust enrichment claims as well.

## IV.   Conclusion

For the foregoing reasons, Defendants' motion to dismiss for failure to state a claim is GRANTED.  Foreign Defendants' motion to dismiss for lack of personal jurisdiction is DENIED as moot.  Within twenty-one days of the date of this Opinion and Order, Plaintiffs shall file a letter informing the Court whether they intend to move for leave to file a Second Consolidated Amended Complaint and, if so, explaining why leave should be granted.

The Clerk of Court is directed to close the motion at Docket Number 113.

SO ORDERED.

Dated: September 30, 2019
      New York, New York

_____
J. PAUL OETKEN
United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE: MEXICAN GOVERNMENT
BONDS ANTITRUST LITIGATION

18-CV-2830 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

In this consolidated putative class action, Plaintiffs allege that Defendants — several

banks and related affiliates — conspired to manipulate the market for certain debt securities

issued by the Mexican government.  A subset of Defendants[1] ("Moving Defendants") move to

dismiss the complaint for lack of personal jurisdiction and improper venue, pursuant to Federal

Rules of Civil Procedure 12(b)(2) and 12(b)(3), respectively.  For the reasons that follow, the

motion to dismiss for lack of personal jurisdiction is granted.[2]

---

[1] Moving Defendants are Banco Nacional de México, S.A., Institución de Banca
Múltiple, Grupo Financiero Banamex; Banco Santander (México), S.A., Institución de Banca
Múltiple, Grupo Financiero Santander México; Bank of America México, S.A., Institución de
Banca Multiple, Grupo Financiero Bank of America; BBVA Bancomer S.A., Institución de
Banca Múltiple, Grupo Financiero BBVA Bancomer; Deutsche Bank México, S.A., Institutión
de Banca Múltiple; HSBC México, S.A., Institución de Banca Múltiple, Grupo Financiero
HSBC.

[2] The Court also grants the pending motions to seal various materials submitted in
connection with this motion.  (*See* Dkt. Nos. 177, 202.)  The material sought to be sealed pertains
to ongoing criminal proceedings in Mexico, and the disclosure thereof may impede the ongoing
action.  (*See* Dkt. No. 165.)  Accordingly, for the reasons described at greater length in the
Court's opinion at Docket Number 165 granting a related motion, the Court concludes that the
standard for sealing materials set out in *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110 (2d
Cir. 2006), are met here.

## I.      Background

The following facts are taken from the Second Consolidated Amended Class Action

Complaint (Dkt. No. 163 ("SAC")) unless otherwise noted.

As this Court has previously explained in greater detail, Mexican government bonds

("MGBs") are debt securities issued and backed by the Mexican government.  (SAC ¶ 291.)  The

Bank of Mexico ("Banxico") issues MGBs via auctions that typically occur once a week.  (SAC

¶¶ 293–94.)  Participation in the auctions is limited to a group of pre-approved financial

institutions, consisting mostly of Banxico-designated "Market Makers."  (SAC ¶¶ 294–96, 316–

20.)  (All of the Moving Defendants participate in the "Market Maker Program" for MGBs,

which helps guarantee liquidity in the MGB market.  (SAC ¶¶ 294–96, 316–20.)  After the

MGBs are issued via the auction, they may be resold in the MGB over-the-counter market.

(SAC ¶ 322.)

Moving Defendants are all Mexico-based banks, so their United States MGB over-the-

counter trading involved an MGB trading desk in Mexico, a United States (non-party) affiliate's

sales desk located in New York, and a broker-dealer affiliate. (SAC ¶ 66.)  Employees on the

New York sales desks were primarily responsible for marketing MGBs to investors in the United

States.  (SAC ¶¶ 76–79.)  For example, the sales desks managed customer relationships, made

sales calls, distributed trade ideas to U.S. investors, and arranged MGB trades with the

Defendant's U.S. customers.  (SAC ¶¶ 95, 110–11, 114–15 131–32, 139, 156–58, 160–62, 176–

78, 180–82, 197–99, 203–04, 216–17, 220–22, 229.)  Each time a customer in the United States

contacted a sales desk in New York to trade MGBs, the sales desk forwarded the customer

request to Defendants in Mexico to determine a price. (SAC ¶¶ 81–87.)  The Defendants'

Mexico-based MGB traders were responsible for pricing the trade and sending the price back to

the New York sales desk, either by telephone or electronically, so that the sales desk could offer

the price to the customer in the United States.  *Id.*  Each time a customer accepted a price quoted by a Defendant for an MGB sale, the Defendant's MGB traders distributed MGBs by executing a "back-to-back" transaction in which the Defendant transferred MGBs to a broker-dealer, and simultaneously executed an equal and offsetting transaction with the customer to send the MGBs to the customer's account in the United States.  (*See, e.g.,* SAC ¶¶ 84–87, 123–24, 149-50, 167–68, 188–89, 210–11, 223–30.)

Plaintiffs are U.S. pension funds alleging that they purchased or sold MGBs though these distribution channels at supra-competitive prices as a result of Defendants' conspiracy.  (*See* SAC at 7–10.)  They filed the present action March 30, 2018, and filed an amended complaint on July 18, 2018, alleging that Defendants had conspired to fix the weekly MGB auction, to fix the bid-ask spread on the secondary market, and to otherwise inflate the price of resold MGBs.  (*See* Dkt. Nos. 1, 75.)  On September 30, 2019, this Court granted a motion to dismiss the then-operative complaint, which named as defendants both foreign and domestic entities, for failure to state a claim.  *See In re Mexican Gov't Bonds Antitrust Litig.*, 412 F. Supp. 3d 380, 392 (S.D.N.Y. 2019) ("MGB I").  It also dismissed as moot the foreign defendants' motion to dismiss for lack of personal jurisdiction.  (*Id.*)  Thereafter, Plaintiffs filed the Second Amended Consolidated Class Action Complaint (Dkt. No. 163, "SAC"), which names as defendants only a subset of the initial defendants, and only foreign entities.  Those foreign entities, the Moving Defendants, now move to dismiss the SAC for lack of personal jurisdiction and improper venue, largely renewing the arguments from their first motion to dismiss.

## II.   Legal Standard

To survive a Rule 12(b)(2) motion to dismiss, a plaintiff "bears the burden of demonstrating personal jurisdiction over a person or entity against whom it seeks to bring suit." *Penguin Gr. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d Cir. 2010) (citation omitted).  In the

absence of a "full-blown evidentiary hearing on the motion," the plaintiff is required to make only "a prima facie showing" that jurisdiction exists. *Schultz v. Safra Nat'l Bank*, 377 F. App'x. 101, 102 (2d Cir. 2010) (citation omitted). Such a showing must satisfy three elements: "(1) proper service of process upon the defendant; (2) a statutory basis for personal jurisdiction; and (3) accordance with constitutional due process principles." *Eternal Asia Supply Chain Mgmt. (USA) Corp. v. Yian Chen*, 12 Civ. 6390, 2013 WL 1775440, at *3 (S.D.N.Y. Apr. 25, 2013) (citation omitted). These elements must be met with "factual specificity"; conclusory allegations will not suffice. *Cont'l Indus. Grp., Inc. v. Equate Petrochemical Co.*, 586 F. App'x 768, 769 (2d Cir. 2014) (citation omitted).

## III.   Discussion

Moving Defendants argue principally that the Court's exercise of personal jurisdiction over them would not comport with due process.

"The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful contacts, ties, or relations." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471–72 (1985) (citation omitted). Accordingly, "the exercise of personal jurisdiction must comport with constitutional due process principles." *Licci*, 673 F.3d at 60. As the Second Circuit has explained:

> Due process permits a court to exercise personal jurisdiction over a non-resident where the maintenance of the suit would not offend traditional notions of fair play and substantial justice. To determine whether this is so, we apply a two-step analysis in any given personal jurisdiction case. First, we ask whether the defendant has sufficient minimum contacts with the forum to justify the court's exercise of personal jurisdiction . . . . If the defendant has sufficient minimum contacts, we proceed to the second stage of the due process inquiry, and consider whether the assertion of personal jurisdiction is reasonable under the circumstances of the particular case.

*Porina v. Marward Shipping Co., Ltd.*, 521 F.3d 122, 127 (2d Cir. 2008) (quotation marks and internal citations omitted).

Courts recognize two forms of personal jurisdiction, specific and general, but only specific is claimed here. "[S]pecific jurisdiction exists when a State exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum." *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567–68 (2d Cir. 1996) (quotation marks and citations omitted). "[I]t is essential . . . that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958).

Plaintiffs advance three independent theories of specific jurisdiction: first, that Moving Defendants purposefully availed themselves of the United States by marketing and transacting MGBs here via their non-party affiliates' New York desks; second, that Moving Defendants are subject to personal jurisdiction based on the effects on the Plaintiffs in the United States; and third, that Moving Defendants are subject to personal jurisdiction on a conspiracy jurisdiction theory. (*See* Dkt. No. 201.)

The issues raised in this case — namely, the conditions under which foreign banks may be haled into court in the United States to answer for alleged anticompetitive conduct abroad — have arisen frequently in recent years. The Court is therefore guided by the decisions of the Second Circuit and other judges in this District who have already tread this ground. The leading case in this Circuit (and, as explained below, the dispositive authority in this case) is *Charles Schwab Corp. v. Bank of America Corp.*, 883 F.3d 68 (2d Cir. 2018). In *Schwab*, purchasers of certain financial instruments that incorporated the London Interbank Offered Rate ("LIBOR")

sued several banks for having allegedly fixed that rate. *Id.* at 78. The fixing of the rate occurred

in London, but the sales of the instruments occurred in the forum state. *Id.* at 83. The Second

Circuit held that due process generally "require[s] that the plaintiff show some sort of causal

relationship between a defendant's U.S. contacts and the episode in suit, and the plaintiff's claim

must in some way 'arise from the defendants' purposeful contacts with the forum." *Id.* at 84.

Thus, the Court held, there existed no personal jurisdiction over the defendants with respect to

the claim that Defendants committed fraud through their daily LIBOR submissions, even though

the same Defendants later sold the instruments, which incorporated the fraudulent rate, to

plaintiffs in California, the forum state. *Id.* at 83–84. By way of distinction, the Court held that

state-law fraud claims grounded in misrepresentations made during the sales process in

California could proceed, because the unlawful conduct arose from those contacts. *Id.*

The upshot of *Schwab* is that purposeful availment in antitrust cases generally requires

in-forum contacts that bear a causal relationship to defendants' *wrongdoing*, not merely to

plaintiff's *harm*. Applying that principle here, the Court cannot conclude that Defendants'

contacts confer personal jurisdiction over them. Even if Defendants established contacts with the

forum by marketing and selling MGBs in the United States via the non-party affiliates' trade

desks and broker dealers, as Plaintiffs claim, a conspiracy does not "arise from" an *ex post*

attempt to profit from the conspiracy. *See id.* at 12. Defendants' alleged antitrust violations

instead arise from three discrete but related schemes: the conspiracy to fix the Banxico MGB

auctions; the conspiracy to sell MGBs in the over-the-counter market at inflated prices; and the

alleged conspiracy to fix the bid-ask spread. Each of those agreements occurred in Mexico

alone. (*See* SAC at 148–150.)

Plaintiffs insist that their claims "arise out of" sales in New York because in the absence of the sales, they would not have been injured and therefore they would not have had antitrust standing to bring the claims.  (*See* Dkt. No. 201 at 8–9.)  But the antitrust standing requirement goes to the question whether "the plaintiff is a proper party to bring a private antitrust action," *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 157 (2d Cir. 2016), not whether there has been a violation of the law in the first instance.  If conduct satisfying such a requirement can supply the relevant causal nexus, then virtually any time a plaintiff has statutory standing — or even *constitutional* standing — arising out of an injury in the forum state, personal jurisdiction could be exercised over the defendant.  Plaintiff's theory is therefore at odds with *Schwab*'s emphasis on the contacts that cause the defendant's allegedly unlawful conduct, rather than the contacts that provide the relevant jurisdictional hooks.

Nor can Plaintiffs invoke "the so-called 'effects test,'" under which personal jurisdiction is "invoked where . . . the conduct that forms the basis for the controversy occurs entirely out-of-forum, and the only relevant jurisdictional contacts with the forum are therefore in-forum effects harmful to the plaintiff." *In re Platinum & Palladium Antitrust Litig.*, No. 14 Civ. 9391, 2017 WL 1169626, at *42 (S.D.N.Y. 2017) (citation omitted).  For such claims, "the exercise of personal jurisdiction may be constitutionally permissible if the defendant expressly aimed its conduct at the forum."  *See Licci*, 732 F.3d at 173 (citing *Calder v. Jones*, 465 U.S. 783, 789 (1983) (emphasis added).)  Harmful effects alone, however, will not establish jurisdiction: "'[T]he fact that harm in the forum is foreseeable . . . is insufficient for the purpose of establishing specific personal jurisdiction over a defendant.'"  *Waldman*, 835 F.3d at 339 (quoting *In re Terrorist Attacks*, 714 F.3d at 674).

Again, *Schwab* controls.  In *Schwab*, the Court held that the defendants who had fixed LIBOR in London and then later sold LIBOR-incorporating instruments to plaintiffs in California had not "expressly aimed" their conduct at California; instead, those facts indicated "mere foreseeability."  *Schwab*, 883 F.3d at 87.  This was so *even though* defendants there actively and intentionally sought to profit from their manipulation via conduct in California.  *See id.*  The Court sees no distinction between the profit-driven, injury-imposing sales at issue in *Schwab* and the profit-driven, injury-imposing sales here.[3]

Plaintiffs also claim that conspiracy jurisdiction provides an independent and sufficient basis upon which personal jurisdiction may rest.  A party seeking to invoke conspiracy jurisdiction must allege (1) the existence of a conspiracy, (2) that each defendant participated in the conspiracy, and (3) that a co-conspirator committed "overt acts in furtherance of the conspiracy" within the forum.  *In re SSA Bonds Antitrust Litig.*, 420 F. Supp. 3d 219, 236 (S.D.N.Y. 2019).  But here, the alleged co-conspirators — the hook to the third element — are other similarly situated Moving Defendants.  Having determined that none of the Moving Defendants is subject to personal jurisdiction in its own right, or has purposely availed itself of the forum for the purposes of this lawsuit, the Court cannot find that they are nonetheless subject to personal jurisdiction because of their alleged affiliation with one another.  The doctrine of conspiracy jurisdiction does not permit Plaintiffs to turn nothing into something.

---

[3] The pre-*Schwab* decision cited by Defendants does not change this conclusion.  In *In re Magnetic Audiotape Antitrust Litigation*, 334 F.3d 204 (2d Cir. 2003), the Second Circuit held that plaintiffs were entitled to jurisdictional discovery because they had alleged that the defendant had participated in a meeting in which a scheme to specifically fix prices in the United States were discussed.  *See id.* at 207–08.  No analogous allegation exists here: the alleged agreements involved *all* MGBs *globally*, and thus the agreement itself, at its formation, was not "expressly aimed" at the United States.

The foregoing analysis applies with equal force to Plaintiffs' unjust enrichment claims. Plaintiffs argue that because *Schwab* allowed certain state-law claims premised on in-forum contacts to proceed, the unjust enrichment claims here should proceed because the transactions in the forum generated the unjust enrichment.  (*See* Dkt. No. 10–11.)  But in distinction to the state claims allowed in *Schwab*, which were premised on distinct misrepresentations furnished in the process of selling the instruments in California, *see Schwab*, 883 F.3d at 83–84, the underlying illegal conduct upon which the unjust enrichment claim here is premised is the same as the antitrust claims, and the same jurisdictional issues therefore plague the unjust enrichment claims.

One may fairly question the wisdom of *Schwab*'s parsimonious approach to personal jurisdiction, particularly in light of arguably more generous attitude the Supreme Court has taken in the cases *Schwab* purports to interpret.  *See generally Calder*, 465 U.S. 783.  And clarity on this score may be in the offing: the Supreme Court is currently considering the extent to which due process requires a causal nexus between defendants' contacts in the forum and the claims. *See* Petition for a Writ of Certiorari, *Ford Motor Company v. Bandemer*, No. 19-368, 2019 WL 4598227 (U.S. Sept. 18, 2019).  But unless and until the Supreme Court weighs in, this Court is bound to apply the Second Circuit's precedents faithfully and to give their reasoning full effect. And the understanding of *Schwab* set out herein is consistent with the weight of authority in this district.  *See, e.g., In re ICE LIBOR Antitrust Litig.*, No. 19 Civ. 439, 2020 WL 1467354, at *3 n.9 (S.D.N.Y. Mar. 26, 2020) (analyzing profit-driven antitrust conspiracy claims and concluding that plaintiffs must allege a "'causal relationship' between . . . defendants' conspiracy to set rates and their respective trading activities in the United States"); *Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, 204-06 (S.D.N.Y. 2018) ("*BBSW I*") (same); *Contant v. Bank of Am. Corp.*, 385 F. Supp. 3d 284, 294 (S.D.N.Y. 2019) ("The overt acts in furtherance of the conspiracy are the actions undertaken to accomplish the price fixing (i.e., the manipulation of the FX market), not

the sale of FX instruments at prices affected by the price fixing.")  That opinion compels the determination that the Court lacks personal jurisdiction over Moving Defendants.

Finally, Plaintiffs request leave to conduct "limited discovery to confirm that Defendants fixed the prices of Plaintiffs' in-forum MGB trades."  (Dkt. No. 201 at 29–30.)  Courts have "broad discretion in determining whether or not to permit discovery aimed at establishing personal jurisdiction."  *Vista Food Exchange, Inc. v. Champion Foodservice, LLC*, 124 F. Supp. 3d 301, 313 (S.D.N.Y. 2015) (internal quotation marks and citation omitted).  The party seeking discovery bears the burden of "showing necessity."  *Molchatsky v. United States*, 778 F. Supp. 2d 421, 438 (S.D.N.Y. 2011).  Where a plaintiff fails to establish a prima facie case for jurisdiction, "a district court does not err in denying jurisdictional discovery."  *Vista*, 124 F. Supp. 3d at 314; *see also Best Van Lines Inc. v. Walker*, 490 F.3d 239, 255 (2d Cir. 2007) ("We conclude that the district court acted well within its discretion in declining to permit discovery because the plaintiff had not made out a prima facie case for jurisdiction.").  A court may also deny jurisdictional discovery where "additional discovery would not uncover unknown facts or cure the deficiencies in the Plaintiff's pleading."  *Vista*, 124 F. Supp. 3d at 314 (internal quotation marks and citation omitted).

As discussed, Plaintiffs have failed to make a prima facie case for personal jurisdiction. The Court sees no way in which additional discovery would cure the jurisdictional defects at issue.  Accordingly, Plaintiffs' request for jurisdictional discovery is denied.

## IV.    Conclusion

For the foregoing reasons, Moving Defendants' motion to dismiss is GRANTED. Plaintiffs' motions to file certain materials under seal are GRANTED.

The Clerk of Court is directed to close the motion at Docket Numbers 165, 176, 177, and

202.

SO ORDERED.

Dated:  November 30, 2020
         New York, New York

_____
              J. PAUL OETKEN
         United States District Judge

11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: MEXICAN GOVERNMENT BONDS ANTITRUST LITIGATION | 18-CV-2830 (JPO)<br><br>OPINION AND ORDER |

J. PAUL OETKEN, District Judge:

In this consolidated putative class action, Plaintiffs allege that Defendants conspired to manipulate the market for certain debt securities issued by the Mexican government. On November 30, 2020, the Court granted a motion to dismiss the complaint for lack of personal jurisdiction from a subset of the Defendants ("Moving Defendants").[1] Plaintiffs have filed a motion for reconsideration of that order. For the reasons that follow, the motion for reconsideration is denied.

## I.      Background

### A.      Factual Background

As previously explained in greater detail, Plaintiffs are U.S. pension funds alleging that they purchased or sold Mexican government bonds through certain distribution channels. (*See* Dkt. No. 163 ("SAC") at 7-10.) The Second Consolidated Amended Class Action Complaint generally alleges that several banks and related affiliates conspired to sell Mexican government bonds ("MGB") through those channels at supra-competitive prices. (*See id.*)

---

[1] The Moving Defendants are Banco Nacional de México, S.A., Institución de Banca Múltiple, Grupo Financiero Banamex; Banco Santander (México), S.A., Institución de Banca Múltiple, Grupo Financiero Santander México; Bank of America México, S.A., Institución de Banca Multiple, Grupo Financiero Bank of America; BBVA Bancomer S.A., Institución de Banca Múltiple, Grupo Financiero BBVA Bancomer; Deutsche Bank México, S.A., Institución de Banca Múltiple; and HSBC México, S.A., Institución de Banca Múltiple, Grupo Financiero HSBC.

The alleged conspiracy works like this: The Bank of Mexico issues Mexican government bonds in an auction each week.  (*See* SAC ¶¶ 293-94.)  The auction is limited to a group of pre-approved financial institutions, designated "Market Makers."  (*See* SAC ¶¶ 294-96, 316-20.)  Those institutions include the Moving Defendants.  (*See* SAC ¶¶ 294-96, 316-20.)  Once issued bonds, the Moving Defendants may sell them in the over-the-counter market.  (*See* SAC ¶ 322.)

As relevant here, the Moving Defendants are all Mexico-based banks.  (*See* SAC ¶ 66.)  When they sell a bond in the over-the counter market, they use an MGB trading desk in Mexico, a nonparty affiliate's sales desk in New York, and a nominal broker-dealer affiliate.  (*See id.*)  In a typical sale, a customer from the United States would contact a sales desk in New York to trade MGBs.  (*See* SAC ¶¶ 81-87.)  The sales desk would forward the customer request to the MGB trading desk in Mexico.  (*See id.*)  The MGB trading desk would determine a price, which it would send to the sales desk in New York by telephone or electronically.  (*See id.*)  The sales desk in New York would offer the price to the customer.  (*See id.*)

If a customer accepted, the MGB trading desk in Mexico would distribute the bonds.  (*See, e.g.*, SAC ¶¶ 84-87, 123-24, 149-50, 167-68, 188-89, 210-11, 223-30.)  They would execute a "back-to-back" transaction.  (*See id.*)  That means that the trading desk would transfer the bonds to a broker-dealer, who would simultaneously execute a transaction with the customer.  (*See id.*)  The customer would receive the bonds in his account in the United States.  (*See id.*)

### B.     Procedural History

The Court granted a motion to dismiss the SAC for lack of personal jurisdiction on November 30, 2020.  (*See* Dkt. No. 222 ("Opinion and Order") at 11.)  As relevant here, the Court concluded that the exercise of jurisdiction would not comport with constitutional due process.  (*See* Opinion and Order at 4.)  In doing so, the Court rejected Plaintiffs' argument that there was specific jurisdiction over the Moving Defendants.  *See id.* at 5.  The Court concluded

that the "dispositive authority" on the issue was *Charles Schwab Corp. v. Bank of America Corp.*, 883 F.3d 68 (2d Cir. 2018).  *Id.*  In *Schwab*, as here, the fixing of the rate occurred outside of the United States, but the sales of the instruments occurred in the United States.  *See id.* at 5.  The Court read *Schwab* to conclude that there was no specific jurisdiction over claims that the defendants there had submitted fraudulent rates, but there was specific jurisdiction over claims that the defendants had made misrepresentations during sales.  *See id.* at 5-6.  Applying *Schwab*, the Court concluded that there was no specific jurisdiction over Plaintiffs' antitrust claims because the alleged wrongful conduct — conspiring to fix MGB auctions, conspiring to inflate MGB prices, and conspiring to fix the bid-ask spread — occurred in Mexico.  *Id.* at 6.  And it concluded that there was no specific jurisdiction over Plaintiffs' unjust enrichment claim because it was based on the same allegedly wrongful conduct.  *See id.* at 9.  Accordingly, the Court granted the Moving Defendants' motion to dismiss.  *See id.* at 10.

Plaintiffs have moved for reconsideration under Federal Rule of Civil Procedure 54(b), arguing that *Ford Motor Co. v. Montana Eighth Judicial District Court*, 141 S. Ct. 1017 (2021), reflects an intervening change in law that compels a different result.  (*See* Dkt. No. 228.)

## II.    Legal Standard

Federal Rule of Civil Procedure 54(b) provides that "any order or other decision . . . that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties . . . may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."  The standard for a motion for reconsideration is "strict."  *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995).  It is "not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a 'second bite at the apple.'"  *Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012).  Rather, the moving party must "point to controlling decisions or data that

the court overlooked — matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader*, 70 F.3d at 257.  Typically, the moving party must identify "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992).

## III.   Discussion

### A.   Timeliness

Plaintiffs' motion for reconsideration is denied as untimely.  Local Rule 6.3 directs a party to file a notice of motion for reconsideration "within fourteen (14) days after the entry of the Court's determination of the original motion."  Plaintiffs did not do so, nor did they ask for an extension.  Plaintiffs protest that they rely on an intervening change in law, and *Ford Motor Co. v. Montana Eighth Judicial District Court*, 141 S. Ct. 1017 (2021), had not been decided at the time.  But the Court's order highlighted *Ford* in the order granting the Moving Defendants' motion to dismiss for lack of jurisdiction, which placed Plaintiffs on notice that *Ford* might bear on the relevant law, and Plaintiffs could have asked for an extension at that time.  In any event, Plaintiffs did not file a motion for reconsideration within fourteen days of that decision either; they waited nearly two months after *Ford* to raise their objection.  The motion is untimely.

### B.   Merits

Plaintiffs' motion for reconsideration is also denied as unpersuasive.  Plaintiffs move for reconsideration on the ground that the Court is no longer bound by *Charles Schwab Corp. v. Bank of America Corp.*, 883 F.3d 68 (2d Cir. 2018).  But the facts there are indistinguishable.  In *Schwab*, the alleged misconduct — setting fraudulent rates — took place outside of the United States, the sales of the instruments took place in the United States, and those sales did not give rise to specific jurisdiction over a fraud claim.  *See id.* at 83-84.  Here, the alleged misconduct —

conspiring to fix auctions, prices, and a bid-ask spread — took place outside of the United States, and the sales of the instruments took place in the United States. Those sales must also not give rise to specific jurisdiction over an antitrust claim. There, as here, the sales were not part of the misconduct in the suit. Nor is there any other legally recognized connection that might justify specific jurisdiction. The Court is "bound" by *Schwab* "unless and until that case is reconsidered by [the Second Circuit] sitting in banc (or its equivalent) or is rejected by a later Supreme Court decision." *Monsanto v. United States*, 348 F.3d 345, 351 (2d Cir. 2003).

Plaintiffs argue that *Ford Motor Co. v. Montana Eighth Judicial District Court*, 141 S. Ct. 1017 (2021), displaced *Schwab*. But *Ford* and *Schwab* are not irreconcilable. *Ford* is not about the sale of financial instruments; not about rate-setting; and not about fraud or conspiracy. *See Ford*, 141 S. Ct. at 1022-1025. And *Ford*, by its terms, does not compel the conclusion that there *is* specific jurisdiction over foreign misconduct based on sales in the United States like those in *Schwab*. At most, *Ford* undermines the rationale leading to *Schwab*'s bottom line. *Schwab* held that specific jurisdiction over the fraud claim did not exist in part because the "transactions did not cause Defendants' . . . submissions . . . , nor did the transactions in some other way give rise to claims seeking to hold Defendants liable for those submissions." *Schwab*, 883 F.3d at 84. *Ford* holds that "some relationships will support jurisdiction without a causal showing." *Ford*, 141 S. Ct. at 1026. If the Second Circuit thinks that *Schwab* reflects one of those relationships, it is for the Second Circuit to say so. For a district court to ignore binding Second Circuit precedent, it is not enough for a Supreme Court decision to be in "tension" with that precedent. *Monsanto*, 348 F.3d at 351. It must be "all but certain" that the Second Circuit precedent will be overruled. *United States v. Emmenegger*, 329 F. Supp. 2d 416, 429 (S.D.N.Y. 2004) (Lynch, J.); *see United States v. Diaz*, 122 F. Supp. 3d 165, 179 (S.D.N.Y. 2015)

(articulating test as whether Supreme Court decision "so undermines [the precedent] that it will almost inevitably be overruled by the Second Circuit").  It is not all but certain that the Second Circuit will overrule *Schwab*.  Accordingly, Plaintiff's motion for reconsideration is denied.

## IV.    Conclusion

For the foregoing reasons, Plaintiffs' motion for reconsideration is DENIED.

The Clerk of Court is directed to close the motion at Docket Number 228.

SO ORDERED.

Dated: March 30, 2022
       New York, New York

_____
              J. PAUL OETKEN
         United States District Judge

6

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------X

IN RE MEXICAN GOVERNMENT BONDS
ANTITRUST LITIGATION

                                                        18 **CIVIL** 2830 (JPO)

                                                        <u>**JUDGMENT**</u>

----------------------------------------------------------X


       It is hereby **ORDERED, ADJUDGED AND DECREED:**  That for the reasons
stated in the Court's Order dated August 17, 2022, the letter request at Docket Number 280 is
granted. Final judgment is entered in this case pursuant to Rule 58 of the Federal Rules of Civil
Procedure. When a court "has dismissed all of the served defendants, and only unserved
defendants 'remain,' there is no reason to preclude the immediate and automatic entry of a final
judgment, as there is no basis for believing that there will be any further adjudications in the
action." Cotton v. McCarthy, 383 F. App'x 26, 27 (2d Cir. 2010) (citing Leonhard v. United
States, 633 F.2d 599, 608 (2d Cir. 1980)). That is the case here; accordingly, the case is closed.

**Dated:**  New York, New York

     August 17, 2022


                                                        **RUBY J. KRAJICK**
                                                _____
                                                        **Clerk of Court**
                                        **BY:**
                                                        *K. Mango*
                                                _____
                                                        **Deputy Clerk**

**SA 37**