# 22-2039-cv

## United States Court of Appeals

*for the*

## Second Circuit

---

OKLAHOMA FIREFIGHTERS PENSION & RETIREMENT SYSTEM, ELECTRICAL WORKERS PENSION FUND LOCAL 103, I.B.E.W., GOVERNMENT EMPLOYEES RETIREMENT SYSTEM OF THE VIRGIN ISLANDS, MANHATTAN AND BRONX SURFACE TRANSIT OPERATING AUTHORITY PENSION PLAN, METROPOLITAN TRANSPORTATION AUTHORITY DEFINED BENEFIT PENSION PLAN MASTER TRUST, BOSTON RETIREMENT SYSTEM, UNITED FOOD AND COMMERCIAL WORKERS UNION AND PARTICIPATING FOOD INDUSTRY EMPLOYERS TRI-STATE PENSION FUND, SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY, on behalf of themselves and all other similarly situated,

*Plaintiffs-Appellants,*

– v. –

*(For Continuation of Caption See Inside Cover)*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

## BRIEF FOR DEFENDANTS-APPELLEES

---

ADAM S. HAKKI
SHEARMAN & STERLING LLP
*Attorneys for Defendant-Appellee*
  *Bank of America Mexico, S.A.,*
  *Institucion de Banca Multiple,*
  *Grupo Financiero Bank of*
  *America*
599 Lexington Avenue
New York, New York 10022
(212) 848-4000

BORIS BERSHTEYN
SUSAN SALTZSTEIN
KAMALI P. WILLETT
KARTIK NARAM
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
*Attorneys for Defendant-Appellee HSBC*
  *Mexico, S.A., Institucion de Banca Multiple,*
  *Grupo Financiero HSBC*
One Manhattan West
New York, New York 10001
(212) 735-3000

*(For Continuation of Appearances See Inside Cover)*

BANCO SANTANDER (MEXICO) S.A. INSTITUCION DE BANCA MULTIPLE, GRUPO FINANCIERO SANTANDER MEXICO, BBVA BANCOMER S.A., INSTITUCION DE BANCA MULTIPLE, GRUPO FINANCIERO BBVA BANCOMER, HSBC MEXICO, S.A., INSTITUCION DE BANCA MULTIPLE, GRUPO FINANCIERO HSBC, BANCO NACIONAL DE MEXICO, S.A., INSTITUCION DE BANCA MULTIPLE, GRUPO FINANCIERO BANAMEX, BANK OF AMERICA MEXICO, S.A., INSTITUCION DE BANCA MULTIPLE, GRUPO FINANCIERO BANK OF AMERICA, DEUTSCHE BANK MEXICO, S.A. INSTITUCION DE BANCA MULTIPLE,

*Defendants-Appellees,*

BANCO SANTANDER, S.A., SANTANDER INVESTMENT SECURITIES INC., SANTANDER HOLDINGS USA, INC., SANTANDER INVESTMENT BOLSA, SOCIEDAD DE VALORES, S.A.U., BANCO BILBAO VIZCAYA ARGENTARIA, S.A., BBVA SECURITIES INC., BBVA COMPASS BANCSHARES, INC., GRUPO FINANCIERO BBVA BANCOMER, S.A. DE C.V., JPMORGAN CHASE & CO., JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, JP MORGAN SECURITIES LLC, J.P. MORGAN BROKER-DEALER HOLDINGS, INC., HSBC HOLDINGS PLC, HSBC BANK PLC, HSBC SECURITIES (USA) INC., HSBC MARKETS (USA) INC., HSBC NORTH AMERICA HOLDINGS INC., HSBC LATIN AMERICA HOLDINGS (UK) LIMITED, BARCLAYS PLC, BARCLAYS CAPITAL PLC, BARCLAYS CAPITAL INC., BARCLAYS BANK PLC, GRUPO FINANCIERO BARCLAYS MEXICO, S.A. DE C.V., CITIGROUP INC., CITIGROUP GLOBAL MARKETS INC., CITIGROUP FINANCIAL PRODUCTS INC., CITIGROUP GLOBAL MARKETS HOLDINGS INC., BANK OF AMERICA N.A., BANK OF AMERICA CORPORATION, BANKAMERICA INTERNATIONAL FINANCIAL CORPORATION, MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, DEUTSCHE BANK AG, DEUTSCHE BANK SECURITIES, INC., DEUTSCHE BANK AMERICAS HOLDING CORP., J.P. MORGAN SECURITIES PLC, GRUPO FINANCIERO BANAMEX S.A. DE C.V., BANCO J.P. MORGAN, S.A. INSTITUCION DE BANCA MULTIPLE, J.P. MORGAN GRUPO FINANCIERO, BARCLAYS CAPITAL SECURITIES LIMITED, BARCLAYS BANK MEXICO, S.A., INSTITUCION DE BANCA MULTIPLE, GRUPO FINANCIERO BARCLAYS MEXICO, CREDIT SUISSE GROUP AG, CREDIT SUISSE AG, BANCO CREDIT SUISSE (MEXICO) S.A., ING GROEP N.V., ING BANK, N.V., ING FINANCIAL MARKETS LLC, GRUPO FINANCIERO CREDIT SUISSE (MEXICO), S.A. DE C.V., UBS BANK MEXICO, S.A., INSTITUCION DE BANCA MULTIPLE, UBS GRUPO FINANCIERO, JOHN DOES 1- 10,

*Defendants.*

ALAN SCHOENFELD
WILMER CUTLER PICKERING HALE
    AND DORR LLP
*Attorneys for Defendant-Appellee Banco*
    *Santander (Mexico) S.A. Institucion*
    *de Banca Multiple, Grupo Financiero*
    *Santander Mexico*
Seven World Trade Center
250 Greenwich Street
New York, New York 10007
(212) 230-8800

LEV L. DASSIN
ROGER A. COOPER
SAMUEL LEVANDER
CLEARY GOTTLIEB STEEN
    & HAMILTON LLP
*Attorneys for Defendant-Appellee Banco*
    *Nacional de Mexico, S.A., Institucion*
    *de Banca Multiple, Grupo Financiero*
    *Banamex*
One Liberty Plaza
New York, New York 10006
(212) 225-2000

JOHN TERZAKEN
KAREN M. PORTER
SIMPSON THACHER & BARTLETT LLP
*Attorneys for Defendant-Appellee*
    *Deutsche Bank Mexico, S.A.*
    *Institucion de Banca Multiple*
900 G Street, NW
Washington, DC 20001
(202) 636-5500

PAUL S. MISHKIN
CAROLINE STERN
DAVIS POLK & WARDWELL LLP
*Attorneys for Defendant-Appellee BBVA*
    *Bancomer, S.A., Institucion de Banca*
    *Multiple, Grupo Financiero BBVA*
    *Bancomer*
450 Lexington Avenue
New York, New York 10017
(212) 450-4000

## CORPORATE DISCLOSURE STATEMENT

### 1. Banco Nacional de México, S.A., Institución de Banca Múltiple, Grupo Financiero Banamex

Defendant Banco Nacional de México, S.A., Institución de Banca Múltiple, Grupo Financiero Banamex is an indirect, wholly-owned subsidiary of Citigroup Inc. Citigroup Inc., a publicly held corporation, has no parent corporation and no publicly held corporation owns 10% or more of its stock.

### 2. Banco Santander (México), S.A., Institución de Banca Múltiple, Grupo Financiero Santander México

Banco Santander México, S.A. Institucion de Banca Múltiple, Grupo Financiero Santander México certifies that Banco Santander Mexico, S.A. Institucion de Banca Múltiple, Grupo Financiero Santander México is ultimately a wholly owned subsidiary of Banco Santander, S.A. It is not otherwise affiliated with any other publicly traded company, and no other publicly traded company owns 10% or more of its stock. Banco Santander, S.A. is a publicly traded company and has no parent company. As of 31 December 2022, the only shareholder appearing on Banco Santander, S.A.'s register of shareholders with a stake 10% or more was State Street Bank & Trust Company, which held approximately 14.23% of the company's common stock. Banco Santander, S.A. believes that those shares are held in custody in the name of third parties. To the best of Banco Santander, S.A.'s knowledge, none of those third parties itself holds a stake of over 3% in the company's shares

(3% is the lower threshold provided under Spanish law to disclose a significant holding in a listed company).

3. **Bank of America México, S.A., Institución de Banca Múltiple, Grupo Financiero Bank of America**

Defendant Bank of America México, S.A., Institución de Banca Múltiple, Grupo Financiero Bank of America (n/k/a Bank of America México, S.A., Institución de Banca Múltiple) is an indirect, wholly owned subsidiary of Bank of America Corporation. Bank of America Corporation is a publicly held company whose shares are traded on the New York Stock Exchange and has no parent corporation. Based on the U.S. Securities and Exchange Commission Rules regarding beneficial ownership, Berkshire Hathaway Inc., 3555 Farnam Street, Omaha, Nebraska 68131, beneficially owns greater than 10% of Bank of America Corporation's outstanding common stock.

4. **BBVA Bancomer S.A., Institución de Banca Múltiple, Grupo Financiero BBVA Bancomer**

Defendant BBVA Bancomer S.A., Institución de Banca Múltiple, Grupo Financiero BBVA Bancomer (now known as BBVA México, S.A., Institución de Banca Múltiple, Grupo Financiero BBVA México) is organized under the laws of Mexico and is 99.99% directly owned by Grupo Financiero BBVA México, S.A. de C.V. (formerly Grupo Financiero BBVA Bancomer, S.A. de C.V.). Grupo Financiero BBVA México, S.A. de C.V. is organized under the laws of Mexico and

is more than 99.99% directly owned by Banco Bilbao Vizcaya Argentaria, S.A. Banco Bilbao Vizcaya Argentaria, S.A. is organized under the laws of the Kingdom of Spain and is publicly traded on the New York Stock Exchange under the ticker symbol BBVA. No publicly held company has an ownership interest of 10% or more of Banco Bilbao Vizcaya Argentaria, S.A.

### 5. Deutsche Bank México, S.A., Institución de Banca Múltiple

Defendant Deutsche Bank México, S.A. Institución de Banca Múltiple is 99.9% owned by Deutsche México Holdings, S.a.r.l., which is wholly owned by DB AG Cayman Branch, which is a branch of Deutsche Bank AG, which is a publicly held company. To its knowledge, no public company holds 10% or more of Deutsche Bank AG's stock. Deutsche Bank AG has no parent corporation.

### 6. HSBC México, S.A., Institución de Banca Múltiple, Grupo Financiero HSBC

Defendant HSBC México S.A., Institución de Banca Múltiple, Grupo Financiero HSBC is a corporation organized under the laws of Mexico, and is not a publicly traded company. HSBC México S.A., Institución de Banca Múltiple, Grupo Financiero HSBC is a 99.99% owned subsidiary of Grupo Financiero HSBC, S.A. de C.V., which, in turn, is a 99.99% owned subsidiary of HSBC Latin America Holdings (UK) Limited, which, in turn, is a wholly owned subsidiary of HSBC Holdings plc.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ...........................................i

TABLE OF CONTENTS...........................................................iv

TABLE OF AUTHORITIES ....................................................vi

COUNTERSTATEMENT OF THE ISSUES...............................1

SUMMARY OF ARGUMENT AND COUNTERSTATEMENT OF THE
    CASE .........................................................................1

COUNTERSTATEMENT OF THE FACTS ...........................5

    A.    The Parties......................................................5

    B.    Mexican Government Bonds Were Auctioned, Priced,
        and Quoted in Mexico...............................................6

    C.    Plaintiffs Allege That Defendants Conspired to
        Manipulate MGB Auctions, Prices, and Bid-Ask Spreads
        in Mexico ......................................................9

    D.    Plaintiffs' First Two Complaints Have Been Dismissed..........10

        1.    The District Court Dismissed Plaintiffs' First
            Amended Complaint For Improper Group Pleading......10

        2.    The District Court Dismissed Plaintiffs' Second
            Amended Complaint for Lack of Personal
            Jurisdiction....................................................11

        3.    The District Court Denied Plaintiffs' Motion for
            Reconsideration ...........................................12

LEGAL STANDARDS ...................................................13

ARGUMENT......................................................................14

I.    THE DISTRICT COURT CORRECTLY CONCLUDED
    THAT DEFENDANTS ARE NOT SUBJECT TO PERSONAL
    JURISDICTION .....................................................14

A. The District Court Properly Rejected Plaintiffs' Purposeful Availment Theory.....................................................15

B. The District Court Properly Rejected Plaintiffs' Conspiracy Jurisdiction Theory................................................25

C. The District Court Properly Rejected Plaintiffs' Purposeful Direction Theory....................................................28

D. The District Court Correctly Held That *Ford* Does Not Compel a Different Result .......................................31

   1. Plaintiffs' Motion Was Untimely ...................................31

   2. *Ford* Does Not Overrule *Schwab I*................................32

   3. *Ford* Does Not Create Personal Jurisdiction Over Defendants ........................................................35

II. THE DISTRICT COURT PROPERLY DENIED PLAINTIFFS' REQUEST FOR JURISDICTIONAL DISCOVERY ....................................................................40

CONCLUSION ...................................................................42

# TABLE OF AUTHORITIES

## CASES

*In re Aluminum Warehousing Antitrust Litigation*,
    90 F. Supp. 3d 219 (S.D.N.Y. 2015) ............................................................41

*Bandemer v. Ford Motor Co.*,
    931 N.W.2d 744 (Minn. 2019) ........................................................36, 37, 38

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*,
    305 F.3d 120 (2d Cir. 2002) ..........................................................................24

*Best Van Lines, Inc. v. Walker*,
    490 F.3d 239 (2d Cir. 2007) ...................................................................31, 40

*Bristol-Myers Squibb Co. v. Superior Court of California*,
    137 S. Ct. 1773 (2017).......................................................................18, 32, 34

*Burger King v. Rudzewicz*,
    471 U.S. 462 (1985).................................................................................25, 35

*Celestin v. Caribbean Air Mail, Inc.*,
    30 F.4th 133 (2d Cir. 2022) ..........................................................................25

*Charles Schwab Corp. v. Bank of America Corp.*,
    883 F.3d 68 (2d Cir. 2018) ....................................................................passim

*Chloe v. Queen Bee of Beverly Hills, LLC*,
    616 F.3d 158 (2d Cir. 2010) .................................................................. 24-25

*City of Long Beach v. Total Gas & Power North America, Inc.*,
    465 F. Supp. 3d 416 (S.D.N.Y. 2020) .....................................................20, 21

*Contant v. Bank of America Corp.*,
    No. 17 Civ. 3139 (LGS), 2019 WL 12276059 (S.D.N.Y. July 8, 2019) ......27

*Daimler AG v. Bauman*,
    571 U.S. 117 (2014)......................................................................................15

*Daniel v. American Board of Emergency Medicine*,
    428 F.3d 408 (2d Cir. 2005) .........................................................................15

*Daou v. BLC Bank, S.A.L.*,
    42 F.4th 120 (2d Cir. 2022) ....................................................13, 42

*Dennis v. JPMorgan Chase & Co.*,
    343 F. Supp. 3d 122 (S.D.N.Y. 2018) ........................................22

*Eisemann v. Greene*,
    204 F.3d 393 (2d Cir. 2000) ......................................................32

*El Omari v. International Criminal Police Organization*,
    35 F.4th 83 (2d Cir. 2022) .........................................................14

*Ford Motor Co. v. Montana Eighth Judicial District Court*,
    141 S. Ct. 1017 (2021).........................................................passim

*Gucci America, Inc. v. Weixing Li*,
    768 F.3d 122 (2d Cir. 2014) ......................................................15

*Haber v. United States*,
    823 F.3d 746 (2d Cir. 2016) ......................................................41

*Hepp v. Facebook*,
    14 F.4th 204 (3d Cir. 2021) .......................................................34

*Hu v. City of New York*,
    927 F.3d 81 (2d Cir. 2019) ..........................................................5

*Jackson v. Tanfoglio Giuseppe, S.R.L.*,
    615 F.3d 579 (5th Cir. 2010) .....................................................19

*Jazini v. Nissan Motor Co.*,
    148 F.3d 181 (2d Cir. 1998) ......................................................40

*Johnson v. UBS AG*,
    791 F. App'x 240 (2d Cir. 2019) ..................................................5

*Knight v. Standard Chartered Bank*,
    531 F. Supp. 3d 755 (S.D.N.Y. 2021) ........................................32

*Laba v. JBO Worldwide Supply Pty Ltd*,
    No. 20 Civ. 3443 (AKH), 2022 WL 252658 (S.D.N.Y. Jan. 26, 2022)........28

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
    732 F.3d 161 (2d Cir. 2013) ...........................................................29

*LNS Enterprises LLC v. Continental Motors, Inc.*,
    22 F.4th 852 (9th Cir. 2022) ..................................................... 36-37

*McCarthy v. S.E.C.*,
    406 F.3d 179 (2d Cir. 2005) ...........................................................29

*Melea, Ltd. v. Jawer SA*,
    511 F.3d 1060 (10th Cir. 2007) ...................................................27

*Penguin Group (USA) Inc. v. American Buddha*,
    609 F.3d 30 (2d Cir. 2010) .............................................................13

*Prime International Trading, Ltd. v. BP P.L.C.*,
    784 F. App'x 4 (2d Cir. 2019).........................................................30

*RJE Corp. v. Northville Industries Corp.*,
    329 F.3d 310 (2d Cir. 2003) ..........................................................14

*Schlafly v. Eagle Forum*,
    No. 19-2405, 2022 WL 1261319 (3d Cir. Apr. 28, 2022)............................33

*Schwab Short-Term Bond Market Fund v. Lloyds Banking Group PLC*,
    22 F.4th 103 (2d Cir. 2021) ...................................................21, 27

*Sullivan v. Barclays PLC*,
    No. 13-cv-2811 (PKC), 2017 WL 685570 (S.D.N.Y. Feb. 21, 2017) .... 39-40

*In re Terrorist Attacks on Sept. 11, 2001*,
    714 F.3d 659 (2d Cir. 2013) ..........................................................13

*Town of Southold v. Wheeler*,
    48 F.4th 67 (2d Cir. 2022) .............................................................20

*Unspam Technologies, Inc. v. Chernuk*,
    716 F.3d 322 (4th Cir. 2013) .........................................................26

*Vapotherm, Inc. v. Santiago*,
    38 F.4th 252 (1st Cir. 2022) ..........................................................33

*Walden v. Fiore,*
    571 U.S. 277 (2014).......................................................................14, 16, 18, 30

*Waldman v. Palestine Liberation Organization,*
    835 F.3d 317 (2d Cir. 2016) .....................................................................29, 30

*World-Wide Volkswagen Corp. v. Woodson,*
    444 U.S. 286 (1980)...........................................................................................35

## COUNTERSTATEMENT OF THE ISSUES

1. Whether the District Court correctly held that plaintiff-appellants failed to allege personal jurisdiction over defendant-appellees—all banks based in Mexico—for an alleged conspiracy in Mexico to rig Mexican government bond auctions, inflate the prices of those bonds in the over-the-counter market, and fix the bid-ask spread.

2. Whether the District Court abused its discretion by concluding that jurisdictional discovery is unwarranted where plaintiff-appellants failed to plead a *prima facie* case of personal jurisdiction even with the benefit of having filed an amended complaint containing allegations based on materials obtained from a Mexican government investigation and settling former defendants.

## SUMMARY OF ARGUMENT AND COUNTERSTATEMENT OF THE CASE

The District Court correctly held that plaintiffs' allegations of an antitrust conspiracy carried out in Mexico—by Mexican banks purportedly manipulating the market for Mexican debt securities through a handful of Mexico-based individual traders—do not subject defendants to personal jurisdiction in this forum.

First, the District Court's conclusion adheres to well-settled principles of personal jurisdiction, including this Court's controlling guidance in *Charles Schwab Corp. v. Bank of America Corp.*, 883 F.3d 68 (2d Cir. 2018) ("*Schwab I*").   As

*Schwab I* instructs, "personal jurisdiction will not lie against any [d]efendant" when the underlying claims stem from alleged anticompetitive misconduct occurring outside the United States. And, boiling down the 150-page Second Amended Complaint (the "SAC"), that is precisely what plaintiffs allege here. The SAC alleges a conspiracy <u>in Mexico</u> to (1) rig Mexican government bond ("MGB") auctions, (2) inflate the prices of those bonds in the over-the-counter market, and (3) fix the bid-ask spread. Because all of that alleged misconduct took place in Mexico, the District Court properly dismissed plaintiffs' claims under *Schwab I*.

In search of a jurisdictional tether to this forum, plaintiffs spend much of their brief conflating the activities of the Mexico-based defendants with non-party broker-dealer affiliates in the United States, arguing, contrary to their own allegations, that "defendants' conspiracy was centered in New York." (Plaintiffs' Brief ("Br.") at 1.) That attempted sleight-of-hand disregards the distinction between the Mexican bank defendants and separate non-party U.S.-based entities, many of which have been dismissed from this case due to plaintiffs' impermissible group pleading and have not been named as defendants in the operative complaint. So, when plaintiffs' brief refers to a "defendant's respective sales desk" or "their U.S. branch offices" (*id.* at 1–2), it conflates two distinct legal entities (one a defendant, one not) that operate in different jurisdictions and play different and separate roles in an MGB transaction. Defendants are based in Mexico; the affiliated entities are not. Defendants are

alleged to have manipulated MGBs; the affiliated entities are not. All defendants maintain separate books and records and a separate corporate existence from their U.S. affiliates, and no defendant had a U.S. branch or office that transacted in MGBs at any time during the Class Period. Once plaintiffs' linguistic sleight-of-hand is dispelled, no question remains that the purported anticompetitive conduct is all alleged to have taken place in Mexico—and that *Schwab I*'s "dispositive authority" controls here. (Special Appendix ("SA") 24.)

Second, plaintiffs' theory of conspiracy jurisdiction fails—and cannot be characterized as an "independently sufficient basis" to exercise jurisdiction (Br. at 22, 37)—because plaintiffs do not allege that any in-forum actor participated in the alleged conspiracy. Where no alleged co-conspirator is subject to personal jurisdiction in its own right, defendants' alleged ties to each other cannot provide an independent basis for jurisdiction.

Third, as the District Court correctly held, plaintiffs' "effects test" theory of personal jurisdiction also fails here. Tellingly, plaintiffs appear to have abandoned this defective theory on appeal, and for good reason: Plaintiffs' allegations depict defendants' MGB business as global in reach, and they do not allege that defendants "'expressly aimed [their] conduct at the forum.'" (SA 26 (citation omitted).)

Fourth, the U.S. Supreme Court's decision in *Ford Motor Co. v. Montana Eighth Judicial District Court*, 141 S. Ct. 1017 (2021) ("*Ford*"), which plaintiffs

invoked in an untimely motion for reconsideration before the District Court, does not alter the result here. *Ford* does not "abrogate" *Schwab I*, as plaintiffs wrongly suggest, but reiterates the requirement that a "defendant's suit-related conduct must create a substantial connection with the forum state." And here, it does not. In any event, plaintiffs' attenuated theory of jurisdiction does not meet the standard that *Ford* reaffirmed.

Finally, failing to make a *prima facie* case for personal jurisdiction, even with the benefit of materials obtained both from a Mexican government investigation and settling former defendants, plaintiffs cannot show that the District Court abused its discretion by denying jurisdictional discovery. In place of any independent basis for the discovery they purport to need, plaintiffs simply restate their contention that the District Court's ruling on personal jurisdiction was wrong. (Br. at 23.) That circular argument exposes plaintiffs' request for jurisdictional discovery as a makeweight.

Plaintiffs thus offer no reason to disturb any of the District Court's rulings.

## COUNTERSTATEMENT OF THE FACTS[1]

### A. The Parties

Plaintiffs are eight investors that allegedly transacted in MGBs with defendants' non-party U.S.-based affiliates between January 1, 2006 and April 19, 2017 (the "Class Period"). (Joint Appendix ("JA") 450 ¶ 504.)[2] Plaintiffs do not plausibly allege that they transacted MGBs directly with any of the defendants themselves.[3]

---

[1] The facts are drawn from the allegations in the SAC (which are accepted as true for purposes of this appeal), documents incorporated in the SAC by reference, and matters of which the Court may take judicial notice. *See Hu v. City of New York*, 927 F.3d 81, 88 (2d Cir. 2019). In addition, "[c]ourts may consider materials outside the pleadings on a motion to dismiss for lack of personal jurisdiction." *Johnson v. UBS AG*, 791 F. App'x 240, 241–243 (2d Cir. 2019) (affirming dismissal on personal jurisdiction grounds based, in part, on defendant's "uncontested declaration filed below").

[2] Defendants consist of the following Mexico-based entities: Banco Santander (México), S.A., Institución de Banca Múltiple, Grupo Financiero Santander México ("Santander México"), BBVA Bancomer S.A., Institución de Banca Múltiple, Grupo Financiero BBVA Bancomer ("BBVA-Bancomer") (now known as BBVA México, S.A., Institución de Banca Múltiple, Grupo Financiero BBVA México), Banco Nacional de México, S.A., Institución de Banca Múltiple, Grupo Financiero Banamex ("Citibanamex"), Deutsche Bank México, S.A., Institución de Banca Múltiple ("Deutsche Bank México"), HSBC México, S.A., Institución de Banca Múltiple, Grupo Financiero HSBC ("HSBC México"), and Bank of America México, S.A., Institución de Banca Múltiple, Grupo Financiero Bank of America ("Bank of America México").

[3] Appendix D of the SAC lists one transaction with defendant Citibanamex (JA 485), but Citibanamex has no record of this transaction and submitted a sworn declaration stating that it never occurred. (*See* Supplemental Appendix 107–108

*(cont'd)*

Defendants are six banks headquartered in and organized under the laws of Mexico. (JA 315–318 ¶¶ 22, 27, 31, 35, 39, 43; *see* Supplemental Appendix ("Supp. App'x") 92 ¶ 3 (Santander México); *id.* 99 ¶ 3 (BBVA-Bancomer); *id.* 106 ¶ 4 (Citibanamex); *id.* 102 ¶ 4 (Deutsche Bank México); *id.* 110 ¶ 4 (HSBC México); *id.* 95 ¶ 4 (Bank of America México).) Each defendant's trading desk responsible for the market making and trading of MGBs is, and during the Class Period was, located in Mexico. (Supp. App'x 93 ¶ 11; *id.* 99 ¶ 6; *id.* 106 ¶ 10; *id.* 103 ¶ 9; *id.* 111 ¶ 8; *id.* 96 ¶ 9.) No defendant has branches or offices anywhere in New York, nor did any defendant have branches or offices anywhere in the United States that transacted in MGBs at any time during the Class Period. (Supp. App'x 92–93 ¶¶ 4–6, 10; *id.* 99 ¶ 5; *id.* 106 ¶¶ 6, 10; *id.* 102 ¶ 4; *id.* 110–111 ¶¶ 6, 8; *id.* 95–96 ¶¶ 6, 9.) All defendants maintain separate books and records and a separate corporate existence from their affiliates and subsidiaries. (Supp. App'x 93 ¶ 12; *id.* 100 ¶ 9; *id.* 106 ¶ 7; *id.* 103 ¶ 11; *id.* 111 ¶ 9; *id.* 96 ¶ 12.)

## B. Mexican Government Bonds Were Auctioned, Priced, and Quoted in Mexico

Mexican government bonds are debt securities issued by the Mexican government through auctions held in Mexico. (JA 306 ¶ 1, JA 384 ¶ 292.) MGBs

---

¶¶ 18–20.) Plaintiffs failed to present any corroborating evidence to the District Court in response to Citibanamex's declaration.

come in different types, each with a different face value (*i.e.*, what the bondholder will receive at maturity), time to maturity, and coupon payment (*i.e.*, how much, if anything, the bondholder will receive in periodic interest payments). (JA 385 ¶ 297.) These range from short-term zero-coupon bonds that mature in 30 days to long-term, 30-year bonds with regular coupon payments, and many permutations in between. (JA 385–86 ¶¶ 297–301.) In the MGB auctions, participants—a group of financial institutions pre-approved by the Bank of Mexico ("Banxíco")—submitted confidential "bid schedules" indicating the amount of MGBs each was willing to buy and for what price. (JA 384 ¶ 294.) Defendants in this case participated in MGB auctions as part of Banxíco's "Market Maker" program. (JA 306 ¶ 3, JA 391–392 ¶¶ 316–320.)

The Market Maker program helped guarantee liquidity in the MGB market by ensuring a steady supply of bidders at MGB auctions. (JA 391 ¶ 316.) As designated Market Makers, defendants committed to bid for at least 100% of the total amount of MGBs for sale in each auction. (JA 306 ¶ 3; *see* JA 391–392 ¶¶ 316–318.) In return, Market Makers received access to new MGB supply through programs like the "Market Maker Option Program," which allowed them to purchase additional MGBs the day after an auction at the previous day's auction price. (JA 332–333 ¶ 104.)

Once MGBs were auctioned, they began trading around the world in the over-the-counter market.  (*See* JA 392 ¶ 319; JA 325–326 ¶ 80 (exemplar chat allegedly showing Taiwan sales desk requesting MGB quote from trading desk in Mexico).)  In this secondary market, Market Makers agreed to present "two-way quotes" for each MGB, in all their maturities, listing (a) the price at which the Market Maker would buy a given MGB in the market (the "bid" price), and (b) the price at which the Market Maker would sell the same MGB (the "ask" price).  (JA 392 ¶¶ 319–320.)  The difference is called the "bid-ask spread."  (*Id.*)

When investors in the U.S. wanted to trade MGBs, they typically contacted a salesperson in the U.S. employed by a broker-dealer affiliate, not an MGB trader in Mexico.  (*See* JA 329 ¶ 90.)  According to the SAC, acting wholly distinctly and separately from defendants, these U.S.-based non-parties managed customer relationships, made sales calls, distributed trade ideas to U.S. investors, and arranged MGB trades with U.S. customers.  (JA 330–366 ¶¶ 95, 110–11, 114–15 131–32, 139, 156–58, 160–62, 176–78, 180–82, 197–99, 203–04, 216–17, 220–22, 229.)  The Mexico-based MGB traders, meanwhile, determined the price for a given MGB trade.  (*See, e.g.*, JA 327 ¶ 84.)  That price quote went to the U.S.-based broker-dealer affiliate, which in turn relayed the quoted price to the interested investor.  (*Id.*)  If the investor decided to complete the trade, the non-party broker-dealer affiliate in the U.S. served as the counterparty of record.  (*Id.* ¶ 83.)  The SAC does not allege

that this process differed in any meaningful way based on the location of the sales desk or the MGB's end-buyer; whether the request came from Tulsa or Taiwan, the MGB traders priced the trade in Mexico.

### C. Plaintiffs Allege That Defendants Conspired to Manipulate MGB Auctions, Prices, and Bid-Ask Spreads in Mexico

Plaintiffs allege a conspiracy comprising "three discrete but related schemes" (Br. at 31; *see* JA 453 ¶ 518), all of which occurred in Mexico. First, plaintiffs allege a "conspiracy to fix the Banxíco MGB auctions" (Br. at 31) by defendants' MGB traders in Mexico who purportedly shared price information with each other and submitted "fixed bids" during the auctions held there (JA 426 ¶ 429). Second, plaintiffs allege a "conspiracy to sell MGBs in the over-the-counter market at inflated prices" (Br. at 31; *see* JA 433 ¶ 449), where "the same" Mexico-based trading desks that allegedly rigged the MGB auctions "were also responsible for determining prices charged to investors in the MGB secondary market" (JA 322 ¶ 67). And third, plaintiffs allege a "conspiracy to fix the bid-ask spread" of MGBs (Br. at 31; *see* JA 435 ¶ 452), the product of MGB traders in Mexico "buying low and selling high" (JA 435 ¶ 456; *see also* JA 322 ¶ 67 (alleging defendants' "activities in both the MGB auction process and the MGB secondary market were carried out by their respective MGB trading desks")).

In support of their conspiracy allegations, plaintiffs make several additional assertions. For example, plaintiffs allege that defendants "sent MGB traders to New

York City to meet with clients and network with investors" (JA 323–324 ¶ 74), though they do not allege that any of those meetings corresponded to any misconduct giving rise to their claims or to their own transactions. Plaintiffs also point to chatroom transcripts among MGB traders—information that plaintiffs obtained from settling former defendants in this case and from a Mexican government investigation—purportedly in furtherance of the alleged conspiracy. (JA 410–426 ¶¶ 396–429.) Defendants disagree with plaintiffs' characterization of these chats, but regardless, all the MGB traders participating in the chats were based in Mexico. (*See* Supp. App'x 100 ¶¶ 11, 12; *id.* 107 ¶ 13; *id.* 104 ¶¶ 13, 14; *id.* 111 ¶ 10; *id.* 96 ¶ 13.)

## D. Plaintiffs' First Two Complaints Have Been Dismissed

### 1. The District Court Dismissed Plaintiffs' First Amended Complaint For Improper Group Pleading

On July 18, 2018, plaintiffs filed their first Consolidated Amended Class Action Complaint (*see* JA 165–267), alleging violations of Sections 1 and 3 of the Sherman Act, as well as common-law unjust enrichment, against 52 bank defendants, including 13 banks located in Mexico and banks based in the United States, the U.K., Germany, Switzerland, and Spain. (SA 1–4; JA 192–209 ¶¶ 73–197.) All 52 named defendants jointly moved to dismiss the complaint for failure to state a claim, and a subset of "Foreign Defendants"—including the defendants in

this appeal—also moved to dismiss for lack of personal jurisdiction and improper venue. (SA 10; *see* JA 43–46.)

On September 30, 2019, the District Court (Oetken, J.) dismissed the complaint for "fail[ing] to state a claim against any Defendant" because it "impermissibly relie[d] on 'group pleading' by failing to differentiate" among the 52 defendants named in the complaint. (SA 1, 10; *see generally* SA 1–19 ("*MGB I*").) Because plaintiffs' group pleading was "fatal" to their claims, the District Court did not (and did not need to) reach the merits of defendants' personal jurisdiction and venue arguments. (SA 10–11.)

### 2. The District Court Dismissed Plaintiffs' Second Amended Complaint for Lack of Personal Jurisdiction

On December 9, 2019, plaintiffs filed a Second Consolidated Amended Class Action Complaint ("SAC") which named only Mexican banks as defendants. (JA 50; SA 22.) Defendants again moved to dismiss the complaint for failure to state a claim and for lack of personal jurisdiction and venue.

On November 30, 2020, the District Court granted defendants' motion to dismiss for lack of personal jurisdiction. (*See* SA 20–30 ("*MGB II*").) In doing so, the District Court (1) correctly applied this Court's ruling in *Schwab I* to hold that the alleged conspiracy in Mexico to rig MGB auctions, fix MGB prices, and inflate the resulting bid-ask spread did not constitute "purposeful availment" of this forum (SA 24–26), (2) correctly rejected plaintiffs' attempt to invoke the "'effects test'" of

11

jurisdiction because plaintiffs failed to allege that defendants "expressly aimed" their conduct at the forum (SA 26–27), and (3) correctly rejected plaintiffs' "conspiracy jurisdiction" theory because the allegations failed to identify any co-conspirator who committed "overt acts in furtherance of the conspiracy" within the forum. (SA 27.) In addition, the District Court denied plaintiffs' request for jurisdictional discovery because it "s[aw] no way in which additional discovery would cure the jurisdictional defects at issue." (SA 29.)[4] In its analysis of personal jurisdiction, the District Court flagged that the U.S. Supreme Court was "currently considering" issues potentially relevant to this case in *Ford Motor Co. v. Montana Eighth Judicial District Court*. (SA 28.)

### 3. *The District Court Denied Plaintiffs' Motion for Reconsideration*

On May 20, 2021—six months after the District Court's dismissal and nearly two months after the Supreme Court decided *Ford*—plaintiffs filed a motion for reconsideration of the District Court's dismissal in *MGB II* based on *Ford*. (JA 63–64.) On March 30, 2022, the District Court denied plaintiffs' motion on two grounds: (1) the motion was "untimely" under Local Rule 6.3, which requires a motion for reconsideration to be made within 14 days of the court's determination,

---

[4] Because the District Court found there was no personal jurisdiction, it did not reach the merits of defendants' arguments regarding plaintiffs' failure to state a claim.

or at least within 14 days of new authority on which a party wishes to rely, and (2) the motion was "unpersuasive" on the merits because this case is "indistinguishable" from *Schwab I*, which *Ford* did not "displace[ ]."  (SA 31–36.)

This appeal followed.

## LEGAL STANDARDS

This Court reviews *de novo* a district court's decision dismissing a complaint for lack of personal jurisdiction.  *Daou v. BLC Bank, S.A.L.*, 42 F.4th 120, 128 (2d Cir. 2022).  To survive a motion to dismiss for lack of personal jurisdiction, plaintiffs "bear[] the burden of demonstrating personal jurisdiction" over each defendant. *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d Cir. 2010).  To meet that burden, plaintiffs "'must make a prima facie showing that jurisdiction exists,'" which entails "'making legally sufficient allegations of jurisdiction, including an averment of facts that, if credited[,] would suffice to establish jurisdiction over the defendant.'"  *Schwab I*, 883 F.3d at 81 (alteration in original) (quoting *Penguin Grp.*, 609 F.3d at 34–35).

 "To establish personal jurisdiction over a defendant, due process requires a plaintiff to allege (1) that a defendant has 'certain minimum contacts' with the relevant forum, and (2) that the exercise of jurisdiction is reasonable in the circumstances."  *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013) (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945)).  At issue here

is specific jurisdiction, which arises only when "the defendant's suit-related conduct . . . create[s] a substantial connection with the forum State." *Walden v. Fiore*, 571 U.S. 277, 284 (2014).

This Court "review[s] denial of a motion for reconsideration for abuse of discretion." *RJE Corp. v. Northville Indus. Corp.*, 329 F.3d 310, 316 (2d Cir. 2003).

This Court also "review[s] [the] district court's denial of jurisdictional discovery for abuse of discretion, always mindful that a district court has wide latitude to determine the scope of discovery." *El Omari v. Int'l Crim. Police Org.*, 35 F.4th 83, 94 (2d Cir. 2022) (citation omitted), *cert. denied* 143 S. Ct. 214 (2022) (affirming district court's denial of plaintiff's request for jurisdictional discovery).

## ARGUMENT

## I. THE DISTRICT COURT CORRECTLY CONCLUDED THAT DEFENDANTS ARE NOT SUBJECT TO PERSONAL JURISDICTION

The District Court properly applied controlling decisions of this Court and held that defendants lacked sufficient "minimum contacts" with the forum because: (1) defendants did not purposefully avail themselves of the forum, (2) defendants were not subject to jurisdiction through in-forum acts by an alleged co-conspirator, and (3) defendants did not purposefully direct their conduct into the forum.[5]

---

[5] For the Sherman Act claims, defendants maintain that the relevant forum for assessing defendants' contacts is New York, not the United States as a whole; plaintiffs disagree (Br. at 24 n.5). But a "nationwide contacts" analysis is

*(cont'd)*

14

## A. The District Court Properly Rejected Plaintiffs' Purposeful Availment Theory

The District Court correctly held that plaintiffs' theory of purposeful availment fails under *Schwab I*, "[t]he leading case in this Circuit" addressing "the conditions under which foreign banks may be haled into court in the United States to answer for alleged anticompetitive conduct abroad." (SA 24.) In *Schwab I*, "purchasers of certain financial instruments that incorporated the London Interbank Offered Rate ('LIBOR') sued several banks for having allegedly fixed that rate. The fixing of the rate occurred in London, but the sales of the instruments occurred in [California]." (SA 24–25 (citing *Schwab I*, 883 F.3d at 78, 83).) As this Court

---

inappropriate here because, among other things, plaintiffs fail to allege venue under the Clayton Act (*see* n.11, *infra*; *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 423–25 (2d Cir. 2005) (holding that Section 12 of the Clayton Act's worldwide "service of process provision applies . . . only in cases in which its venue provision is satisfied")), and such an analysis runs counter to the Supreme Court's focus on due process as a matter of fundamental fairness and reasonableness to the defendant. *Daimler AG v. Bauman*, 571 U.S. 117, 139 (2014) (stating such "exorbitant exercises of all-purpose jurisdiction would scarcely permit out-of-state defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit"). Plaintiffs mischaracterize this Court's precedent, moreover, by citing *Gucci America, Inc. v. Weixing Li*, 768 F.3d 122, 142 n.21 (2d Cir. 2014), for the proposition that "[t]his Court has repeatedly assumed that . . . 'when a civil case arises under federal law and a federal statute authorizes nationwide service of process, the relevant contacts for determining personal jurisdiction are contacts with the United States as a whole.'" (Br. at 24 n.5.) In fact, in *Gucci* this Court noted that it "has not yet decided that issue." 768 F.3d at 142 n.21. At any rate, the Court need not decide that issue here because plaintiffs fail to allege sufficient "minimum contacts" with either forum.

explained, "[c]ourts typically require that the plaintiff show some sort of causal relationship between a defendant's U.S. contacts and the episode in suit, <u>and the plaintiff's claim must in some way arise from the defendants' purposeful contacts with the forum</u>." *Schwab I*, 883 F.3d at 84 (emphasis added) (citation and internal quotation marks omitted).

Applying that rule, this Court declined to exercise personal jurisdiction over the defendants with respect to claims "premised on false submissions in London," even though those defendants later sold instruments incorporating the rigged rate to the plaintiffs in California. *Id.* Those sales were not "'suit-related conduct [that] create[d] a substantial connection with [California]'" for the plaintiffs' fraud claims because the claims were "premised solely on Defendants' false LIBOR submissions in London." *Id.* at 83–84 (alterations in original) (quoting *Walden*, 571 U.S. at 284). "[A]ctivities in London d[id] not constitute California contacts," and the sales in California neither caused nor gave rise to "claims seeking to hold [d]efendants liable for those submissions" in London. *Id.* That the sales in California enabled the defendants to profit from the London-based conspiracy was not enough: "[F]inancial self-interest is not the same as furthering a conspiracy through California-directed sales." *Id.* at 87.

As in *Schwab I*, the alleged conspiracy in this case took place outside the United States. The "three discrete but related schemes" comprising the alleged

conspiracy implicate acts committed in (and only in) Mexico. (Br. at 31; *see* JA 453 ¶ 518). <u>First</u>, plaintiffs allege a "conspiracy to fix the Banxíco MGB auctions" (Br. at 31) involving Mexico-based traders working for Mexican banks who purportedly coordinated with each other to manipulate auctions conducted in Mexico. (JA 426 ¶ 429.) <u>Second</u>, plaintiffs allege a "conspiracy to sell MGBs in the over-the-counter market at inflated prices" (Br. at 31; *see* JA 433 ¶ 449), but those prices were determined in Mexico by "the same" Mexico-based trading desks that allegedly rigged the MGB auctions. (JA 322 ¶ 67.) And <u>third</u>, plaintiffs allege a "conspiracy to fix the bid-ask spread" (Br. at 31; *see* JA 435 ¶ 452) in which MGB traders in Mexico allegedly suppressed prices at which they purchased MGBs and inflated prices at which they sold MGBs. (JA 435 ¶ 456; *see also* JA 322 ¶ 67 (alleging defendants' "activities in both the MGB auction process and the MGB secondary market were carried out by their respective MGB trading desks").)

Likewise, as in *Schwab I*, defendants' alleged contacts with the forum "did not cause" the alleged price-fixing; nor did those contacts "in some other way give rise to claims seeking to hold [defendants] liable for" the alleged price fixing. *See Schwab I*, 883 F.3d at 84. Here, the acts allegedly giving rise to plaintiffs' injuries— the alleged price-fixing itself—took place entirely in Mexico. (*See* JA 453–454 ¶¶ 518–519 (alleging this three-part conspiracy "caused Plaintiffs and members of the Class to be overcharged or underpaid in their MGB transactions").) That the

allegedly price-fixed MGBs ultimately made their way to plaintiffs in the United States, through the actions of non-parties unrelated to the alleged price-fixing, does not confer personal jurisdiction over defendants. The specific jurisdiction inquiry "focuses on 'the relationship among the defendant, the forum, and the litigation,'" not the relationship between the defendant and U.S.-based plaintiffs (particularly where, as here, that alleged relationship is mediated by a separate non-party). *Walden*, 571 U.S. at 284 (citation omitted). Where no substantial connection exists between the forum and the defendants' suit-related activities, "specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State." *Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 137 S. Ct. 1773, 1781 (2017).[6]

Carefully adhering to the distinction—drawn in *Schwab I*—between the place of alleged misconduct and the place of plaintiffs' injury, the District Court correctly rejected plaintiffs' purposeful availment theory. (SA 25.)

---

[6] As a consequence, even if defendants had sold MGBs to plaintiffs in the United States directly, rather than through non-party intermediaries, personal jurisdiction over defendants still would not exist: Under *Schwab I*, plaintiffs fail to allege the requisite connection between sales in the United States and the purported anticompetitive conduct in Mexico. 883 F.3d at 83–84 ("[S]ales in California do not alone create personal jurisdiction for claims premised solely on Defendants' false LIBOR submissions in London.").

Plaintiffs try to skirt *Schwab I*'s "dispositive authority" in several ways, most egregiously by conflating the acts of separate corporate entities—*i.e.*, defendant Mexican banks and their U.S. affiliates, which have already been dismissed from this case and which plaintiffs have not named as defendants in the SAC. But "there can be no specific personal jurisdiction" where plaintiffs' argument "conflates" separate corporate entities "and treats the contacts of one entity as applicable to all." *Jackson v. Tanfoglio Giuseppe, S.R.L.*, 615 F.3d 579, 585–86 (5th Cir. 2010); *see also Schwab I*, 883 F.3d at 86 (noting that "bare allegation[s]" in complaint "do[ ] not allow us to determine whether any particular broker-dealer's contacts should be imputed to any particular Defendant").

Plaintiffs' conflation of these separate entities echoes the indiscriminate group pleading that sunk their earlier complaint. (*See* SA 14 (finding "the [first] complaint contain[ed] almost no individualized allegations at all").) As noted, (a) all defendants maintain separate books and records and a separate corporate existence from their affiliates and subsidiaries, (b) no defendant has branches or offices anywhere in New York, and (c) no defendant had branches or offices anywhere in the United States that transacted in MGBs at any time during the Class Period. (Supp. App'x 92–93 ¶¶ 3–6, 12; *id.* 99–100 ¶¶ 3, 5, 7–9; *id.* 106 ¶¶ 4, 6–7; *id.* 102–103 ¶¶ 4, 8, 11; *id.* 110–111 ¶¶ 4, 6, 9; *id.* 95–96 ¶¶ 4, 6, 12.) <u>Plaintiffs dispute none of this.</u> Yet, over and over again, plaintiffs' brief refers to defendants trading MGBs

in the United States through their "respective sales desk" or "their U.S. branch offices." (*See, e.g.*, Br. at 1–2, 29.) Blurring the entities in this way cannot mask the fact—fatal to plaintiffs' claims—that the misconduct as alleged in the SAC took place entirely in Mexico.

In a footnote, plaintiffs wrongly suggest that the U.S.-based affiliates acted as "agent[s]" through which defendants transacted "indirect sales" in the forum, conferring personal jurisdiction over defendants. (Br. at 31–32 n.6.) Besides waiving this argument by failing to raise it in the District Court, *see Town of Southold v. Wheeler*, 48 F.4th 67, 85 (2d Cir. 2022), plaintiffs simply do not allege facts to support it. An "indirect sales" theory of personal jurisdiction requires, as plaintiffs acknowledge, that "'the alleged agent acted in New York for the benefit of, with the knowledge and consent of, and <u>under some control by, the nonresident principal</u>.'" (Br. at 31 n.6 (citing *Schwab I*, 883 F.3d at 85) (emphasis added).) "For that theory to succeed," however, plaintiffs "must do more than 'generally allege[ ] that [the non-resident principal] controlled or otherwise directed or materially participated in the operations of the broker-dealer[ ], and reaped proceeds or other financial benefits from the broker-dealer['s] sales of [the relevant] financial instruments.'" *City of Long Beach v. Total Gas & Power N. Am., Inc.*, 465 F. Supp. 3d 416, 439 (S.D.N.Y. 2020) (quoting *Schwab I*, 883 F.3d at 86), *aff'd*, No. 20-2020-CV, 2021 WL 5754295 (2d Cir. Dec. 3, 2021).

Plaintiffs' allegations flunk that test. Their footnote cites allegations in the SAC that defendants in Mexico quoted prices and relayed them to U.S.-based affiliates (JA 327–328 ¶¶ 84–87) and booked the resulting proceeds in their own records (JA 338 ¶¶ 123–124, JA 349 ¶ 168). But those purported activities fall woefully short of alleging the agency relationship—including the element of "control"—needed to establish specific jurisdiction over indirect counterparties.[7] *Schwab I*, 883 F.3d at 84–86 (holding that "sparse allegations of agency . . . are too conclusory to make a prima facie showing of personal jurisdiction"); *Total Gas & Power N. Am.*, 465 F. Supp. 3d at 439 (dismissing "threadbare allegations of control" where "the complaint does not allege plausibly that any defendant exercised control, extensive or otherwise, over any other defendant with regard to the facts giving rise to this lawsuit").[8]

---

[7] Plaintiffs also incorrectly point to these communications to argue *Schwab Short-Term Bond Market Fund v. Lloyds Banking Group PLC*, 22 F.4th 103 (2d Cir. 2021) ("*Schwab II*"), *cert. denied*, 142 S. Ct. 2852 (2022), compels the conclusion that these allegations are "sufficient to establish personal jurisdiction over related antitrust claims" (Br. at 25–26). As explained in more detail in section I.B, *infra*, plaintiffs' reliance on that case fails. In *Schwab II*, plaintiffs alleged that U.S.-based bank executives directed foreign defendants from the United States to manipulate a benchmark rate outside the United States. 22 F.4th at 123. Despite plaintiffs' multiple amended pleadings, they have not alleged that defendants engaged in any similar in-forum activity here.

[8] Even if plaintiffs had plausibly alleged MGB sales in the United States through an agency relationship (which they did not), *Schwab I* still forecloses this theory of jurisdiction because, as noted above, plaintiffs fail to allege the requisite

*(cont'd)*

Next, plaintiffs try to distinguish *Schwab I* on the basis that the conspiracy there had "the primary goal of projecting a false image of . . . financial soundness," but that distinction is illusory. (Br. at 32.) The contrast plaintiffs attempt to manufacture here—between a conspiracy motivated by "image" and one motivated by profit—ignores this Court's analysis in *Schwab I*. As this Court recognized, the alleged conspiracy in *Schwab I* aimed both to "project an image of financial stability to investors" <u>and</u> to "lower[] [the defendants'] interest payment obligations on financial instruments tied to LIBOR." 883 F.3d at 78. And, like plaintiffs here, the plaintiffs in *Schwab I* pressed the argument "that Defendants conspired not only to manipulate [the foreign rate], but also 'to earn profits' from that manipulation." *Id.* at 87. Yet this Court explained that "financial self-interest is not the same as furthering a conspiracy through [U.S.]-directed sales." *Id.*; *see* SA 27; *see also Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, 205 (S.D.N.Y. 2018) (rejecting similar argument because "the conspiracy to manipulate LIBOR alleged in *Charles Schwab* was indeed motivated in part by financial incentives . . . and precludes a finding of personal jurisdiction"). So too here. Whichever way plaintiffs characterize its supposed motive, the alleged conspiracy, and all acts in furtherance of the conspiracy, remain rooted in Mexico.

---

connection between sales in the U.S. and the purported anticompetitive conduct in Mexico. (*See* n.6, *supra*; *Schwab I*, 883 F.3d at 83–84.)

In addition, plaintiffs seize on defendants' alleged marketing activities and chatroom messages, but these allegations do not show purposeful availment of this forum. The premise of plaintiffs' argument stems from conclusory statements in the SAC that infer defendants' "marketing activities" from the size of the U.S. market for MGBs. (*See* Br. at 8 (citing JA 331–33 ¶¶ 99–105); *see* JA 331 ¶ 100 ("Defendants' efforts to develop the U.S. MGB market caused the United States to become the leading export market for MGBs in the world by a wide margin.").) From there, plaintiffs go on to allege examples of "marketing activities" that did not take place in the United States, such as defendants generating "market color and trade ideas" while based in Mexico. (JA 323 ¶ 73; *see* JA 335 (chart purporting to show MGB trading desk participating in "marketing process" from Mexico City).) And, even if marketing activity had occurred in the United States, plaintiffs still fail to link this conduct to defendants' alleged auction-rigging or price-fixing, much less plaintiffs' own transactions.

The chatroom messages plaintiffs proffer as purported evidence that defendants "unlawfully coordinate[d] prices and trading positions" (*see, e.g.*, Br. at 15) do not move the ball on plaintiffs' jurisdictional arguments either. Notably, plaintiffs identify in their brief each of the chat participants as an employee of a Mexican bank. (*See id.* at 14–15 (citing chats involving Deutsche Bank Mexico, JP Morgan Mexico, Citibanamex, Bank of America Mexico, and HSBC Mexico).) And

despite receiving "hundreds" of chat messages from cooperating former defendants (JA 311 ¶ 13), all plaintiffs can muster for a purported nexus to the United States are a chat showing that a trader traveled to New York for routine networking (JA 323–324 ¶ 74), three chats referencing potential sales to "foreigners" (JA 413 ¶ 402; JA 421–422 ¶ 417) or an "offshore" investor (JA 413–414 ¶ 403) (without any indication of where in the world they were located), a communication involving a Taiwan-based salesperson (JA 326 ¶ 80), and a reference to "gringos" (to which plaintiffs added the descriptor "U.S. clientele," without any indication of who the "gringos" are, where they are located, or whether any transaction with them ever occurred) (JA 416 ¶ 408; Br. at 10).

None of these chats suggest that a transaction involving a U.S. customer was contemplated—and certainly not that the alleged conspiracy among Mexico-based traders in Mexico had a causal connection to the United States. To the contrary, the chats underscore that any alleged conspiracy to set prices took place entirely outside the United States.

Tellingly, plaintiffs attempt to prop up their jurisdictional arguments with citations to inapposite cases involving, for example, an out-of-state law firm "deliberately cultivat[ing]" a market in New York, *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 128–29 (2d Cir. 2002) (cited at Br. at 27), a merchant shipping handbags directly to New York consumers, *Chloe v. Queen Bee*

*of Beverly Hills, LLC*, 616 F.3d 158, 165 (2d Cir. 2010) (cited at Br. at 27), and a case that does not address personal jurisdiction at all, *Celestin v. Caribbean Air Mail, Inc.*, 30 F.4th 133, 135–36 (2d Cir. 2022) (analyzing *forum non conveniens*) (cited at Br. at 27). In the same vein, plaintiffs' strained analogy to the Supreme Court's decision in *Burger King v. Rudzewicz*, 471 U.S. 462 (1985) (Br. at 28), confirms that plaintiffs' jurisdictional allegations here lack merit. In *Burger King*, the Supreme Court affirmed the assertion of personal jurisdiction in Florida over a defendant who operated a Burger King franchise in Michigan, where that defendant "deliberately 'reach[ed] out beyond'" his home state to negotiate and execute "a carefully structured 20-year relationship that envisioned continuing and wide-reaching contacts with [the plaintiff] in Florida." 471 U.S. at 479–80 (citation omitted). The fleeting, indirect transactions with defendants that plaintiffs rely on here do not come close to the long-term, continuous, and direct contractual relationship justifying the exercise of personal jurisdiction under *Burger King*.

## B. The District Court Properly Rejected Plaintiffs' Conspiracy Jurisdiction Theory

Plaintiffs' theory of "conspiracy jurisdiction" merely repackages the same failed arguments about personal jurisdiction and employs the same sleight-of-hand to conflate Mexico-based defendants with U.S.-based affiliates. (*See* Br. at 37–40.) To invoke conspiracy jurisdiction, a plaintiff must allege that: "(1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's

overt acts in furtherance of the conspiracy had sufficient contacts with a [forum] to subject that co-conspirator to jurisdiction in that [forum]." *Schwab I*, 883 F.3d at 87; *Unspam Techs., Inc. v. Chernuk*, 716 F.3d 322, 330 (4th Cir. 2013) (holding that "plaintiffs' allegations of conspiracy are conclusory and speculative and do not satisfy the requirements for establishing a conspiracy theory of personal jurisdiction"). This doctrine does not water down the constitutional requirements for personal jurisdiction: Plaintiffs still must identify a co-conspirator's "minimum contacts" with the forum "in furtherance of the conspiracy." *Schwab I*, 883 F.3d at 87 (holding that "[t]o allow jurisdiction absent a showing that a co-conspirator's minimum contacts were in furtherance of the conspiracy would be inconsistent with the 'purposeful availment' requirement").

Here, as the District Court correctly held, plaintiffs' conspiracy jurisdiction theory goes nowhere because they cannot identify any purported member of the conspiracy whose contacts with the U.S. would subject it to jurisdiction. For that reason, plaintiffs' conspiracy theory is not an independent basis for jurisdiction, as they urge, but a second swing at the same flawed argument. As the District Court noted, "[h]aving determined that none of the [defendants] is subject to personal jurisdiction in its own right, or has purposely availed itself of the forum for the purposes of this lawsuit, the Court cannot find that they are nonetheless subject to personal jurisdiction because of their alleged affiliation with one another." (SA 27.)

In other words, conspiracy jurisdiction "does not permit [p]laintiffs to turn nothing into something." *Id.*; *see Schwab I*, 883 F.3d at 87 (rejecting theory where "pleading does not permit an inference that certain Defendants' sales in [forum] were in furtherance of the conspiracy"); *Melea, Ltd. v. Jawer SA*, 511 F.3d 1060, 1070 (10th Cir. 2007) (holding that conspiracy jurisdiction elements were "lacking" where the plaintiff failed to show "substantial steps in furtherance of the conspiracy are taken in the forum"); *see also Contant v. Bank of Am. Corp.*, No. 17 Civ. 3139 (LGS), 2019 WL 12276059, at *1 (S.D.N.Y. July 8, 2019) (noting "*Schwab* did not abrogate . . . long-standing principle[s]" of jurisdiction and rejecting conspiracy jurisdiction theory "[g]iven the absence of any non-conclusory allegation connecting [the defendants'] conspiracy-related conduct to New York").

Plaintiffs' reliance on *Schwab II* is misplaced. There, the Court exercised conspiracy jurisdiction over the defendants because evidence corroborated allegations that the defendants' "executives and managers <u>in the United States</u> mandated that their subordinates manipulate LIBOR." *Schwab II*, 22 F.4th at 123 (emphasis added). That is a far cry from plaintiffs' argument here. Nothing in plaintiffs' string citation to the SAC alleges an analogous act carried out <u>in the United States</u> (Br. at 26); instead, those citations confirm that MGB traders in Mexico, <u>not</u> affiliates in the United States, determined MGB prices (*see* JA 335–336 ¶ 115; JA 342 ¶ 139; JA 348 ¶ 159; JA 353 ¶ 179; JA 359 ¶ 202; JA 365 ¶ 221).

Plaintiffs thus again disregard corporate boundaries by improperly imputing "in-forum MGB sales" to defendants. And, like in *Schwab I*, because "the conspiracy to manipulate" occurred outside the United States, plaintiffs' "pleading does not permit an inference" that any subsequent MGB sales in the United States "were in furtherance of the conspiracy." *Schwab I*, 883 F.3d at 87.

Trying to compensate for this fatal flaw, plaintiffs largely gloss over the jurisdictional prong of the conspiracy jurisdiction analysis in their brief and instead invite the Court "to evaluate the strength of [their] conspiracy allegations itself." (Br. at 39–40.) But allegations about the existence of a conspiracy carried out on foreign soil, standing alone, no matter how strong (and defendants have much to say about the weakness of the conspiracy allegations here), do not warrant personal jurisdiction in this forum. *Schwab I*, 883 F.3d at 86 ("[W]e have made clear that the mere existence of a conspiracy is not enough."); *see also Laba v. JBO Worldwide Supply Pty Ltd*, No. 20 Civ. 3443 (AKH), 2022 WL 252658, at *2 (S.D.N.Y. Jan. 26, 2022) (rejecting "[p]laintiff's attempt to establish personal jurisdiction over the [defendants] on a conspiracy theory" because "[p]laintiff must do more than simply assert that a conspiracy existed").

## C. The District Court Properly Rejected Plaintiffs' Purposeful Direction Theory

On appeal, plaintiffs do not argue—and therefore appear to have abandoned their theory—that defendants are "subject to personal jurisdiction based on the

effects on the [p]laintiffs in the United States" (SA 24), but such a theory would fail in any event.[9] "The effects test is a theory of personal jurisdiction typically invoked where . . . the conduct that forms the basis for the controversy occurs entirely out-of-forum, and the only relevant jurisdictional contacts with the forum are therefore in-forum effects harmful to the plaintiff." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 173 (2d Cir. 2013) (citing *Calder v. Jones*, 465 U.S. 783, 789 (1983)). "In such circumstances, the exercise of personal jurisdiction may be constitutionally permissible if the defendant <u>expressly aimed</u> its conduct at the forum." *Id.* (emphasis added). But "the fact that harm in the forum is foreseeable . . . is insufficient for the purpose of establishing specific personal jurisdiction over a defendant." *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 339 (2d Cir. 2016) (citation omitted); *Schwab I*, 883 F.3d at 87 ("The 'foreseeability of causing injury in another State' . . . will not suffice." (citation omitted)).

As the District Court correctly held, and plaintiffs do not contest here, the "effects test" theory cannot salvage plaintiffs' case for personal jurisdiction. (SA 26–27.) General allegations about the size of the U.S. market for MGBs, or the

---

[9] Nor can plaintiffs try to resuscitate this theory for the first time on appeal in a reply brief: "[A]rguments not raised in an appellant's opening brief, but only in his reply brief, are not properly before an appellate court even when the same arguments were raised in the trial court." *McCarthy v. S.E.C.*, 406 F.3d 179, 186 (2d Cir. 2005).

traders' knowledge that MGB counterparties resided in the U.S., do not show that defendants "expressly aimed [their] conduct at the forum." (SA 26.) At most, such allegations show "that harm in the forum is foreseeable," which "is insufficient for the purpose of establishing specific personal jurisdiction over a defendant." *Waldman*, 835 F.3d at 339; *see Walden*, 571 U.S. at 291 (holding that where "relevant conduct occurred entirely in Georgia . . . the mere fact that his conduct affected plaintiffs with connections to the forum State does not suffice to authorize jurisdiction"); *Prime Int'l Trading, Ltd. v. BP P.L.C.*, 784 F. App'x 4, 10 (2d Cir. 2019) ("Plaintiffs do not allege anything more than [the defendant's] 'mere knowledge that United States citizens might be wronged,' which is plainly insufficient to confer specific, personal jurisdiction." (citation omitted)).

In *Schwab I*, moreover, this Court dismissed virtually identical allegations that defendants "knew . . . that their misconduct . . . would produce substantial and foreseeable effects in the United States." 883 F.3d at 87–88. The District Court correctly saw "no distinction between the profit-driven, injury-imposing sales at issue in *Schwab* and the profit-driven, injury-imposing sales here." (SA 27.) To hinge personal jurisdiction on plaintiffs' place of injury would, as the District Court observed, improperly equate personal jurisdiction with the requirements for plaintiffs' standing: As plaintiffs would have it, "virtually any time a plaintiff has statutory standing—or even <u>constitutional</u> standing—arising out of an injury in the

forum state, personal jurisdiction could be exercised over the defendant." (SA 26 (emphasis in original).) That is not the law. So, "[a]gain, *Schwab* controls." (SA 27.) And, as a result, plaintiffs cannot show purposeful direction any more than they can show purposeful availment. *See Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 243 (2d Cir. 2007) (noting that purposeful availment and purposeful direction are often "conceptually overlapping[] methods of demonstrating minimum contacts").

### D. The District Court Correctly Held That *Ford* Does Not Compel a Different Result

Plaintiffs' last-ditch attempt to establish personal jurisdiction came in a belated, and ultimately meritless, motion for reconsideration premised on the Supreme Court's decision in *Ford*. That attempt, too, was properly rejected by the District Court.

#### 1. *Plaintiffs' Motion Was Untimely*

The District Court correctly held that plaintiffs' motion was untimely. "Local Rule 6.3 directs a party to file a notice of motion for reconsideration 'within fourteen (14) days after the entry of the [District] Court's determination of the original motion.'" (SA 34.) But here, despite the District Court's order in *MGB II* "highlight[ing] *Ford*," thus placing plaintiffs "on notice that *Ford* might bear on the relevant law," they failed to seek an extension of time to file a motion for reconsideration while *Ford* was pending in the Supreme Court. (*Id.*) And when *Ford* was eventually decided, plaintiffs then waited another two months to raise their

objection to the District Court. (*Id.*) Under those circumstances, the District Court properly disposed of plaintiffs' belated attempt to invoke *Ford*. *See Eisemann v. Greene*, 204 F.3d 393, 397 (2d Cir. 2000) (noting that "failure to meet the standards of Local Rule 6.3" was "a proper basis for denial of [the plaintiff's] motion for reconsideration").

## 2. Ford *Does Not Overrule* Schwab I

Regardless of timing, the District Court also got it right on the substance: *Ford* does not compel a different result in this case. Notwithstanding plaintiffs' hyperbole, *Ford* does not purport to upend core principles of specific jurisdiction. *Compare Ford*, 141 S. Ct. at 1027 (noting "this Court has stated that specific jurisdiction attaches in cases identical to the ones here"), *with* Br. at 21 (arguing that *Ford* "greatly expands the scope of personal jurisdiction"). Rather, *Ford* "reiterate[s]" the rule that a "defendant's suit-related conduct must create a substantial connection with the forum state." *Knight v. Standard Chartered Bank*, 531 F. Supp. 3d 755, 767 (S.D.N.Y. 2021); *see Ford*, 141 S. Ct. at 1031 (noting the Court "found jurisdiction improper in *Bristol-Myers* [137 S. Ct. at 1781] because the forum State, and the defendant's activities there, lacked any connection to the plaintiffs' claims"). Revealingly, plaintiffs' sweeping interpretation of *Ford*, as a panacea curing all their jurisdictional defects, does not rely on (or even identify) a single case interpreting or applying *Ford*. (Br. at 33–37.)

In fact, claims that hinge on alleged misconduct outside the forum failed before *Ford* (*see* §§ I.A–C, *supra*) and still fail after *Ford*. *See, e.g.*, *Schlafly v. Eagle F.*, No. 19-2405, 2022 WL 1261319, at \*2 (3d Cir. Apr. 28, 2022) (declining to exercise personal jurisdiction under *Ford* where "all of the alleged misdeeds . . . occurred outside of [the forum]" and "the only connection these claims seem to have to [the forum] is the fact that [the plaintiff] happens to live there"); *see also Vapotherm, Inc. v. Santiago*, 38 F.4th 252, 261 (1st Cir. 2022) ("Even considering the test set forth in *Ford*, [the plaintiff] relies too heavily on the fact that [the defendant's] alleged solicitation . . . led to injury in the forum state as the primary basis for relatedness of the tort claim.").

In particular, *Ford* leaves intact *Schwab I*'s holding that transactions in the United States do not constitute "suit-related conduct" creating "a substantial connection with [the forum]" when the alleged misconduct occurred outside the United States. *Schwab I*, 883 F.3d at 83–84 (citation omitted). While *Ford* recognized that "some relationships will support jurisdiction without a causal showing," "[t]hat does not mean anything goes." 141 S. Ct. at 1026. Specifically, "the phrase 'relate to' incorporates real limits, as it must to adequately protect defendants foreign to a forum." *Id.* Post-*Ford*, courts still must scrutinize whether a defendant's contacts with the forum "are related enough to the plaintiffs' suit," *id.*

at 1031, taking into account the "nature and extent of 'the defendant's relationship to the forum State,'" *id.* at 1024 (citation omitted).

At bottom, *Schwab I*'s holding reflects the bedrock principle that without a substantial connection between a defendant's in-forum contacts and the plaintiff's claims, "specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State." *Bristol-Myers Squibb Co.*, 137 S. Ct. at 1781; *see Hepp v. Facebook*, 14 F.4th 204, 207–08 (3d Cir. 2021) (dismissing claims for lack of personal jurisdiction where the plaintiff "failed to establish the strong connection present in *Ford Motor*"). As framed by this Court, the U.S. transactions in *Schwab I* "did not cause Defendants' false LIBOR submissions . . . nor did the transactions <u>in some other way give rise to claims</u> seeking to hold Defendants liable for those submissions." 883 F.3d at 84 (emphasis added). That test guards against claims—like plaintiffs' here—divorced from defendants' in-forum conduct. *Schwab I* thus imposes "real limits, as it must to adequately protect defendants foreign to a forum," just as *Ford* intends. *See* 141 S. Ct. at 1026.

Plaintiffs' reasoning, on the other hand, would open the floodgates to limitless jurisdiction over defendants: Anyone who purchased MGBs from any local broker, anywhere in the world, would be able to haul the Mexican bank defendants to that plaintiff's home forum. That result is antithetical to *Ford*'s guiding principle of "treating defendants fairly," 141 S. Ct. at 1025, because plaintiffs seek to predicate

personal jurisdiction on "'random,' 'fortuitous,' or 'attenuated' contacts," *Burger King*, 471 U.S. at 475 (citation omitted).[10]  Case in point, here plaintiffs seek to subject defendants to personal jurisdiction based on (a) plaintiffs' alleged injury in the forum and (b) non-price-fixing activities undertaken by non-party affiliate entities distinct from defendants themselves.  This theory defies well-established legal principles.  (*See* §§ I.A–B, *supra*.)  And *Ford* does not revive the archaic notion that a party's "amenability to suit would travel with [its] chattel."  *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 296 (1980); *Ford*, 141 S. Ct. at 1028 n.4 ("None of this is to say that any person using any means to sell any good in a State is subject to jurisdiction there if the product malfunctions after arrival." (citing *World-Wide Volkswagen Corp.*, 444 U.S. at 296)).  *Ford* does not, in other words, condemn defendants to follow the MGBs they price in Mexico to any jurisdiction where an investor claims injury.

### 3.  **Ford *Does Not Create Personal Jurisdiction Over Defendants***

As applied to the facts of this case, *Ford*'s formulation does not support exercising personal jurisdiction over defendants.  Notably, the outcome in *Ford*

---

[10]  Plaintiffs' expansive reading of *Ford* also ignores the Supreme Court's words of caution against extrapolating broad rules from its analysis of the specific facts at issue.  For example, the Court "d[id] not consider internet transactions," which "raise doctrinal questions of their own" and involve distinctions that "virtually list themselves."  *Ford*, 141 S. Ct. at 1028 n.4.

depended fundamentally on Ford's concession that it had purposefully availed itself of the forum. The car-maker "d[id] not contest that it d[id] substantial business in" Montana and Minnesota; "in more doctrinal terms, Ford agree[d] that it ha[d] 'purposefully avail[ed] itself of the privilege of conducting activities' in both places." *Ford*, 141 S. Ct. at 1026; *see Bandemer v. Ford Motor Co.*, 931 N.W.2d 744, 750 (Minn. 2019) (noting "Ford does not contest the quality or quantity of its contacts with Minnesota"), *aff'd sub nom. Ford*, 141 S. Ct. at 1017. Defendants here do contest plaintiffs' claim that they conducted substantial MGB business in the United States and have demonstrated to the District Court's satisfaction plaintiffs' failure to allege purposeful availment. Because defendants have not purposefully availed themselves of the forum, this case does not present the circumstances the Supreme Court addressed in *Ford*.

Even beyond the threshold question of purposeful availment, however, plaintiffs' claims do not "relate to" defendants' in-forum contacts. That is a function of defendants' alleged contacts as well as the nature of plaintiffs' claims. First, neither the quantity nor the quality of defendants' alleged contacts with the forum approach Ford's "extreme" association with Montana and Minnesota. *See LNS Enters. LLC v. Cont'l Motors, Inc.*, 22 F.4th 852, 863 (9th Cir. 2022) (rejecting comparison to *Ford* where "[t]here is no indication that [the defendant] advertised, sold, or serviced the type of . . . engine at issue here . . . to the extreme degree that

Ford advertised, sold, and serviced its vehicles in Montana and Minnesota"). Ford admitted it "engages in wide-ranging promotional activities, including television, print, online, and direct-mail advertisements" nationwide, so that "[n]o matter where you live, you've seen them." *Ford*, 141 S. Ct. at 1022. The same cannot be said about Mexican banks and their trade in MGBs. To project an incorrect image of defendants' supposed activities on that front, plaintiffs fall back on conflating defendants with their U.S.-based affiliates. (*Compare* Br. at 36 (arguing that defendants "employed an MGB sales force in the United States to market and sell MGBs to U.S. investors," which actually refers to the sales desks of the U.S.-based affiliates), *with* Br. at 2 ("defendants set up extensive systems to market and trade their price-fixed MGBs here <u>through U.S.-based sales personnel in their U.S. branch offices</u>.") (emphasis added).) But that proves the point: Defendants themselves did not engage in the kind of pervasive in-forum contacts seen in *Ford*.

The quality of defendants' alleged contacts, too, is distinguishable from Ford's. Not only did Ford direct "promotional activities" into the forum, it also had boots on the ground. Ford conceded, for instance, that it had "employees, certified mechanics, franchises, and real property . . . in Minnesota." *Bandemer*, 931 N.W.2d at 748. Defendants, by contrast, are Mexico-based banks without branches or offices anywhere in the United States that transacted in MGBs at any time during the Class Period. (Supp. App'x 92–93 ¶¶ 4–6, 10; *id.* 99 ¶ 5; *id.* 106 ¶¶ 6, 10; *id.* 102 ¶ 4; *id.*

110–111 ¶¶ 6, 8; *id.* 95–96 ¶¶ 6, 9.)  And, unlike in *Ford*, the products at issue in this case did not require (or even allow for) continuing support or maintenance in the forum once brought here.  *See* 141 S. Ct. at 1028.  Defendants therefore did not maintain "ongoing connections" with plaintiffs in the forum, like Ford did.  *See id.*

Second, the theory of liability underpinning *Ford* embraced multiple jurisdictions—where the cars were designed, produced, and ultimately driven—because the plaintiffs' claims in that case implicated the cars' design, production, and use.  141 S. Ct. at 1023 (describing the plaintiffs' claims); *see Bandemer*, 931 N.W.2d at 754 (explaining that the Minnesota plaintiff's "claims are about the design of the Crown Victoria and therefore his claims are about more than one specific car").  Here, by contrast, plaintiffs' theory of liability turns on an alleged conspiracy carried out in one place—Mexico—with no additional misconduct occurring in the United States.  (*See* SA 27.)  The bonds were, plaintiffs say, price-fixed in Mexico before ever reaching the United States.  (*See* Br. at 18 ("[P]laintiffs suffered injury when they transacted MGBs in the United States . . .  at artificial prices sent by defendants in Mexico").)[11]

---

[11]  Plaintiffs also fail to allege venue under Section 12 of the Clayton Act or FRCP 4(k)(2).  Plaintiffs do not satisfy Section 12's venue requirements as to any defendant here.  Plaintiffs fail to adequately allege that any defendant is "found" or "transacts business" in the Southern District of New York.  Each defendant and each defendant's trading desk responsible for trading MGBs was based in Mexico during the Class Period, and no defendant has (or had during the Class

*(cont'd)*

Third, the dearth of in-forum business activity alleged in the SAC—and corroborated by defendants' sworn declarations—also illustrates why, unlike in *Ford*, subjecting Mexico-based defendants to specific personal jurisdiction in this forum is neither "reasonable" nor "predictable." *Ford*, 141 S. Ct. at 1030. Plaintiffs do not plead any facts showing that defendants "enjoy[] the benefits and protection of [New York] laws." *Id.* at 1029 (citation omitted). Rather, plaintiffs' arguments for jurisdiction here turn *Ford* on its head. *Ford* noted that the settled rules of specific jurisdiction provide foreign defendants with "fair warning," allowing them to "'structure [their] primary conduct' to lessen or avoid exposure to a given State's courts." *Id.* at 1025 (citation omitted). In this case, by concocting jurisdictional arguments that disregard defendants' corporate forms (*see* § I.A, *supra*), plaintiffs trample on the fairness interest at the heart of *Ford*.

For similar reasons, while plaintiffs attempt to tie the outcome of this appeal to *Sullivan v. Barclays*, No. 19-1769, another appeal pending before the Court (Br. at 3), they overstate the similarities between the two cases. Unlike in *Sullivan*, for example, none of the defendants here maintain offices in New York or trade in the relevant securities in the United States. *See Sullivan v. Barclays PLC*, No. 13-cv-

---

Period) a branch or office in the Southern District of New York. But in any event, the Court need not reach this issue because plaintiffs have failed to allege direct transactions with any State, New York or otherwise, sufficient to establish personal jurisdiction over any defendant.

2811 (PKC), 2017 WL 685570, at *44 (S.D.N.Y. Feb. 21, 2017) (noting one of the defendant banks "employs traders in Stamford, Connecticut, who trade in derivatives tied to the Euribor, specifically including interest rate swaps"). In the end, this Court need not look to *Sullivan* (or wait for the decision of the *Sullivan* panel) to affirm the District Court's ruling in this case.

## II.  THE DISTRICT COURT PROPERLY DENIED PLAINTIFFS' REQUEST FOR JURISDICTIONAL DISCOVERY

Plaintiffs' baseless request for jurisdictional discovery was also properly denied. "[T]he district court acted well within its discretion in declining to permit discovery because," for the reasons explained above, "[plaintiffs] had not made out a prima facie case for jurisdiction." *Best Van Lines*, 490 F.3d at 255; *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 185 (2d Cir. 1998) (holding that district court did not err in denying jurisdictional discovery where the plaintiffs did not establish a prima facie case for jurisdiction over the defendant). Under the circumstances, jurisdictional discovery is inappropriate and would be futile.

First, plaintiffs' argument for reversing the District Court's denial of jurisdictional discovery is circular. Rather than identifying an independent basis for jurisdictional discovery, plaintiffs simply repeat their view that the District Court's analysis of personal jurisdiction was wrong. (*See* Br. at 41 ("The district court's refusal to allow the discovery on the basis that 'plaintiffs have failed to make a prima facie case for personal jurisdiction' is, as discussed above, legal error, and as such is

also necessarily an abuse of discretion requiring reversal.").)  Therefore, plaintiffs'
appeal of the District Court's order denying jurisdictional discovery is not an
independent basis for reversal.

Second, plaintiffs fail to specify (and, more to the point, failed to specify
before the District Court) what discovery they purportedly require in addition to the
materials already obtained from a Mexican government investigation as well as from
settling defendants in this case.  *See, e.g.*, *Haber v. United States*, 823 F.3d 746, 753
(2d Cir. 2016) ("[A] district court does not abuse its discretion if it denies
jurisdictional discovery where a plaintiff 'failed to show how the information [she]
hoped to obtain from this discovery would bear on the critical issue' for
jurisdiction.") (citation omitted); *In re Aluminum Warehousing Antitrust Litig.*, 90
F. Supp. 3d 219, 239 (S.D.N.Y. 2015) (denying jurisdictional discovery where
plaintiffs knew findings of government investigation and already "had discovery
from [some] alleged conspirators").

Third, plaintiffs' multiple pleading attempts confirm that the jurisdictional
flaws inherent to their case are incurable.  Over four years after bringing this action,
plaintiffs are still vaguely searching for some "more specific evidence that
[d]efendants fixed the prices of the MGBs they transacted with plaintiffs in the
forum." (Br. at 41.)  But plaintiffs' own pleadings and defendants' declarations
conclusively dispel the notion that any part of the alleged conspiracy occurred in the

United States, so there is no remaining factual question that additional discovery would resolve. Plaintiffs' conclusory arguments to the contrary—that they have "already more than adequately alleged that defendants fixed the prices of MGBs traded in the United States" and are "plainly" entitled to even more discovery—do not change these facts or establish that Judge Oetken abused his discretion. *See Daou v. BLC Bank, S.A.L.*, 42 F.4th 120, 133 n.6 (2d Cir. 2022) (holding that district court did not abuse its discretion denying request for jurisdictional discovery where "no factual dispute needs to be resolved in order to determine whether the district court had personal jurisdiction"). Thus, the District Court did not err—much less abuse its discretion—when it denied plaintiffs' request to keep tilting at unspecified jurisdictional windmills.

## CONCLUSION

For the reasons stated herein, the judgment below should be affirmed.

Dated:  New York, New York
       February 6, 2023

                Respectfully submitted,

                /s/ Boris Bershteyn
                Boris Bershteyn
                Susan Saltzstein
                Kamali P. Willett
                Kartik Naram
                SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                One Manhattan West
                New York, New York 10001
                Tel:  (212) 735-3000
                Fax:  (212) 735-2000
                boris.bershteyn@skadden.com
                susan.saltzstein@skadden.com
                kamali.willett@skadden.com
                kartik.naram@skadden.com

                *Attorneys for Defendant-Appellee HSBC México, S.A., Institución de Banca Múltiple, Grupo Financiero HSBC*

/s/ Roger A. Cooper
Lev L. Dassin
Roger A. Cooper
Samuel Levander
CLEARY GOTTLIEB STEEN &
HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Tel: (212) 225-2000
Fax: (212) 225-3999
ldassin@cgsh.com
racooper@cgsh.com
slevander@cgsh.com

*Attorneys for Defendant-Appellee Banco
Nacional de México, S.A., Institución de
Banca Multiple, Grupo Financiero
Banamex*

/s/ Alan Schoenfeld
Alan Schoenfeld
WILMER CUTLER PICKERING HALE
AND DORR LLP
250 Greenwich Street, 45 Floor
New York, New York 10007
Tel: (212) 937-7294
Fax: (212) 230-8888
alan.schoenfeld@wilmerhale.com

*Attorney for Defendant-Appellee Banco
Santander (México) S.A. Institución de
Banca Múltiple, Grupo Financiero
Santander México*

/s/ Adam S. Hakki
_____
Adam S. Hakki
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, New York 10022
Tel:  (212) 848-4000
Fax:  (212) 848-7179
ahakki@shearman.com

*Attorney for Defendant-Appellee Bank of
America México, S.A., Institución de Banca
Múltiple, Grupo Financiero Bank of
America*


/s/ Paul S. Mishkin
_____
Paul S. Mishkin
Caroline Stern
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Tel:  (212) 450-4000
Fax:  (212) 450-4800
paul.mishkin@davispolk.com
caroline.stern@davispolk.com

*Attorneys for Defendant-Appellee BBVA
Bancomer, S.A., Institución de Banca
Múltiple, Grupo Financiero BBVA
Bancomer*

/s/ John Terzaken

John Terzaken
Karen M. Porter
SIMPSON THACHER & BARTLETT LLP
900 G Street, N.W.
Washington, District of Columbia 20001
Tel:  (202) 636-5500
Fax:  (202) 636-5502
john.terzaken@stblaw.com
karen.porter@stblaw.com

*Attorneys for Defendant-Appellee Deutsche Bank México, S.A. Institución de Banca Múltiple*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(5) of the Federal Rules of Appellate Procedure, the foregoing brief is in 14-Point Times New Roman proportional font and contains 10,331 words and thus is in compliance with the type-volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure.

Dated: February 6, 2023
     New York, New York

/s/ Boris Bershteyn
Boris Bershteyn